1  Thomas Buchele, CA Bar No. 129657
   Earthrise Law Center
2  Lewis & Clark Law School
   10101 S Terwilliger Blvd.
3  Portland OR  97219-7799
   Tel:  503-768-6736
4  Fax: 503-768-6642
   Email: tbuchele@lclark.edu
5

6  Rachel M. Fazio, CA Bar No. 187580
   John Muir Project of the Earth Island Institute
7  P.O. Box 897
   Ridgecrest, CA 92314
8  Tel: 530-273-9290
   Email: rachelmfazio@gmail.com
9

10  Attorneys for Plaintiffs

11                    UNITED STATES DISTRICT COURT

12                    EASTERN DISTRICT OF CALIFORNIA

13

14  **EARTH ISLAND INSTITUTE**, a non-            No.
    profit corporation; **SEQUOIA**
15  **FORESTKEEPER**, a non-profit
    corporation,
16                                                **COMPLAINT FOR PARTIAL VACATUR,**
                    Plaintiffs,                   **INJUNCTIVE, AND DECLARATORY**
17                                                **RELIEF**
            v.
18

19  **RANDY MOORE**, in his official capacity
    as the Chief of the United States Forest
20  Service; **DEAN GOULD,** in his official      Administrative Procedure Act, 5 U.S.C. §§ 701
    capacity as the Forest Supervisor for the    *et seq.*; National Environmental Policy Act, 42
21  Sierra National Forest; **JENNIFER**          U.S.C. §§ 4321 *et seq.*; National Forest
    **EBERLIEN,** in her official capacity as the Management Act, 16 U.S.C. §§ 1600 *et seq.*
22  Regional Forester for the Pacific Southwest
    Region; **UNITED STATES FOREST**
23  **SERVICE,** an agency of the United States
    Department of Agriculture,
24
                    Defendants.
25

26

27

28

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701–706 (APA) and 28 U.S.C. §§ 1331 (federal question) & 2412 (costs and fees). Plaintiffs are challenging final agency actions of the U.S. Forest Service ("Forest Service" or "Service"), as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 704 (actions reviewable)

2.      Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because the events or omissions giving rise to this claim occurred, and are occurring, in this district, primarily in Madera and Fresno Counties.

3.      An actual judiciable controversy exists between the parties hereto.

**INTRADISTRICT VENUE**

4.      This case is properly filed in Fresno, California and properly before the Fresno Division of this District pursuant to Local Rule 120(d) because the events or omissions giving rise to this claim occurred, and are occurring, primarily in the Sierra National Forest in Madera and Fresno Counties.

**INTRODUCTION**

5.      Plaintiffs Earth Island Institute and Sequoia ForestKeeper (collectively "Plaintiffs") challenge Defendant U.S. Forest Service's ("Forest Service" or "Service") R5 Fuels Reduction Treatments within Giant Sequoia Groves, Sequoia and Sierra National Forests Decision Memo on July 22, 2022 ("July 2022 Decision Memo"), approving procedures that were described in the document Emergency Response For Giant Sequoia Groves ("Emergency Response Procedures"). The July 2022 Decision Memo was signed by Defendant U.S. Forest Service Chief Randy Moore ("Moore").

6.      The Emergency Response Procedures were initially proposed by Defendant Jennifer Eberlien, the Pacific Southwest Regional Forester, and describe wildfire fuels reduction logging alleged to mitigate fire risks in twelve Giant Sequoia groves.

7.      Although the July 2022 Decision Memo authorizes seven separate projects involving logging and other activities in twelve Giant Sequoia groves in the Sequoia and Sierra National Forests, each of these seven projects is being considered separately for NEPA

1   COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

compliance. At this time, Plaintiffs are solely challenging the legal compliance of those activities authorized by the July 2022 Decision Memo relevant to the Nelder Grove Historical Area in the Sierra National Forest—the Nelder Grove Fuels Reduction Project ("Nelder Grove Project" or "Project").

8.    In 2017, the Railroad fire burned approximately 80% of Nelder Grove, leaving only the Southeastern portion unburned. Some areas of Nelder Grove burned at high-intensity, killing all mature Giant Sequoias in these portions of the Grove. In the intervening years, young Giant Sequoias have been naturally regenerating in these portions of the Grove, reestablishing in the areas where the high-severity fire killed the mature sequoias but also allowed the Giant Sequoia's life cycle—which is dependent on high-intensity fire to allow for seed dispersal and reproduction—to continue.

9.    The July 2022 Decision Memo allows the Service to begin implementing the Nelder Grove Project without preparing any National Environmental Policy Act ("NEPA") analysis documents, including a decision memorandum identifying the categorical exclusion that the Service is using. However, the Proposed Emergency Response indicates that the Nelder Grove Project was initially developed under one of the categorical exclusions ("CE") found in 36 C.F.R. § 220.6(e). As of the filing of this Complaint, the Service has not indicated any plans to complete the decision memorandum and supporting record for the CE as required by 36 C.F.R. § 220.6(e) or reveal which specific CE allegedly covers the Nelder Grove Project, seemingly entirely exempting the Project from ever complying with the regulatory requirements to scope and document certain CEs.

10.    The Forest Service did not consult with the Council on Environmental Quality ("CEQ") to develop "alternative arrangements" for NEPA compliance prior to finalizing the July 2022 Decision Memo.

11.    On November 8, 2022, the Forest Service published a scoping notice for logging activities claimed to protect Giant Sequoias in Nelder and McKinley Groves ("November 2022 Scoping Notice"). This scoping notice states that it will include the previously authorized Nelder Grove activities in its unspecified "environmental analysis," even though that work is already

1    underway. The Nelder Grove portion of the scoping notice describes the activities "covered by

2    the emergency order" to include "treatments" that were not authorized by the July 2022 Decision

3    Memo.

4           12.     In addition to challenging the legal compliance of the July 2022 Decision Memo

5    with NEPA, Plaintiffs are also challenging the ensuing activities that the Service undertook and is

6    continuing to undertake in Nelder Grove that are not authorized by the July 2022 Decision Memo.

7    Plaintiffs allege on information and belief that these unauthorized activities were approved by

8    Defendant Dean Gould, the Forest Supervisor for the Sierra National Forest.

9           13.     These unauthorized activities include thinning activities in the approximately 80%

10   of Nelder Grove that recently experienced fire where the risk of re-burn is low as well as

11   mechanical thinning activities—involving heavy machinery—throughout the entirety of the

12   Grove. Not only do these activities contradict the authority provided by the July 2022 Decision

13   Memo, they also pose a risk to naturally-regenerating young sequoias—seedlings and saplings

14   that have thrived in the post-fire ecology of Nelder Grove in the past few years.

15          14.     Young Sequoias in these portions of Nelder Grove are quickly regenerating and

16   becoming established, with some measuring up to twelve feet high in spring 2023. Activities,

17   particularly those involving mechanical thinning in areas that burned with high severity where no

18   mature sequoias remain alive, crush and kill these young Giant Sequoias, threatening the very

19   species the Proposed Emergency Response and July 2022 Decision Memo purport to protect.

20   These activities have killed some of the Giant Sequoias offspring reproducing in the Nelder

21   Grove Project Area as a result of the 2017 Railroad Fire. If allowed to continue, these activities

22   will kill more of these offspring.

23          15.     The July 2022 Decision Memo, the Emergency Response Procedures it authorizes,

24   and the unauthorized activities in Nelder Grove violate NEPA, the implementing regulations

25   promulgated by the CEQ, the implementing regulations promulgated by the Forest Service, the

26   National Forest Management Act ("NFMA"), and the APA.

27          16.     Plaintiffs seek from this Court declaratory and injunctive relief, including

28   appropriate injunctive relief to ensure that Defendants take no further actions toward proceeding

3    COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

1    with the challenged actions in Nelder Grove until they have complied with NEPA and NFMA.

2    Such relief prevents the Forest Service from conducting logging and other activities with the

3    potential to have significant environmental impacts in Nelder Grove prior to finalizing any

4    environmental analysis under NEPA, including logging in areas where no "emergency" exists

5    because the recently burned areas have low potential for high severity wildfire and because the

6    logging would kill the natural regeneration of Giant Sequoias, the very tree the Emergency

7    Response Procedures claims to protect.

8                                            **PARTIES**

9            17.    Plaintiff **EARTH ISLAND INSTITUTE ("Earth Island")** is a nonprofit

10    corporation organized under the laws of the State of California and headquartered in Berkeley,

11    California. Earth Island's mission is to develop and support projects that counteract threats to the

12    biological and cultural diversity that sustains the environment. Through education and activism,

13    these projects promote the conservation, preservation, and restoration of the earth. One of these

14    projects is the John Muir Project—whose mission is to protect all federal public forestlands from

15    commercial exploitation that undermines and compromises science-based ecological

16    management. John Muir Project offices are located in Tulare County, California. Earth Island is a

17    membership organization with over 15,000 members in the United States, over 3,000 of whom

18    use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual,

19    and other purposes. Earth Island through its John Muir Project has a longstanding interest in

20    protection of national forests. Earth Island's John Muir Project and Earth Island members actively

21    participate in governmental decision-making processes with respect to national forest lands in

22    California and rely on information provided through the NEPA processes to increase the

23    effectiveness of their participation. Earth Island's members include individuals who regularly use

24    public lands within the Sierra National Forest, including the Nelder Grove areas currently being

25    logged in particular, for scientific study, recreational enjoyment, aesthetic beauty, and nature

26    photography. These members' interests will be irreparably harmed by the ongoing logging, as

27    they will no longer be able to scientifically study these areas in their current state, take nature

28    photographs of the area in its current state, or enjoy the aesthetic beauty of the unlogged forest

1    habitat and its inhabitants.

2        18.    Plaintiff **SEQUOIA FORESTKEEPER** is a non-profit corporation residing in

3    Kernville, California. Its mission is to protect and restore the ecosystems of the Southern Sierra

4    Nevada, including, but not limited to, the Giant Sequoia National Monument, Sequoia National

5    Forest, and Sierra National Forest through monitoring, enforcement, education, and litigation.

6    Sequoia ForestKeeper's members use and continue to use the national forests of the Southern

7    Sierra Nevada for activities such as hiking, bird and animal watching, aesthetic enjoyment, quiet

8    contemplation, scientific study, and to improve their health, including Nelder Grove. Many of its

9    members also have been actively involved in formulating management policies for public lands

10   and preserving local areas, including participating in revising the Sierra National Forest plan.

11   These members' interests will be irreparably harmed by the planned logging and other activities,

12   as they will no longer be able to scientifically study these areas in their undisturbed state, take

13   nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the

14   naturally regenerating Sequoia forest habitat and its inhabitants.

15       19.    This suit is brought by Plaintiffs on behalf of themselves and their adversely

16   affected members and staff. Each plaintiff has an organizational interest in the proper and lawful

17   management of the Sierra National Forest. Plaintiffs' and their members' present and future

18   interests in the use of Nelder Grove are and will be directly and adversely affected by the

19   challenged decision. Those adverse effects include, but are not limited to: (1) impacts to wildlife

20   and their habitats within and around the Nelder Grove Project area from logging and other Project

21   activities; (2) reduction and impairment of recreation opportunities related to Giant Sequoias,

22   including loss of young, naturally regenerating sequoia forests; (3) impaired aesthetic value of

23   forest lands, trails, and landscapes caused by Defendants' logging and other Project activities; and

24   (4) loss of scientific study and viewing opportunities with regard to wildlife in areas subject

25   logging and other Project activities—specifically regarding the natural regeneration of Giant

26   Sequoias.  In addition, Plaintiffs and their members and staff have an interest in ensuring that

27   Defendants comply with all applicable laws, regulations, and procedures pertaining to the

28   management of national forests. These are actual, concrete injuries caused by Defendants' failure

        5   COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

1    to comply with mandatory duties under NEPA, NFMA, and other federal laws. Because

2    Defendants' actions approving the Project violate the law, a favorable decision by this Court will

3    redress the actual and imminent injury to Plaintiffs.

4         20.    Beyond submitting two comments—one in December 2022 and one in June

5    2023—on the belated November 2022 Scoping Notice, Plaintiffs have not had the opportunity to

6    participate in administrative actions to protect Plaintiffs or their interests within the Nelder Grove

7    Project area because the Forest Service did not make the July 2022 Decision Memo, the

8    underlying Emergency Response Procedure, or other information pertaining to the proposed

9    Nelder Grove Project available to the public for notice and comment. In addition, many of the

10   documents upon which the Forest Service relies are not publicly available. Plaintiffs have

11   exhausted any and all available administrative remedies. Reviewable final agency action exists

12   that is subject to this Court's review under 5 U.S.C. §§ 702 & 704.

13        21.    The Forest Service's implementation of the Nelder Grove Project is in

14   contravention of NEPA and NFMA. Because Defendants' actions affecting Nelder Grove violate

15   the law, a favorable decision by this Court will redress the actual and imminent injuries to

16   Plaintiffs. If the Forest Service were to comply with NEPA and NFMA, it would cease Project

17   implementation until it has completed the requisite NEPA analysis demanded by the Project. At a

18   minimum, this would involve publishing a properly scoped and documented CE for the Nelder

19   Grove Project.

20        22.    It is much more likely, however, that the necessary NEPA procedure would be to

21   prepare an environmental impact statement ("EIS"), according to alternative arrangements

22   developed with the CEQ, given the potential significant effects to the historic Nelder Grove and

23   its resident Giant Sequoias, the certainty that logging will kill young Giant Sequoias regenerating

24   as a result of the 2017 Railroad Fire, and the possibility that logging and other project activities

25   will increase wildfire severity in and around mature Giant Sequoias, as plaintiffs documented in

26   their comments in the form of dozens of scientific studies, including many Forest Service studies,

27   finding that mechanical thinning and post-fire logging tend to increase severity in wildfires.

28   Proper NEPA analysis would consider additional alternatives to the proposed action, and could

1  minimize or avert the harm to Plaintiffs' members that will be caused from the logging of trees.

2        23.    Defendant **RANDY MOORE**, Chief of the U.S. Forest Service, signed the July

3  2022 Decision Memo. The July 2022 Decision Memo was the Forest Service's final agency action

4  regarding those Nelder Grove Project activities described in the Emergency Response Procedures.

5  Defendant Moore is only sued in his official capacity.

6        24.    Defendant **DEAN GOULD**, Forest Supervisor for the Sierra National Forest,

7  signed the November 2022 Scoping Notice that described activities taking place in Nelder Grove

8  that were not authorized by the July 2022 Decision Memo. Defendant Gould is only sued in his

9  official capacity.

10        25.    Defendant **JENNIFER EBERLIEN**, Regional Forester for the Pacific Southwest

11  Region, proposed the Emergency Response Procedures authorizing emergency activities in

12  Nelder Grove that were subsequently approved by Defendant Moore. Defendant Eberlien is only

13  sued in her official capacity.

14        26.    Defendant **U.S. FOREST SERVICE** is an agency of the United States and is an

15  division of the Department of Agriculture, and is charged with managing the public lands and

16  resources of the Sierra National Forest in accordance and compliance with NEPA and NFMA and

17  their implementing regulations. The Service is an agency within the meaning of the APA, 5

18  U.S.C. § 551.

19                **STATUTORY AND REGULATORY FRAMEWORK**

20          **National Environmental Policy Act (42 U.S.C. §§ 4321-4370(h)) [1]**

21        27.    Congress enacted the National Environmental Policy Act ("NEPA") in 1969,

22  directing all federal agencies to assess the environmental impacts of proposed actions that

23  significantly affect the quality of the human environment. NEPA seeks to "promote efforts which

24  will prevent or eliminate damage to the environment and biosphere and stimulate the health and

25  welfare of man." 42 U.S.C. § 4321. The primary purposes of NEPA, 42 U.S.C. §§ 4321-4370(h),

26

27                      

[1] NEPA was amended on June 3, 2023, and it is anticipated that the CEQ will amend its
28  regulations during the course of this litigation. However, Plaintiffs based their complaint on the
laws and regulations in effect from July 2022 to May 2023, which is when the relevant acts and
omissions took place.

are to ensure fully informed decision-making and to provide for public participation in environmental analysis and decision-making. 40 C.F.R. §§ 1500.1(a), (b). NEPA's public disclosure goals are twofold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to ensure that the public has had sufficient information to review, comment on, and challenge (if necessary) the agency's action. See 42 U.S.C. §§ 4321, 4332.

28.   The CEQ promulgates regulations implementing NEPA. CEQ's regulations are binding on all federal agencies, 40 C.F.R. § 1500.3(a), and can be found at 40 C.F.R. Parts 1500–1508.

29.   Agency actions taken pursuant to NEPA are reviewable by this Court under the APA. 5 U.S.C. §§ 702, 704, 706.

30.   There are three potential avenues for federal agencies to comply with NEPA, each reflecting a different level of analysis required to meet statutory and regulatory requirements. These are, in descending level of complexity, an Environmental Impact Statement ("EIS"), an Environmental Assessment ("EA"), or a Categorical Exclusion ("CE").

31.   An EIS is appropriate where the agency anticipates that the proposed action will likely have a significant impact, 40 C.F.R. § 1501.3(a)(3), because federal agencies must prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under NEPA, both adverse and claimed beneficial impacts are relevant and may be significant. See 40 C.F.R. § 1508.1(g)(4). Agencies must consider scientific controversy when determining whether a proposed action may have significant impacts.

32.   An EA is appropriate where the agency anticipates that the proposed action is not likely to have significant impacts, or if the significance of impacts is unknown. 40 C.F.R. §§ 1501.3(a)(2), 1501.5(a), 1508.1(h). If, after preparing the EA, the agency determines that the action *is likely to* have significant impacts, then it must prepare an EIS. 40 C.F.R. § 1501.3(a)(3). If the agency determines that it *will not* have significant impacts, then it must issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1501.6(a).

33.     A CE is appropriate for "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. § 1501.4(a). CEs must be identified in an agency's NEPA procedures and "[a]gency NEPA procedures shall identify when documentation of a categorical exclusion determination is required." 40 C.F.R. § 1507.3(e)(2)(ii).

34.     A CE is inappropriate, however, where its use is precluded by the presence of "extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. § 1501.4; see 40 C.F.R. § 1507.3(e)(2)(ii). Therefore, if the agency determines that extraordinary circumstances exist, the agency may only "categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects." 40 C.F.R. § 1501.4(b)(1).

35.     Consequently, to avoid preparation of either an EA or EIS, the agency must employ an established CE which specifically exempts the proposed action from additional NEPA review, conduct any necessary scoping, and determine that no extraordinary circumstances preclude use of the CE. Agencies have an affirmative duty to contemporaneously document their application of a CE and their consideration of extraordinary circumstances so that a reviewing court may determine if their application of the CE was arbitrary and capricious. An agency cannot use a CE to exclude multiple phases of a project from environmental review when it does not itself understand the parameters of those phases or its timetable for completing those phases.

36.     Until an agency publishes a finding of no significance ("FONSI") or record of decision demonstrating compliance with these requirements, it may not take any action that has an adverse environmental impact. 40 C.F.R. § 1506.1.

37.     When there are "emergency circumstances" that make it necessary for an agency to take actions that are likely to have a significant environmental impact, the agency may consult with the CEQ to make "alternative arrangements" for NEPA compliance. 40 C.F.R. § 1506.12. These alternative arrangements are limited "to actions necessary to control the immediate impacts of the emergency," while "[o]ther actions remain subject to NEPA review." *Id.*

38. According to a chart published by the CEQ in May 2019, the CEQ only approved alternative arrangements 47 times between 1980 and 2019.

**U.S. Forest Service's NEPA-Implementing Regulations (36 C.F.R. Part 220)**

39. At 36 C.F.R. § 220.6, the Forest Service's NEPA-implementing regulations list categorical exclusions "for which a project or case file and decision memo are required," 36 C.F.R. § 220.6(e), as well as categories for which a "supporting record and decision memo are not required" but "may be prepared," 36 C.F.R. § 220.6(d). The use of these categorical exclusions is also explicitly limited to situations in which there are no extraordinary circumstances. 36 C.F.R. § 220.6(a); *see also* 40 C.F.R. § 1501.4.

40. 36 C.F.R. § 220.6(b) lists "resource conditions" that should be considered in determining whether extraordinary circumstances preclude the use of a CE and thus require an EA or EIS. These resource conditions include "historic properties or areas." *Id.* § 220.6(b)(1)(vii).

41. Although the CEQ's regulations only explicitly apply the scoping process to the preparation of EISs, see 40 C.F.R. § 1501.9(a), the Forest Service's regulations specify that "[s]coping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation." 36 C.F.R. § 220.4(e); *see also* 36 C.F.R. § 220.6(c).

42. When using a CE to avoid further NEPA analysis, the Service must document in its scoping documents that there are no extraordinary circumstances that may result in an otherwise excluded action having significant impacts.

43. Regarding emergencies, the Forest Service's regulations supplement the CEQ's regulations and define three categories of actions for when "an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis." See 36 C.F.R. § 220.4(b). First, the agency "may take actions necessary to control the immediate impacts of the emergency and are urgently needed to mitigate harm to life, property, or important natural or cultural resources." *Id.* § 220.4(b)(1). When additional actions are urgently needed, the agency may take such actions which are not likely to have significant environmental impacts only after consulting with the Washington Office of the Forest Service about "alternative arrangements" for

1  NEPA compliance. *Id.* § 220.4(b)(2).

2      44.    Finally, the agency may only take actions that are likely to have significant

3  environmental impacts after consulting with the CEQ about "alternative arrangements" in

4  accordance with 40 C.F.R. § 1506.12. *See* 36 § 220.4(b)(3).

5      45.    "Emergency" is a term generally defined as "unforeseen combination of

6  circumstances or the resulting state that calls for immediate action." USFS National

7  Environmental Policy Act Procedures, 73 Fed. Reg. 43084, 43087–88 (July 24, 2008) (codified at

8  36 CFR Part 220) (citing Webster's Third New International Dictionary Of The English

9  Language (1961) and Merriam-Webster's Collegiate Dictionary (11th ed. 2004)).

10      46.    The Service's application of 36 C.F.R. § 220.4(b)(2), when approving the Nelder

11  Grove Project, to authorize intra-agency alternative arrangements that entirely circumvent both

12  the agency's and the CEQ's NEPA regulations is not supported by the CEQ's NEPA regulations.

13  *See* 40 C.F.R. § 1506.12.

14      **U.S. Forest Service Special Area Regulations (36 C.F.R. § 294.1)**

15      47.    Under 36 C.F.R. § 294.1, the Service designates special interest areas "which

16  should be managed principally for recreation use substantially in their natural condition."

17      **National Forest Management Act (16 U.S.C. §§ 1600 *et seq.*)**

18      48.    The National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, is the

19  primary statute governing the administration of national forests. Agency actions taken pursuant to

20  NFMA are reviewable under the APA. 5 U.S.C. §§ 702, 704, 706.

21      49.    NFMA requires the Forest Service to develop and implement a Land and Resource

22  Management Plan ("LRMP" or "Forest Plan") for each unit of the National Forest System. 16

23  U.S.C. § 1604. Forest Plans guide natural resource management activities forest-wide, setting

24  standards, management area goals and objectives, and monitoring and evaluation requirements. A

25  Forest Plan must provide for multiple uses for the forest, including: recreation, range, wildlife,

26  fish, timber, and wilderness.

27      50.    Under NFMA all permits, contracts, and other instruments for the use of National

28  Forest System lands "shall be consistent with the land management plans." *Id.* § 1604(i).

11  COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

Therefore, after a forest plan is developed, all subsequent agency action, including site-specific actions, must comply with NFMA and the governing Forest Plan. The Emergency Response Procedures document claims the proposed actions are "consisten[t] with each respective forest's land management plan."

51.     When the Nelder Grove Project was approved in July 2022, the LRMP governing the Sierra National Forest was from 1991 ("1991 Sierra Forest Plan"). During the 2000's the Forest Service amended every Forest Plan in the Sierra Nevada by adopting the "Sierra Nevada Forest Plan Amendment of 2004" ("2004 Framework"). The 2004 Framework was designed to address inefficiencies within previous Forest Plans and amendments by focusing on old forest ecosystems and associated species and fire and fuels.

52.     The 1991 Sierra Forest Plan requires District Rangers to prepare projects to meet the features outlined in the Plan and conduct site-specific analysis in accordance with NEPA's procedures.

53.     The 1991 Sierra Forest Plan designated Nelder Grove as a "Historical Area"—a subset of the "Special Interest Area" category. *See* 36 C.F.R. § 294.1. The Record of Decision for the Sierra Forest Plan also requires the Service to "Develop a detailed long-term implementable strategy for the Grove" and mandates that "[u]ntil the long-term implementation strategy is approved, only human hazard trees will be removed." If such a strategy exists, Plaintiffs have not been able to find it and thus allege on information and belief that it is not publicly available and does not exist.

54.     In July 2022, the effective LRMP was the 1991 Sierra National Forest Plan, as amended by the 2004 Sierra Nevada Forest Plan Amendment. However, in May 2023, the Forest Service published a new LRMP for the Sierra National Forest ("2023 Sierra Forest Plan"), replacing the 1991 Sierra Forest Plan. Like the 1991 Sierra Forest Plan, the 2023 Sierra Forest Plan also requires projects to be analyzed using appropriate NEPA procedures. Additionally, this plan continues to designate Nelder Grove as a "Historical Area." Unlike the prior plan, however, the 2023 Sierra Forest Plan also describes Desired Conditions, Goals, Suitability, and Guidelines for Nelder Grove. The Desired Conditions describe "Giant sequoia trees…successfully

1   regenerating and recruiting into older age classes" and "[f]ires burn[ing] primarily at low to

2   moderate severity with limited patches of high severity creating canopy gaps of variable sizes and

3   shapes (generally less than one-half acre) and bare mineral soil to promote sequoia regeneration."

4   The Guidelines include maintaining the "[e]cological and hydrologic function of giant sequoia

5   groves" and "thin[ning] conifers to increase heterogeneity and resilience, emphasizing retention

6   of the oldest and largest trees such as giant sequoias and pines." Additionally, the Guidelines

7   specify that "Litter and duff should be removed at least 2 feet and shrubs and small trees at least 6

8   feet from the base of large and old sequoias (especially those containing cat faces) to limit fire

9   impacts." Read together, these guidelines create both a ceiling and floor on the scope of activities

10  that are required or permissible in Nelder Grove.

11  **Administrative Procedure Act (5 U.S.C. §§ 701–706)**

12      55.     Section 702 of the APA, 5 U.S.C. § 702, provides a private cause of action to any

13  person "suffering legal wrong because of agency action, or adversely affected or aggrieved by

14  agency action within the meaning of a relevant statute[.]" The APA provides a cause of action to

15  challenge any final agency action where there is no other adequate remedy in a court. 5 U.S.C. §

16  704.

17      56.     Under Section 706 of the APA, reviewing courts "shall . . . (1) compel agency

18  action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency

19  action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or

20  otherwise not in accordance with law" or "without observance of procedure required by law[.]" 5

21  U.S.C. §§ 706(1), 706(2)(a), (d).

22      57.     NEPA and NFMA do not contain specific judicial review provisions, and the

23  Forest Service's actions governed by NEPA and NFMA are therefore subject to judicial review

24  under the APA.

25  **ADDITIONAL FACTS GIVING RISE TO THE PLAINTIFFS' CAUSE OF ACTION**

26      58.     The Sierra National Forest ("Forest") was originally established as a forest reserve

27  by presidential proclamation in 1893. As it currently stands, the Forest encompasses

28  approximately 1.3 million acres. Located in Central California near the town of Oakhurst, Nelder

Grove of Giant Sequoias is a relatively small portion of the Sierra National Forest, covering just 1,432 acres.

59.     Nelder Grove is most well-known for its mature Giant Sequoias. As one of roughly 70 groves in the Sierra Nevada range, Nelder Grove is a popular destination among the recreating public due to its breathtaking scenery and relatively undisturbed natural settings. The Grove is used by members of the public for wildlife viewing, photography, and scientific studies of species, habitats, and other important biological processes. Plaintiffs' members use Nelder Grove for such purposes, and have an interest in the proper management of the Grove's resources.

60.     The 2017 Railroad Fire burned through approximately 80% of Nelder Grove in 2017, leaving only the southeast portion of the grove unburned. The fire burned at various severities in affected areas of the Grove, including at low- to moderate-severity in most areas and high-severity in other areas.

61.     Prior to the Railroad Fire in 2017, Nelder Grove contained approximately 106 mature Giant Sequoias. The Railroad Fire killed more than 30 mature Giant Sequoias. No mature giant sequoias remain alive in severely-burned portions of Nelder Grove. High-severity fires are necessary for natural Giant Sequoia reproduction because the high temperatures involved are necessary for the release of seeds, and high-severity fire consumes the thick duff and litter on the forest floor, turning it into a nutrient-rich red of mineral ash. Young sequoias need this because it allows them to sink their roots into soil (not just duff and litter), and the mineral ash aids the growth of young sequoias for many years. Giant Sequoias naturally regenerate in high-severity burned areas and this regeneration is occurring in Nelder Grove: Observations by Plaintiffs' members have found that areas of Nelder Grove impacted by recent fires, particularly those impacted by high-severity fire from the 2017 Railroad Fire, are regenerating successfully as young sequoias are becoming established in the Nelder Grove.

62.     Ground-based post-fire logging kills naturally-regenerating trees, including young sequoias. Plaintiff's members have observed that thinning activities in Nelder Grove, and in particularly mechanical thinning activities, have killed naturally-regenerating young Giant Sequoias in previously burned areas of the grove.

63.     Logging activities performed pursuant to the Project, particularly those using mechanical thinning in areas previously recently burned by high-intensity fires, are killing these naturally-regenerating young sequoias, harming the species the Decision Memo seeks to protect and disrupting the natural processes highlighted by the May 2023 Sierra Forest Plan.

64.     In July 2022, Defendant Regional Forester Jennifer Eberlien requested an emergency response to address the purported "emergency" of risk of wildfires in Giant Sequoia groves by issuing the Proposed Emergency Response. The stated objective of the response requested in the Proposed Emergency Response is "to provide for long term survival of Giant Sequoias by reducing the likelihood and effects of high severity wildfire before it occurs in previously unburned or moderately burned Giant Sequoia groves." The Proposed Emergency Response stated, "urgent treatments include removal of green and dead surface and ladder fuels from immediately around large Giant Sequoias to prevent trees from torching." The Proposed Emergency Response further states "unburned groves and portions of groves that did not burn in recent wildfires are at greatest risk." The same document notes the 2017 Railroad Fire affected Nelder Grove and includes a map showing that most of Nelder Grove burned in the Railroad Fire in 2017. The July 2022 Decision Memo also states that "unburned groves and unburned portions of burned groves are under severe threat to wildfire."

65.     The Forest Service's assessments shown in the Proposed Emergency Response are consistent with science showing low-risk of re-burn of fires of any intensity, but especially of high-intensity fires, after a previous fire. Since the Railroad Fire burned in Nelder Grove in 2017, there is a low risk of reburn of the 80% of the grove which was burned by the 2017 Fire.

66.     Despite limiting the activities planned for Nelder Grove to the area "immediately around" live, mature Giant Sequoias in previously unburned or only moderately burned Giant Sequoia groves, the Proposed Emergency Response and July 2022 Decision Memo do not clearly describe the activities planned for Nelder Grove. On one hand, the Proposed Emergency Response includes a chart listing activities planned for each of the seven projects included in the July 2022 Decision Memo and specifies that only "handwork" activities are proposed for the Nelder Grove Project, while "mechanical" activities are proposed for other projects. This

1    assertion was supported by Jennifer Christie, the District Ranger for the Bass Lake Ranger

2    District of the Sierra National Forest, who emailed parties interested in the Nelder Grove Project

3    an update on the On August 23, 2022, ("August 2022 Email Update") responding to questions

4    about the Nelder Grove Project description.

5         67.    The August 2022 Email Update described the specific activities that would occur

6    during "Phase 1" of Project, as well as explaining for the first time that that the Project would be

7    implemented in three to four phases, the remainder of which had not been "worked out or

8    developed" at the time. The August 2022 Email Update specified that "[n]one of the work

9    planned for Phase 1 will be completed via mechanical treatments," and that Phase 1 included

10   felling—but not removing—hazard trees along roads, felling hazard trees immediately around the

11   base of live mature Giant Sequoias, and creating fuel buffers around the base of live mature Giant

12   Sequoias. Notably, the August 2022 Email Update is the first public document that explicitly

13   mentions felling hazard trees in Nelder Grove—particularly outside of the area immediately

14   around live, mature Giant Sequoias in previously unburned and moderately burned groves.

15   Felling of hazard trees is unauthorized because it is outside the scope of the 2022 Decision

16   Memo.

17        68.    On the other hand, the Proposed Emergency Response also contradicts the project-

18   specific description documented in paragraph 66 and broadly describes the activities that the

19   Service is implementing in Sierra National Forest to include both manual and mechanical

20   treatments. This portion of the Proposed Emergency Response specifically lists "emergency fuels

21   treatments" that include the mechanical removal of live trees less than or equal to twenty inches

22   in diameter at breast height.

23        69.    Regardless of this inconsistency, the geographic scope of these activities is still

24   circumscribed to the area immediately around live, mature Giant Sequoias in previously unburned

25   or moderately burned groves that are highly susceptible to severe wildfire due to high fuel

26   accumulation. The focus of the Project is reducing the risk of mortality to monarch Giant

27   Sequoias during the next wildfire. The emergency fuel "treatments" listed for all groves

28   encompassed by the Project, not just Nelder Grove, solely include removing surface and ladder

16   COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

fuels which present the greatest risk from wildfire to living, mature Giant Sequoias.

70.     Procedurally, the July 2022 Decision Memo specified that four projects covered by CEs would be "exclude[d] [from] the requirement at 36 CFR 220.6(e) to document a decision to proceed with an action in a decision memo for certain Categorical Exclusions." The Proposed Emergency Response documents that the Nelder Grove Project is one of these four projects supposedly covered by a CE.

71.     The Proposed Emergency Response and Decision Memo both state that 36 C.F.R. § 220.4(b)(2) allows the Service to exclude the requirement in the Forest Service's regulations at 36 C.F.R. § 220.6(e) to document the use of certain CEs in a decision memo prior to proceeding with the underlying action. Justifying this use of 36 C.F.R. § 220.4(b)(2), the Proposed Emergency Response states that these actions are not likely to have significant adverse environmental impacts.

72.     The Service did not consult with the CEQ about alternative arrangements for the Project. The Decision Memo states that the decision approving the Project "is not an alternative arrangement as defined by the Council on Environmental Quality in 40 CFR 1506.12." As of the filing of this complaint, the Service has not made public any NEPA documents relating to the Project at Nelder Grove or the CE used for the project.

73.     Neither the Proposed Emergency Response nor the Decision Memo specify which CE applies to the Nelder Grove Project, whether the agency considered extraordinary circumstances that could disqualify the Project from being analyzed under a CE, or whether any additional NEPA analysis will be prepared for the Project in the future. The project must fall under a CE identified by 36 C.F.R. § 220.6(e), CEs for which a decision memo and supporting record are required, for two reasons: First, because no CE identified by 36 C.F.R. § 220.6(d) covers the actions identified by the Proposed Emergency Response or Decision Memo; and second, because the Service specifically requested an exemption from the requirements of 36 C.F.R. § 220.6(e), requirements that only apply to those categorical exclusions listed under § 220.6(e).

74.     The Service has not indicated plans to ever satisfy the requirements of 36 C.F.R. §

220.6(e) to prepare a decision memorandum and supporting record.

75.    These 36 C.F.R. § 220.6(e) alternative arrangements for NEPA compliance authorized by Defendant Moore are predicated on seven "associated conditions" also included in the July 2022 Decision Memo. These conditions include the requirement that the Sierra National Forest "initiate[s] public scoping and tribal engagement within 45 days of approved emergency response actions."

76.    On November 8, 2022, the Forest Service published a scoping notice for logging activities claimed to protect Giant Sequoias in Nelder and McKinley Groves. This Scoping Notice was published 109 days after the Defendant Moore signed the July 2022 Decision Memo and 71 days after the Forest Service published a Status of Implementation on August 29, 2022, stating that it had begun to implement the Nelder Grove Project. This Scoping Notice states that it will include the previously authorized Nelder Grove activities in its unspecified "environmental analysis," even though that work is already underway. The Scoping Notice does not include any discussion of extraordinary circumstances such as Nelder Grove's status as a historical area or the scientific controversy around the proposed project activities due to, for example, mortality of young sequoias from mechanical logging, or increased wildfire severity as a result of such logging. As a result, the Scoping Notice fails to consider whether the use of a CE is still appropriate in light of the potential significant impacts associated with these circumstances. Going well beyond what was authorized by the July 2022 Decision Memo, the activities listed in the Nelder Grove portion of the Scoping Notice include mechanically felling both live and dead standing trees, tractor and grabble piling live or dead fuels, mastication, helicopter yarding, and artificially reforesting an unspecified portion of the Nelder Grove Historic Area—activities that were not authorized in the Proposed Emergency Response or the July 2022 Decision Memo. While the July 2022 Decision Memo arguably could be read to authorize some mechanical "fuels reduction" activities in Nelder Grove, at a minimum it does not authorize any treatments outside of the area immediately around live, mature Giant Sequoias in previously unburned or moderately burned Giant Sequoia groves.

77.    Mature Giant Sequoias are not considered at significant risk of being killed by

1   low- or moderate-severity fires. It is extremely unlikely that high-severity fires will burn in the

2   previously burned portions of Nelder Grove before 2027. Despite the low risk, the map attached

3   to the 2022 Scoping Notice depicts activities allegedly authorized by the July 2022 Decision

4   Memo in areas that burned in 2017, including in areas where no live Giant Sequoias are present.

5   The stated objective for the "emergency" is to protect living Giant Sequoias but the activities do

6   not align with the purported emergency.

7          78.     Instead, the on-the-ground activities are killing naturally-regenerating young

8   sequoias in Nelder Grove, disrupting the objectives of the Proposed Emergency Response and

9   July 2022 Decision Memo. The activities conducted by the Forest Service in Fall 2022 involved

10  extensive mechanical felling and piling of trees outside of the area immediately around live,

11  mature Giant Sequoias, and these activities killed most of the post-fire naturally regenerating

12  giant sequoia saplings in the areas where such mechanical logging occurred. No such activities

13  were authorized by the July 2022 Decision Memo. Even abiding by the post hoc information

14  given in the August 2022 Email Update, these activities were not limited to hazard tree "felling",

15  with no mechanical treatments, as promised.

16         79.     Even assuming that the Proposed Emergency Response and July 2022 Decision

17  Memo did include some of ongoing and forthcoming activities in Nelder Grove, no circumstances

18  present in Nelder Grove present an "emergency [] that make[] it necessary to take urgently

19  needed actions before preparing a NEPA analysis" for a CE. 36 C.F.R. § 220.4. The Service has

20  acknowledged the risk that high severity wildfire poses to mature Giant Sequoias in Nelder Grove

21  since at least 2013, when it published a Sierra National Forest assessment acknowledging that

22  "[w]ith little treatment in this grove and continued fire suppression, the trend is toward an

23  increasing threat to the grove from uncharacteristic wildfire which may even scorch fire resistant

24  redwood trees and would likely severely damage most of the white wood (non-redwood) trees in

25  the grove."

26         80.     Additionally, the reality of these risks was further emphasized when high severity

27  wildfires burned in Nelder Grove during the 2017 Railroad Fire, killing mature Giant Sequoias.

28  Following the Railroad Fire, the Service in 2018 began scoping, but never proceeded with, the

Railroad Restoration Project, which purportedly would have reduced long term fuel loading near Nelder Grove. Most recently, the 2020 Castle Fire caused widespread mature Giant Sequoia mortality. The Emergency Response Procedures note that in 2020 following the Castle Fire "the agency began to understand what the extreme fuels buildup and drought could do to Giant Sequoias."

81.     Neither in the Emergency Response Procedures nor the July 2022 Decision Memo does the Service explain why July 2022 is when the situation in Nelder Grove became an emergency.

82.     The Proposed Emergency Response and the July 2022 Decision Memo claim completing NEPA analysis will delay action by 9 to 12 months for the logging projects and that lightning strikes could start a fire any day. This timeline is cited as a justification for requesting and granting the Proposed Emergency Response. The Service also states that drought conditions, increasing temperatures, and increasing wind intensity are all increasing the likelihood of high severity wildfire. None of these conditions suddenly arose in 2022, and the winter of 2023 was one of the biggest snowpacks in many decades.

83.     Additionally, the Proposed Emergency Response and Decision Memo rely on numerous false assertions and assumptions that create the appearance of an emergency and facilitate the application of 36 C.F.R. § 220.4(b). These assertions and assumptions further ignore scientific controversy indicating that the Nelder Grove Project has the potential to have a significant impact on the environment.

84.     The Forest Service states in the Proposed Emergency Response that 22% of all mature Giant Sequoias in existence were killed by wildfires in 2020 and 2021—implying that these wildfires killed 40.6% of all mature Giant Sequoias in their area. Comments submitted by Plaintiffs to the Service in June 2023 show that the true mortality numbers are much closer to 8% of all mature sequoias and 15.5% of mature sequoias within the 2020 and 2021 fire areas.

85.     Although the Forest Service states in both the Proposed Emergency Response and Decision Memo that prior to 2015, the last recorded evidence of extensive Giant Sequoia mortality due to high severity fire occurred in 1297 A.D., this assertion is contradicted by

1   multiple studies conducted by the Forest Service, as well as other accounts describing high

2   severity fire in Giant Sequoia groves, and mature sequoia mortality, during the eighteenth,

3   nineteenth, and twentieth centuries.

4        86.     Both the Proposed Emergency Response and the Decision Memo rely on the

5   assumption that high-severity fire is the primary threat to giant sequoias, and that the Nelder

6   grove and other sequoia groves are best protected by ensuring a low-severity fire regime. Multiple

7   studies, including one released by the Forest Service, contradict this assumption and make clear

8   that Giant Sequoias rely on canopy-destroying disturbances, or moderate to high severity fire, to

9   reproduce. During the past century, as a result of the Forest Service's fire suppression policies,

10   there has been a massive failure of sequoia reproduction. This sterilization will continue if the

11   Forest Service implements the Nelder Grove Project, facilitating exclusively low severity fire.

12   Not only does high-severity fire facilitate Giant Sequoia reproduction, it also causes Sequoias to

13   grow much faster—potentially reaching mature diameters of four to five feet in as little as 90 to

14   170 years.

15        87.     Implicitly undermining these false assertions and assumptions in the Nelder Grove

16   Project documents, the new Sierra Forest Plan, published in May 2023, explicitly states that in its

17   desired conditions for Nelder Grove, "[f]ires burn primarily at low to moderate severity with

18   limited patches of high severity creating canopy gaps of variable sizes and shapes (generally less

19   than one-half acre) and bare mineral soil to promote sequoia regeneration." As identified in the

20   November 8, 2022, Scoping Notice, recent wildfires have burned through Nelder Grove primarily

21   at low or moderate severity but also some high severity.

22        88.     The Proposed Emergency Response and Decision Memo also overlook scientific

23   controversy regarding the Forest Service's thinning of mature trees and conducting post-fire

24   logging ostensibly to achieve its goal of reducing risks to mature Giant Sequoias in unburned and

25   low- or moderate-severity burned portions of Sequoia Groves.

26        89.     A large and growing body of scientific evidence and opinion concludes that

27   logging, including commercial thinning and post-fire logging, makes wildfires spread faster

28   and/or burn more severely, and this puts nearby communities at greater risk.

90.     It is very unlikely that an area will re-burn until about ten years following the previous fire. Even when an area does re-burn less than nine years after the previous fire, there is almost no potential for high-severity fire; rather, low-severity is most likely. Additionally, a re-burn is more likely to be low severity when forest canopy cover is highest; commercial thinning and post-fire logging increases the severity of re-burns.

91.     The Service failed to address any of these recent scientific studies when designing the Nelder Grove Project.

92.     Therefore, the Service cannot support its determination that an emergency exists in Nelder Grove that warrants the intensive project activities currently being implemented. The Service also cannot support its determination that its use of 36 C.F.R. § 220.4(b)(2) is justified because the Service has not shown that the Nelder Grove project will not have significant effects, instead, the project will likely have significant effects.

**CLAIMS FOR RELIEF**

**Violations of NEPA, CEQ Regulations, Forest Service Regulations, NFMA, and APA**

**CLAIM ONE**

**(Failure to Conduct Environmental Review of Unauthorized Project Activities)**

93.     Plaintiffs reallege and incorporate by reference all preceding paragraphs into the claim set forth below.

94.     To satisfy NEPA, for all proposed major federal actions a federal agency must either complete an EIS or EA to evaluate the environmental impacts of a proposed action, or it must demonstrate that the proposed action is categorically excluded from additional NEPA review under an approved CE.

95.     Similarly, NFMA requires that all Forest Service activities are consistent with the overarching Land and Resource Management Plan. Both the 1991 Sierra Forest Plan, which was in effect when the Proposed Emergency Response was authorized in the Decision Memo, and the 2023 Sierra Forest Plan, published in May 2023, require the Forest Service to analyze projects under NEPA's procedures before acting.

96.     The CEQ's NEPA regulations require an agency to prepare an EA for proposed

1   actions that are not likely to have significant effects or for which the significance of the effects

2   are unknown. 40 C.F.R. § 1501.5(a). Alternatively, if an agency has previously determined that

3   the proposed action falls into a category of actions that do not have significant impacts, then it

4   may apply a CE. *Id.* § 1501.4.

5          97.    Absent alternatives arrangements made in response to an emergency situation, the

6   CEQ's NEPA regulations prohibit any major federal action from taking place prior to the action

7   agency publishing a FONSI or record of decision demonstrating compliance with these

8   requirements. *Id.* § 1506.1. The Service's regulation for emergency responses, 36 C.F.R. §

9   220.4(b)(2), limits the scope of the alternative arrangements for NEPA compliance to those

10  emergency actions that are proposed when the responsible official requests alternative

11  arrangements. The Forest Service Chief authorizing alternative arrangements can only anticipate

12  the potential environmental impacts of those actions that are proposed when the decision

13  document is signed. *See id.* Similarly, an agency cannot use a CE to exclude multiple phases of a

14  project from environmental review when it does not itself understand the parameters of those

15  phases or its timetable for completing those phases. Rather, an agency's application of a CE is

16  limited to the project activities that are defined with enough specificity when that CE invoked to

17  thoroughly anticipate whether the activities fall within the predetermined category of actions that

18  normally do not have a significant effect on the human environment and whether there are any

19  extraordinary circumstances in which a normally excluded action may have significant effect. *See*

20  40 C.F.R. § 1501.4.

21         98.    The Forest Service has failed to comply with both NEPA and NFMA by taking

22  actions in Nelder Grove that were not authorized by the alternative arrangements granted by July

23  2022 Decision Memo and without any other prior documentation or authorization.

24         99.    As the July 2022 Decision Memo plainly limits actions to the areas immediately

25  around live and mature Giant Sequoias, these unauthorized actions include at a minimum any

26  actions taken in portions of Nelder Grove that experienced high severity fire in 2017, which killed

27  all mature Giant Sequoias in those areas, and which now have abundant sequoia seedling and

28  sapling reproduction. These actions in these areas include mechanically logging and removing

1   hazard trees, mechanically logging and removing other live trees up to 20 inches in diameter,

2   mechanically logging and removing of snags, tractor and grapple piling, mastication, helicopter

3   yarding and the artificial planting of Giant Sequoias. Additionally, the July 2022 Decision Memo

4   does not explicitly authorize—and thus does not consider the environmental impacts of—any of

5   the aforementioned mechanical logging in the areas of Nelder Grove that are not immediately

6   around live, mature Giant Sequoias. These unauthorized actions are included in the November 8,

7   2022, Scoping Notice, but that document alone does not satisfy NEPA and NFMA's procedural

8   requirements. In the August 2022 Email Update, the Service acknowledged that it had not yet

9   planned any phases of the Nelder Grove Project beyond Phase One—which it specified did not

10  including mechanical logging—implying that it could not have possibly included the potential

11  environmental impacts of these phases in the alternative arrangements that the July 2022 Decision

12  Memo authorized.

13          100.    Therefore, the Forest Service's decision to move forward with Project activities

14  outside of the scope of the July 2022 Decision Memo without first satisfying NEPA's procedural

15  requirements was agency action unlawfully withheld and an agency action that was without

16  observance of procedure required by NEPA and NFMA, and thus in violation of the APA, 5

17  U.S.C. §§ 706(1), (2)(d).

18                              **CLAIM TWO**

19      **(Illegal Use of 36 C.F.R. § 220.4(b)(2) by: (1) Making an Arbitrary and Capricious**

20      **Emergency Determination and (2) Failing to Identify Potential Significant Impacts**

21                      **Requiring Additional NEPA Analysis)**

22          101.    Plaintiffs reallege and incorporate by reference all preceding paragraphs into the

23  counts set forth below.

24                              **COUNT ONE**

25      **(Arbitrary and Capricious Emergency Determination Under 36 C.F.R. § 220.4(b)(2)**

26                  **Allowing for Urgently Needed Emergency Response Actions)**

27          102.    The Forest Service's NEPA regulations allowing for alternative arrangements for

28  NEPA compliance are limited to situations where the responsible official determines that "an

24  COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

1  emergency exists that makes it necessary to take urgently needed actions before preparing a

2  NEPA analysis." 36 C.F.R. § 220.4(b). "Emergency" is a term generally defined as "unforeseen

3  combination of circumstances or the resulting state that calls for immediate action." USFS

4  National Environmental Policy Act Procedures, 73 Fed. Reg. 43084, 43087–88 (July 24, 2008)

5  (codified at 36 CFR Part 220) (citing Webster's Third New International Dictionary Of The

6  English Language (1961) and Merriam-Webster's Collegiate Dictionary (11th ed. 2004)).

7       103.    Such an emergency does not exist in Nelder Grove because the Service has

8  publicly acknowledged the threats that high severity fire poses to the mature Giant Sequoias in

9  Nelder Grove since at least 2013. Now that Giant Sequoia groves have predictably begun to burn

10  with greater frequency, the Service cannot assert—two years after the most severe of these recent

11  fires—that the current circumstances are unforeseen and necessitate circumventing NEPA's

12  procedures.

13       104.    The Proposed Emergency Response and the July 2022 Decision Memo state that

14  granting the Proposed Emergency Response will expedite project implementation by 9 to 12

15  months by allowing the project to proceed prior to completion of NEPA documentation. These

16  documents justify the emergency by claiming that lightning strikes could start a fire any day

17  within this period, purportedly justifying the need for immediate action. But neither the timeline

18  to complete NEPA documentation, particularly the expedited process for completing

19  documentation for a CE, nor the possibility of lightning strikes are unforeseen—the defining

20  feature of an emergency. The Service would have needed to fulfill its NEPA obligations

21  regardless of when it addressed the fuel loads in the Giant Sequoia groves and the risk of

22  lightning strikes starting a wildfire is not so much greater now, or in the summer of 2022, so as to

23  suddenly constitute an emergency. While the Service may be correct in stating that drought

24  conditions, increasing temperatures, and increasing wind intensity are all increasing the likelihood

25  of high severity wildfire, none of these factors suddenly arose in the past year as to create an

26  unforeseen situation. Particularly in Nelder Grove, the moderate- and high-severity wildfire of the

27  Railroad Fire that burned through the grove in 2017 has actually lessened the likelihood of high

28  severity wildfire in the immediate future by reducing fuel loads; even the Forest Service's own

July 2022 Decision Memo admits that unburned groves are at the greatest risk of fire.

105.     In addition to raising the timeline for NEPA compliance and the risk of lightning strikes, the Service also relies on numerous false assertions to support its conclusion that an emergency exists. Specifically, the Service contradicts recent scientific studies and overstates the percentage of mature Giant Sequoias that were killed in recent wildfires, drastically understates the frequency of high severity fire in the past millennium, misrepresents Giant Sequoias need for moderate and high severity fire to regenerate, and overexaggerates the potential for high severity fire in the recently burned Giant Sequoia groves—particularly in the first nine years following a fire.

106.     Therefore, the Service's determination that the present circumstances constitute an emergency in Nelder Grove was arbitrary and capricious and in violation of its own regulations and thus the APA, 5 U.S.C. § 706(2)(A). The Service's authorization of activities in Nelder Grove without prior NEPA documentation based on such a non-existent emergency was also arbitrary and capricious and in and in violation of its own regulations and thus the APA. *Id.* If an emergency does not exist, then the Forest Service must halt project implementation until it prepares appropriate NEPA documentation. *See* 40 C.F.R. § 1506.1.

**COUNT TWO**

**(Illegal Failure to Identify Potential Significant Impacts Under 36 C.F.R. § 220.4(b)(2) and Perform Requisite NEPA Analysis)**

107.     The Forest Service justifies using 36 C.F.R. § 220.4(b)(2) for the alleged emergency present in Nelder Grove by claiming the actions it is undertaking in Nelder Grove are covered by a CE, 36 C.F.R. § 220.6(e). By the plain language of the Service's regulations, the Service may only invoke the emergency response at issue here, 36 C.F.R. § 220.4(b)(2), for those actions that are unlikely to have a significant effect on the environment—either because the action is covered by a CE or because the agency prepares or would prepare an EA and FONSI for the action. Both the CEQ's regulations and the Forest Service's NEPA regulations foreclose the use of a CE when there are extraordinary circumstances in which a normally excluded action may have a significant effect. *See* 40 C.F.R. §§ 1501.4, 1507.3(e)(2)(ii); 36 C.F.R. § 220.6(b)(1).

1    108.    The Service has arbitrarily and capriciously invoked 36 C.F.R. § 220.4(b)(2) to

2    justify the emergency alternative arrangements to NEPA in Nelder Grove because it failed to

3    contemporaneously explain why a CE applies to the Nelder Grove project, why extraordinary

4    circumstances do not apply to its actions to preclude use of a CE, or even identify which CE the

5    Service has invoked.

6    109.    In the twelve months since the Service granted the emergency actions in Nelder

7    Grove through the July 2022 Decision Memo the Service has never identified which CE covers

8    the Nelder Grove Project. The Service has never provided a reasoned explanation why CE it has

9    invoked covers the Nelder Grove Project. The Service has also never shown any consideration

10   that extraordinary circumstances are not present to preclude the use of categorical exclusion.

11   Circumstances in Nelder Grove require that the Service should have at least considered

12   extraordinary circumstances when considering whether a CE covers the actions of the Nelder

13   Grove Project. *See* 36 C.F.R. § 220.6(c).

14   110.    Under the Forest Service's regulations, the presence of "historic properties or

15   areas" is a resource condition that the agency must consider in order to determine whether

16   extraordinary circumstances preclude the use of a categorical exclusion. 36 C.F.R. §

17   220.6(b)(1)(vii). Additionally, the Service must address whether there is scientific controversy

18   regarding potential effects on any of these resource conditions that constitutes extraordinary

19   circumstances.

20   111.    Here, there is no evidence that the Forest Service considered either Nelder Grove's

21   status as a historical area or the scientific controversy surrounding the proposed activities before

22   relying on an unnamed CE to rationalize using the alternative arrangement procedures in 36

23   C.F.R. § 220.4(b)(2).  First, the Service has recognized the importance of treating Nelder Grove

24   with exceptional care since it published the Sierra Forest Plan in 1991, which designated Nelder

25   Grove as a "historical area," required the development of a "detailed long-term implementable

26   strategy" specific to Nelder Grove, and prohibited any activities other than the logging of human

27   hazard trees until this strategy was finalized. In line with this guidance, the Service's own Sierra

28   National Forest Assessment stated in 2013 that Nelder Grove has "unique circumstances" and

1    noted that it had not been subject to vegetation treatment since the mid 1990s.

2           112.    Second, there is scientific controversy regarding the potential effects of the Forest

3    Service's project activities on Nelder Grove that precludes the use of a categorical exclusion by

4    indicating that the project may have significant effects. In addition to the false assertions

5    referenced under Count One which demonstrate controversy, the Service also suggests in its

6    project documents that removing large living trees, standing dead trees, and thinning smaller trees

7    will reduce the likelihood of high severity wildfire. However, numerous studies and even a Ninth

8    Circuit court opinion has recognized that this this type of fuels reduction does not necessarily

9    reduce wildfire risks and often increases them. Multiple studies have even found a positive

10   correlation between the number of trees removed from a forest and the intensity of wildfire in that

11   forest. Particularly in the context of post-fire logging, which the Service in undertaking in the

12   portions of Nelder Grove that burned in the 2017 Railroad Fire, recent scientific studies also

13   demonstrate this logging increases the intensity of subsequent wildfire, in addition to eliminating

14   many of the ecological benefits associated with wildfires.

15          113.    Without addressing extraordinary circumstances, the Service improperly

16   determined that the Project is unlikely to have any significant impacts in its Proposed Emergency

17   Response, stating that the proposed actions "are not likely to have significant adverse

18   environmental impacts." However, both beneficial and adverse effects must be considered when

19   determining whether an action may have a significant impact. 40 C.F.R. § 1501.3. While the

20   Service makes the unsupported assertion that the Project activities described in the July 2022

21   Decision Memo and the Proposed Emergency Response will reduce the likelihood and effects of

22   high severity wildfire before it occurs in previously unburned or moderately burned Giant

23   Sequoia groves, even this outcome would constitute a significant impact on Nelder Grove that

24   requires an EIS. Even if the Service asserts that "fuels reduction treatments" are going to have an

25   overall positive impact on Nelder Grove by reducing the imminent threat from severe wildfire—a

26   conclusion that the Service does not support in either the July 2022 Decision Memo or the

27   Emergency Response Procedures—it still must analyze this significant impact in an EIS.

28          114.    The Service should have, at the very least, considered whether extraordinary

1  circumstances foreclose its use of a CE for the Nelder Grove Project in the November 2022

2  Scoping Notice. Even if a CE validly covers the actions in Nelder Grove authorized by the July

3  2022 decision memo, the Service should have scoped the CE in the November 2022 Scoping

4  Notice and considered extraordinary circumstances at that time. *See* 36 C.F.R. § 220.6(c). The

5  July 2022 Decision Memo stated the Service would publish scoping for the projects "within 45

6  days of approved emergency response actions," yet the Service waited over double that time, 109

7  days, to publish the eventual November 2022 Scoping Notice, violating the "Associated

8  Conditions" listed alongside the Washington Office's decision to grant the emergency

9  authorization under 36 C.F.R. 220.4(b)(2). This procedurally and substantively inadequate

10  scoping notice does not satisfy the conditions that the July 2022 Decision Memo imposes on its

11  alternative arrangements for the Nelder Grove Project CE and thus prohibits the Forest Service

12  from implementing project activities in accordance with those alternative arrangements.

13      115.    Therefore, the Forest Service's decision to authorize the Nelder Grove Project to

14  proceed under 36 C.F.R. § 220.4(b)(2) without first completing NEPA documentation was

15  arbitrary, capricious, and in violation of NEPA and thus the APA, 5 U.S.C. § 706(2)(A), because

16  the Service has failed to show that the Nelder Grove Project is unlikely to have any significant

17  effects on the environment.

18      116.    If, pursuant to Claim Two, Count One, an emergency does not exist to justify

19  invoking 36 C.F.R. § 220.4(b), the Service must prepare all NEPA analysis for the project. Given

20  the aforementioned hands-off management previously employed in Nelder Grove, its historic

21  significance, the scientific controversy surrounding the use of logging to reduce wildfire risks in

22  both unburned and burned groves, and the scientific controversy related to young sequoia

23  mortality from mechanical logging, any action now undertaken may—and likely will—have

24  significant impacts and thus cannot be excluded from NEPA analysis under a CE. Because the

25  extraordinary circumstances present in Nelder Grove preclude the use of a CE to cover the actions

26  of the Nelder Grove Project, the Service must prepare an EIS. In the alternative, the Service's

27  failure to prepare NEPA documentation violates the APA because it constitutes agency action

28  unlawfully withheld. 5 U.S.C. § 706(1).

117.    If, in the alternative to Claim Two, Count One, an emergency does exist in Nelder

Grove to justify invoking 36 C.F.R. § 220.4(b), the Service has failed to show that its actions will

not cause significant impacts and so it acted arbitrarily and capriciously and in violation of the

APA, 5 U.S.C. § 706(2)(A), when it failed to follow 36 C.F.R. § 220.4(b)(3) and consult with the

CEQ about alternative arrangements to comply with NEPA. In the alternative, if an emergency

does exist in Nelder Grove to justify invoking 36 C.F.R. § 220.4(b), the Service violated the

APA, 5 U.S.C. § 706(1), when it failed to produce an adequate scoping notice with a properly

scoped CE addressing extraordinary circumstances.

**CLAIM THREE**

**(As-Applied, the Service's Emergency Regulation Violates NEPA and the CEQ's**

**Implementing Regulations)**

118.    Plaintiffs reallege and incorporate by reference all preceding paragraphs into the

claim set forth below.

119.    The CEQ's regulations and their interpretations of NEPA are entitled to substantial

deference. Although agencies other than the CEQ may adopt their own NEPA regulations to

improve agency efficiency and ensure compliance with NEPA's mandates, all agency procedures

must comply with the CEQ's regulations. 40 C.F.R. § 1507.3(e).

120.    When there are "emergency circumstances" that make it necessary for an agency

to take actions that are likely to have a significant environmental impact, the agency may consult

with the CEQ to make "alternative arrangements" for NEPA compliance. 40 C.F.R. § 1506.12.

These alternative arrangements are limited "to actions necessary to control the immediate impacts

of the emergency." *Id.* NEPA, as interpreted by the CEQ's regulations, does not contain any

waivers from its procedural requirements.

121.    As applied here, the Forest Service's NEPA regulations allow for intra-agency

"alternative arrangements" that exempt the logging in Nelder Grove from the CEQ's NEPA

procedures. *See* 36 C.F.R. § 220.4(b)(2). This use of these regulations here does not comply with

the CEQ's regulations, and therefore NEPA, for at least three reasons.

122.    First, in 40 C.F.R. § 1506.12, the CEQ does not interpret NEPA to allow for intra-

agency alternative arrangements for NEPA compliance. Therefore, any use of the Forest Service's regulations in this respect violates NEPA because the Forest Service did not consult with the CEQ to develop alternative arrangements.

123.     Second, in 40 C.F.R. § 1506.12, the CEQ does not interpret NEPA to allow for actions to be excluded entirely from compliance with NEPA. In the July 2022 Decision Memo, the Service entirely excluded the Nelder Grove Project from the requirement in 36 C.F.R. § 220.6(e) to publish a Decision Memo for certain categorical exclusions. To comply with the CEQ's regulations in 40 C.F.R. § 1506.12, the Service was required to develop alternative arrangements for environmental review, rather than circumvent NEPA's procedures entirely. The July 2022 Decision Memo justified its grant of the emergency actions in part because it would expedite the actions by nine to twelve months by allowing the agency's actions to proceed prior to completing NEPA documentation. Twelve months after the July 2022 Decision Memo was published, the Service has still not completed any documentation required by 36 C.F.R. § 220.6(e) and has indicated it does not plan to do so.

124.     Third, in 40 C.F.R. § 1506.12, the CEQ limits the use of alternative arrangements actions taken in response to emergency circumstances that are necessary to control the immediate impacts of the emergency. Here, the Service did not limit its use of alternative arrangements according to the CEQ's interpretation of NEPA. Instead, it has ambiguously defined and belatedly redefined the project to include a suite of activities, such as mechanically logging and removing hazard trees, mechanically logging and removing live and dead trees, and conducting such activities in portions of Nelder Grove that previously burned in the 2017 Railroad Fire, all of which are not necessary to control the alleged emergency of high severity fire with regard to live, mature sequoias in unburned or moderately burned mature Giant Sequoia groves.

125.     For the aforementioned reasons, 36 C.F.R. § 220.4(b) violates NEPA as applied to the Nelder Grove Project. This application of 36 C.F.R. § 220.4(b) is arbitrary, capricious, and not in accordance with NEPA as interpreted by the CEQ and thus violates the APA, 5 U.S.C. § 703(2)(C).

1

**<u>CLAIM FOUR</u>**

2

**(Violations of NFMA)**

3        126.    Plaintiffs reallege and incorporate by reference all preceding paragraphs into the

4    counts set forth below.

5

**COUNT ONE**

6

**(Failure to Comply with 1991 Sierra Forest Plan, NFMA, and APA)**

7        127.    Under NFMA, all projects must be consistent with the governing land

8    management plan. 16 U.S.C. § 1604(i). The Emergency Response Procedures approved by the

9    July 2022 Decision Memo claims the proposed actions are consistent with applicable forest plans.

10        128.    The 1991 Sierra Forest Plan prohibits removing any trees from Nelder Grove,

11    other than human hazard trees, until the Forest Service develops and approves a detailed long-

12    term implementation strategy for Nelder Grove. The 1991 Sierra Forest Plan requires the

13    implementation strategy to be consistent with the best scientific information available and that

14    any proposed activities in Nelder Grove will provide for aesthetic, recreational, ecological, and

15    scientific values.

16        129.    Here, the Service has not demonstrated in either the Proposed Emergency

17    Response, the July 2022 Decision Memo, or the November 2022 Scoping Notice that it produced

18    a long-term implementation strategy for Nelder Grove or that the activities authorized in the

19    Nelder Grove Project comply with any strategy that does exist.

20        130.    The Forest Service is not limitinng itself to only human hazard trees as it is

21    logging and removing small and large live and dead standing trees in Nelder Grove, in direct

22    contravention of the 1991 Sierra Forest Plan's prohibition on such activities.

23        131.    Therefore, by not following the 1991 Sierra Forest Plan, the Forest Service has

24    violated NFMA, and thus violated the APA, 5 U.S.C. §§ 706(1), (2)(d).

25

**COUNT TWO**

26

**(Failure to Comply with 2023 Sierra Forest Plan, NFMA, and APA)**

27        132.    The aforementioned claims demonstrate that the Forest Service has not satisfied its

28    statutory and regulatory duties in preparing and implementing the Nelder Grove Project. As the

32  COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

Forest Service has begun to implement this Project in violation of law, it must now halt that implementation and comply with NFMA by redesigning the Nelder Grove Project in compliance with the now operative 2023 Sierra Forest Plan. This plan took effect on June 26, 2023, which is 30 days after it was published in the Federal Register on May 26, 2023.

133.   Specifically, the Service cannot log in the portions of Nelder Grove that recently burned in moderate and high severity wildfires because these activities will not achieve the Desired Condition of allowing Giant Sequoias to successfully regenerate. Currently, the Service is killing the Giant Sequoias that regenerated as a result of the Railroad Fire by logging in that portion of Nelder Grove.

134.   Additionally, the 2023 Forest Plan prohibits the Service from taking actions around living large and old sequoias in Nelder Grove beyond removing litter and duff within two feet and small trees within six feet that will compromise the ecological function of Giant Sequoia groves. Giant Sequoias require moderate and high intensity fire to successfully regenerate. Entirely removing the potential of any such fires in Nelder Grove will perpetuate the massive failure of Sequoia reproduction that the Service caused by excluding moderate and high severity fire from Giant Sequoia groves in the twentieth century.

135.   Any such actions taken after June 26, 2023, are in violation of the 2023 Sierra Forest Plan, NFMA, and the APA, 5 U.S.C. §§ 706(1), (2)(d).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.   Declare that the Nelder Grove Project activities that were not authorized in the July 2022 Decision Memo, but are currently being implemented, are agency action "without observance of procedure required by law" in violation of NEPA, NFMA, and the APA, 5 U.S.C. § 706(2)(d);

B.   Declare that the Forest Service's July 2022 Decision Memo as-applied to the ongoing and future actions in Nelder Grove violates 36 C.F.R. § 220.4(b)(2) and is arbitrary, capricious, an abuse of discretion, and/or not in accordance with the law under the APA, 5 U.S.C. § 706(2)(A), or in the alternative declare that the Service's use of 36 C.F.R. § 220.4(b)(2), not 36

C.F.R. § 220.4(b)(3), with respect to Nelder Grove is agency action "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(d);

C. Declare that the Forest Service's failure to prepare an EIS, or in the alternative, publish a properly scoped CE analyzing extraordinary circumstances for the ongoing and future actions in Nelder Grove was both agency action unlawfully withheld, 5 U.S.C. § 706(1) as well as arbitrary, capricious, and in violation of NEPA, 5 U.S.C. § 706(2)(A);

D. Declare that as-applied by the Forest Service with respect to the ongoing and future actions in Nelder Grove, 36 C.F.R. § 220.4(b)(2) violates NEPA;

E. Declare that the ongoing and future actions in Nelder Grove do not comply with both the 1991 and 2023 Sierra Forest Plans and thus violate NFMA;

F. Partially vacate and set aside the portions of the July 2022 Decision Memo authorizing actions in Nelder Grove as illegal agency action under the APA;

G. Preliminarily and permanently enjoin the Forest Service from implementing both the Nelder Grove Project activities described in the July 2022 Decision Memo and those activities described in the November 2022 Scoping Notice until it has complied with NEPA, NFMA, the CEQ's regulations, and its own regulations;

H. Enter appropriate injunctive relief to ensure that Defendants comply with NEPA and NFMA, and specifically to ensure that Defendants and their agents take no further actions toward proceeding with the challenged Nelder Grove Project until they have complied with NEPA and NFMA;

I. Award Plaintiffs Earth Island Institute and Sequoia ForestKeeper their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*; and

J. Grant such further relief as the Court deems just and proper.

Respectfully submitted on this 13th day of July, 2023.

/s/Thomas Buchele
Thomas Buchele, CA Bar No. 129657

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Earthrise Law Center
Lewis & Clark Law School
10101 S Terwilliger Blvd.
Portland OR  97219-7799
Tel:  503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Rachel M. Fazio, CA Bar No. 187580
John Muir Project of the Earth Island Institute
P.O. Box 897
Ridgecrest, CA 92314
Tel: 530-273-9290
Email: rachelmfazio@gmail.com

Attorneys for Plaintiffs

35  COMPLAINT FOR PARTIAL VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF