Thomas Buchele, CA Bar No. 129657
Earthrise Law Center
Lewis & Clark Law School
10101 S Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Rachel M. Fazio, CA Bar No. 187580
John Muir Project of the Earth Island Institute
P.O. Box 897
Ridgecrest, CA 92314
Tel: 530-273-9290
Email: rachelmfazio@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EARTH ISLAND INSTITUTE**, a non-profit corporation; **SEQUOIA FORESTKEEPER**, a non-profit corporation; **SIERRA CLUB**, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**RANDY MOORE**, in his official capacity as the Chief of the United States Forest Service; **DEAN GOULD**, in his official capacity as the Forest Supervisor for the Sierra National Forest; **JENNIFER EBERLIEN,** in her official capacity as the Regional Forester for the Pacific Southwest Region; **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture,<br><br>Defendants. | CASE No. 1:23-cv-01045-JLT-EPG<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: September 11, 2024<br><br>Time: 9:00 am<br><br>Judge: Hon. Jennifer L. Thurston<br><br>Courtroom: 4 |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................. 1

Standard of Review ............................................................. 3

Significance of Nelder Grove ................................................. 3

Plaintiffs Have Article III Standing…………………………………………4

Argument

I.      There is no "Emergency" that Requires Deviating From NEPA's Otherwise
        Mandatory Requirements (Claim 2, Count 1) ........................ 4

II.     The Forest Service's 2022 Memorandum violates NEPA in Multiple Respects
        (Claim 1, Claim 2, Count 2, Claim 3) ............................... 8

        A.      Legal Background ........................................... 8

        B.      The Forest Service's application of its emergency regulation violates NEPA
                and CEQ regulations ...................................... 12

                1.      Defendants' fuels reduction in Nelder Grove exceeds the limited scope
                        of authorization provided by the Chief's Memorandum (Claim 1) ......... 13

                        (a)     The 2022 Memorandum only authorized limited fuels
                                reduction treatments in the immediate vicinity of Giant Sequoias
                                in moderately burned or unburned areas ..................... 14

                        (b)     Defendants' actions in Phase I and II of the Project clearly
                                exceed the limited authorizations in the 2022 Memorandum ...... 15

                2.      The 2022 Memorandum could not completely exempt the Service
                        from the NEPA requirement to Prepare a Decision Memo Regarding
                        the Applicable CE or the Requirement to Determine which Specific CE
                        Supposedly applies to the Project ......................... 18

                3.      The Forest Service violated NEPA by failing to evaluate effects on
                        extraordinary circumstances present in Nelder Grove ............. 20

                4.      The Service's "Not Likely to Have Significant Environmental Impacts"
                        Determination is Arbitrary and Capricious ................... 22

III.    The Forest Service Removed Trees in Violation of the Governing Land Management Plan
        (Claim 4) ......................................................... 24

Conclusion .................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Alaska Center for Environment v. U.S. Forest Service*, 189 F.3d 851 (9th Cir. 1999)................ 21

*Bennett v. Spear*, 520 U.S. 154 (1997)........................................................................ 3

*Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445 (9th Cir. 1996) .................................. 10

*California v. Norton*, 311 F.3d 1162 (9th Cir. 2002)...................................................... 10

*Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961 (9th Cir. 2003) ..... 4

*City of Davis v. Coleman,* 521 F.2d 661 (9th Cir, 1975) ............................................................ 23

*Conservation Congress v. U.S. Forest Service*, No. CIV. 2:12-02416 WBS KJN, 2013 WL
2457481 (E.D. Cal. June 6, 2013) ............................................................................. 22

*Center for Food Safety v. Johanns*, 451 F. Supp. 2d 1165 (D. Haw. 2006) ................................ 11

*Defenders of Wildlife v. U.S. Forest Service*, No. CV-14-02446-TUC-RM, 2015 WL 14070482
(D. Ariz. Sept. 15, 2015) ........................................................................................ 11

*Earth Island Institute v. Elliott*, 318 F.Supp.3d 1155 (E. D. Cal. 2018)...................................... 19

*Flint Ridge Development Company v. Scenic Rivers Association of Oklahoma*, 426 U.S. 776
(1976) .................................................................................................................. 18

*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) ................................................. 4

*Friends of the Inyo v. U.S. Forest Service,* No. 23-15492, 2024 WL 2281568 (9th Cir. May 21,
2024) .................................................................................................................. 10

*FSEEE v. U.S. Forest Service,* No. 2:16-CV-0293-TOR, 2017 WL 2962771 (E.D. WA July 11,
2017) .............................................................................................................. 6, 7

*FSEEE v. U.S. Forest Service*, 726 Fed. Appx. 605 (9th Cir. 2018) ............................................. 6

*Greater Hells Canyon Council v. Stein*, 2018 WL 3966289 (D. Or. June 11, 2018) .................. 20

*Hanly v. Kleindeinst,* 471 F.2d 832 (2d Cir. 1972) ......................................................... 23

*Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) .......................... 3

*Jones v. City of Portland,* No. 3:18-cv-01485-SB, 2018 WL 7078670 (D. Or. Dec. 21, 2018) ..... 6

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983) ................................................... 3

*Mountain Communities for Fire Safety v. Elliot*, 25 F.4th 667 (9th Cir. 2022) .................... 9

*Natural Resource Defense Council v. Winter,* 518 F.3d 658 (9th Cir. 2008) ...................... 7

*Natural Resource Defense Council v. Winter,* 527 F. Supp. 2d 1216 (C.D. Ca. 2008) ......... 7

*Natural Resource Defense Council v. Winter,* 555 U.S. 7 (2008) ...................................... 7

*Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d 846 (9th Cir. 2005) ............ 23

*ONRC Action v. Bureau of Land Management*, 150 F.3d 1132 (9th Cir. 1998) .................. 8

*San Francisco Baykeeper v. Browner,* 147 F. Supp 2d 991 (N.D. Cal. 2001) ................... 3

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) .................................................. 9

**Statutes**                                                                                                        **Page(s)**

5 U.S.C. § 704 ................................................................................................................. 3

5 U.S.C. § 706(1) ................................................................................................... 3, 12, 18

5 U.S.C. § 706(2) ..................................................................................................... 10, 18

5 U.S.C. § 706(2)(A) ................................................................................................ 3, 19

5 U.S.C. §§ 701–706 ........................................................................................................ 3

16 U.S.C. § 1600(3) ...................................................................................................... 24

16 U.S.C. § 1604(i) ....................................................................................................... 24

42 U.S.C. § 4321 ............................................................................................................. 8

42 U.S.C. § 4332 .............................................................................................. 8, 9, 12, 18

42 U.S.C. § 4332(2)(C) .................................................................................................. 11

42 U.S.C. §§ 4321–4370h ..................................................................................... 8

**Regulations**                                                                    **Page(s)**

36 C.F.R. § 219.15(b) .......................................................................................... 25

36 C.F.R. § 220.1(b) ........................................................................................... 12

36 C.F.R. § 220.4 ................................................................................................ 18

36 C.F.R. § 220.4(b) ........................................................................... 1, 2, 5, 6, 12, 13

36 C.F.R. § 220.4(b)(2) ....................................................... 1, 2, 6, 13, 17, 22, 23

36 C.F.R. § 220.4(b)(3) ................................................................................... 2, 22

36 C.F.R. § 220.5 ............................................................................................... 5, 9

36 C.F.R. § 220.6 ............................................................................................... 5, 9

36 C.F.R. § 220.6(a)(1)–(2) ............................................................................. 9, 10

36 C.F.R. § 220.6(b)(1) ............................................................................ 20, 21, 22

36 C.F.R. §§ 220.6(b)(1)(i) ....................................................................... 20, 21, 22

36 C.F.R. §§ 220.6(b)(1)(vi) .................................................................................. 20

36 C.F.R. §§ 220.6(b)(1)(vii) ................................................................................. 20

36 C.F.R. § 220.6(d) ............................................................................................ 10

36 C.F.R. § 220.6(e) .......................................................................................... 9, 18

36 C.F.R. § 220.6(f)(2) ........................................................................................ 10

40 C.F.R. § 1500.1(a) ........................................................................................ 8, 13

40 C.F.R. § 1500.1(b) ............................................................................................ 8

40 C.F.R. § 1500.3(a) ............................................................................................ 8

40 C.F.R. § 1500.6 ................................................................................................ 18

40 C.F.R. § 1501 ................................................................................................... 9

40 C.F.R. § 1501.2(a) ............................................................................................ 19

iv MEMO IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

40 C.F.R. §§ 1501.3(a)(1)–(3) ............................................................................ 9

40 C.F.R. § 1501.3(b) ...................................................................................... 23

40 C.F.R. § 1501.4(a) ........................................................................................ 9

40 C.F.R. § 1501.4(b) ................................................................................. 19, 20

40 C.F.R. § 1501.4(b)(1) ................................................................................... 9

40 C.F.R. § 1506.11 ................................................................................. 5, 7, 11

40 C.F.R. § 1506.12 ......................................................................... 5, 11, 12, 13

40 C.F.R. § 1507.1 ............................................................................................ 8

40 C.F.R. § 1507.2 ............................................................................................ 8

40 C.F.R. § 1507.3 ............................................................................................ 8

40 C.F.R. § 1507.3(e)(2)(ii) ......................................................................... 9, 20

40 C.F.R. pts. 1500–1508 ................................................................................. 8

**Other**                                                                                  **Page(s)**

73 Fed. Reg. 43084 (July 24, 2008) .......................................................... 2, 6, 7

85 Fed. Reg. 43304 (July 16, 2020) .............................................................. 11

86 Fed. Reg. 57773 (Oct. 19, 2021) .............................................................. 21

87 Fed. Reg. 66987 (Nov. 7, 2022) ............................................................... 21

89 Fed. Reg. 35442 (May 1, 2024) .................................................................. 8

85 Fed. Reg. 29532 (June 15, 2020) .............................................................. 21

# TABLE OF ACRONYMS

APA ................................................................................................. Administrative Procedure Act

CE .......................................................................................................... Categorical Exclusion

CEQ ........................................................................................... Council on Environmental Quality

DBH ............................................................................................................ Diameter Breast Height

EIS .............................................................................................. Environmental Impact Statement

NEPA ........................................................................................ National Environmental Policy Act

NFMA ........................................................................................ National Forest Management Act

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

INTRODUCTION

Plaintiffs Earth Island Institute, Sequoia ForestKeeper and the Sierra Club (collectively "Plaintiffs" or "Earth Island") challenge the decision by Defendants (collectively "the Service") to include the Nelder Grove Historical Area, ("Nelder Grove") located in the Sierra National Forest, in their July 22, 2022 Decision Memorandum authorizing, pursuant to 36 C.F.R. § 220.4(b)(2), an "emergency response" for "fuels treatments" and "alternative arrangements" for compliance with the National Environmental Policy Act ("NEPA"), in twelve Giant Sequoia groves. AR 00001-37 ("2022 Memorandum").[1] The stated "objective for emergency response is to provide for long-term survival of Giant Sequoias by reducing the likelihood and effects of high severity wildfire before it occurs in previously unburned or moderately burned Giant Sequoia Groves." AR 00006.

In 2017 the Railroad Fire burned portions of Nelder Grove. Some areas of the grove were severely burned and a number of mature Giant Sequoias were killed. There are currently no living mature Giant Sequoias in the severely burned areas of Nelder Grove. However, after that fire, and especially in the severely burned areas, there has been substantial Giant Sequoia regeneration and there are numerous young Giant Sequoias growing in the severely burned areas. In 2018 the Service began NEPA scoping for the Railroad Restoration Project, which purportedly would have reduced fuel loading near Nelder Grove, but it never proceeded with that project. *See* ECF 44 and 45, ¶ 88. Any alleged urgent need to act regarding the current conditions in Nelder Grove was caused entirely by the Service's failure to act since 2017 and is not therefore an actual "emergency." Moreover, although fuels treatments within the severely burned areas of Nelder Grove are outside the expressly stated objective of the authorized emergency response, the Service nevertheless illegally has included such treatments for the severely burned areas, and as it has begun to implement those treatments it admits that it is killing some of the regenerating young Giant Sequoias. *Id.* ¶ 64.

The Service's NEPA regulations do authorize "necessary" and "urgently needed" action when an "emergency exists," 36 C.F.R. § 220.4(b), and also allow for "emergency alternative arrangements" under NEPA when "the nature and scope of the proposed emergency actions are

---

[1] Plaintiffs cite to the Service's December 2023 Administrative Record, ECF 25 and April 2024 Supplement, ECF 43-3, as "AR_____," referencing the page numbering at the bottom, right-hand corner of each record page.

such that they must be undertaken prior to preparing any NEPA analysis and documentation associated with a [categorical exclusion] or an [Environmental Assessment and Finding of No Significant Impact]". *Id.* § 220.4(b)(2). Importantly, the Service can only authorize such emergency actions and alternative arrangements by itself, and avoid consulting with the Council on Environmental Quality ("CEQ"), if it also determines that its emergency actions are not likely to have significant environmental impacts. *Id.* §§ 220.4(b)(2) and (3).

The term "emergency" in Section 220.4(b) is meant to be applied using its "common usage." 73 Fed. Reg. 43084, 43087-88 (July 24, 2008). No such emergency exists in Nelder Grove. The Service has believed since at least 2017 after the Railroad Fire, (and in fact for many years before that) that it needed to take action in Nelder Grove to protect the remaining mature Giant Sequoias. The Service's own inaction cannot create the supposed "emergency" that allows it to avoid otherwise applicable legal requirements. Moreover, even if there were an emergency regarding the remaining living Giant Sequoias in Nelder Grove, there is no such emergency regarding the severely burned areas where there are no living mature Giant Sequoias in need of immediate protection. Such actions in already severely burned areas that include the killing of young regenerating Giant Sequoias are beyond the scope of the 2022 Memorandum and require full, pre-decisional compliance with NEPA, which has not occurred. The "alternative arrangements" allowed by this regulation also cannot allow the Service to evade determining and identifying which categorical exclusion ("CE") supposedly applies to the actions in Nelder Grove and to not consider, before implementing the emergency actions, whether there are extraordinary circumstances in Nelder Grove that prevent reliance on any CE. The Service admits that as of April of 2024, it still has not identified which CE supposedly applies to the actions it is undertaking in Nelder Grove (hereinafter "the Project"). And there is no record evidence that the Service has considered or evaluated, before claiming a CE applied, or at any time thereafter, whether the Project could significantly impact extraordinary circumstances, such as the complex historic and archaeologic sites in the Nelder Grove Historic Area. The 2022 Memorandum's assertions that the emergency actions "are not likely to have significant adverse environmental impacts," are completely conclusory, AR 00002, 00005, and there is no evidence in the record to support them. Moreover,

1  such a finding would have had to consider the significant scientific controversy and uncertainty

2  regarding the fuel reduction techniques the Service has authorized and there is no record evidence

3  that occurred. Finally, the 2022 Memorandum did not and could not excuse the Service from

4  complying with its own Forest Plan. Here the 1991 Sierra National Forest Plan controlled in July

5  of 2022, and that Plan prohibited any tree removal, other than hazard trees, in the Sierra National

6  Forest's Giant Sequoia groves, until after the Service prepared a "long-term implementable

7  strategy" for those groves. AR 00465 The Service has no such plan for Nelder Grove and its

8  emergency response in that Grove, which includes removing trees including young Giant Sequoias,

9  therefore violates the controlling forest plan and the National Forest Management Act ("NFMA").

10  **Standard of Review**

11  Judicial review of agency actions under NEPA is governed by the Administrative Procedure

12  Act ("APA"). 5 U.S.C. §§ 701–706; *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 964 (9th

13  Cir. 2002). Under the APA, courts may review "final agency action for which there is no other

14  adequate remedy in a court[.]" 5 U.S.C. § 704. A final agency action is one that marks the

15  consummation of the agency's decision-making process and one by which rights or obligations

16  have been determined or from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154,

17  177–78 (1997). Under the APA, a court shall "hold unlawful and set aside agency action, findings,

18  and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

19  accordance with law." 5 U.S.C. § 706(2)(A). Under this standard an "agency must examine the

20  relevant data and articulate a satisfactory explanation for its action[.]" *Motor Vehicle Mfrs. Ass'n*

21  *of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

22  Section 706(1) of the APA allows a reviewing court to "compel agency action unlawfully

23  withheld or unreasonably delayed." Agency action is "unlawfully withheld" if an agency fails to

24  act in violation of a clear requirement prescribed by Congress. *See S. F. Baykeeper v. Browner,* 147

25  F. Supp 2d 991, 1005 (N.D.Cal. 2001).

26  **Significance of Nelder Grove**

27  The Nelder Grove Historical Area is located in the Sierra National Forest, Bass Lake Ranger

28  District, on the western slopes of the Sierra Nevada Mountains. Buchele Decl. Ex. 1 at 1–2. Nelder

Grove spans 1,434 acres and contained over 100 mature Giant Sequoias before the 2017 Railroad Fire killed about three dozen of them. Buchele Decl. Ex. 1 at 1; Buchele Decl. Ex. 2 at 1–2. Giant Sequoia trees depend on fires to maintain their presence in the forest and have been successfully regenerating in Nelder Grove. Buchele Decl. Ex. 1 at 12–13; ECF 44 and 45 at ¶ 14. Not only is Nelder Grove one of the few places in the Sierra National Forest to view "one of nature's natural phenomena" of "irreplaceable value," it is also historically significant as a logging camp and even has connections to John Muir. Buchele Decl. Ex. 1 at 9, 15.

**Plaintiffs Have Article III Standing**

Plaintiffs' declarations from Chad Hanson, Maya Khosla and Jeremy Clar establish Plaintiffs have Article III standing to bring this action because their members have standing to sue in their own right. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000). Further, the interests Plaintiffs seek to protect are germane to their purposes, and individual members' participation is not necessary for the Court to provide relief. *Id.*; *See* Clar Decl. at ¶¶ 4, 5; Hanson Decl. at ¶ 4; Khosla Decl. at ¶7. Plaintiffs' members have standing because they have suffered an injury in fact caused by the challenged action, and those injuries are likely to be redressed by the requested relief. *See Citizens for Better Forestry v. U.S. Dep't of Agric.,* 341 F.3d 961, 975–76 (9th Cir. 2003*)*. Plaintiffs' members propose to their partners, hike, picnic, conduct scientific research, film, photograph and view scenery and wildlife, and engage in other aesthetic, educational, observational, spiritual, and recreational activities within Nelder Grove and the Sierra National Forest, including the Project area and adjacent lands. *See* Clar Decl. at ¶¶ 6– 8; Hanson Decl. at ¶¶ 10–12, 20–26; Khosla Decl. at ¶¶ 10–15. *See generally Laidlaw*, 528 U.S. at 180–81.

**Argument**

**I.     There is no "Emergency" that Requires Deviating From NEPA's Otherwise Mandatory Requirements (Claim 2, Count 1).**

NEPA's regulations recognize that "emergency circumstances" can arise that justify deviating from its other mandatory requirements for conducting public environmental analysis of the impacts of proposed actions before those actions are approved and implemented:

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of the regulations in this subchapter, the Federal agency taking the action should consult with the Council about alternative arrangements for compliance with section 102(2)(C) of NEPA. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

40 C.F.R. § 1506.12. The Service has supplemented this CEQ regulation with its own NEPA regulation regarding "emergency responses":

(b) Emergency responses. When the responsible official determines that an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis and any required documentation in accordance with the provisions in §§ 220.5, 220.6, and 220.7 of this part, then the following provisions apply.

(1) The responsible official may take actions necessary to control the immediate impacts of the emergency and are urgently needed to mitigate harm to life, property, or important natural or cultural resources. When taking such actions, the responsible official shall take into account the probable environmental consequences of the emergency action and mitigate foreseeable adverse environmental effects to the extent practical.

(2) If the responsible official proposes emergency actions other than those actions described in paragraph (b)(1) of this section, and such actions are not likely to have significant environmental impacts, the responsible official shall document that determination in an EA and FONSI prepared in accord with these regulations. If the responsible official finds that the nature and scope of proposed emergency actions are such that they must be undertaken prior to preparing any NEPA analysis and documentation associated with a CE or an EA and FONSI, the responsible official shall consult with the Washington Office about alternative arrangements for NEPA compliance. The Chief or Associate Chief of the Forest Service may grant emergency alternative arrangements under NEPA for environmental assessments, findings of no significant impact and categorical exclusions (FSM 1950.41a). Consultation with the Washington Office shall be coordinated through the appropriate regional office.

(3) If the responsible official proposes emergency actions other than those actions described in paragraph (b)(1) of this section and such actions are likely to have significant environmental impacts, then the responsible official shall consult with CEQ, through the appropriate regional office and the Washington Office, about alternative arrangements in accordance with CEQ regulations at 40 CFR 1506.11 as soon as possible.

36 C.F.R. § 220.4(b). When promulgating this regulation the Service explained that:

There is no special meaning intended for the term "emergency" beyond its common usage as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" (Webster's Third New International Dictionary Of The English Language 1961 and Merriam-Webster's Collegiate Dictionary (11th ed. 2004)); "a sudden, urgent, usually unexpected occurrence or occasion requiring immediate action" (Random House Dictionary of the English Language (2ed. 1987)); "a state of things unexpectedly arising, and urgently demanding immediate action" (The Oxford English Dictionary 2ed. 1991) and "[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures * * *" (Black's Law Dictionary 260, 562 (8th ed.

2004)).

73 Fed. Reg. 43084, 43087-88.

The 2022 Memorandum cites to 36 C.F.R. § 220.4(b)(2) as the source for its "emergency authority." AR 00001. After describing a series of wildfires that killed mature Giant Sequoias in 2015, 2017, 2020 and 2021, it describes the underlying "emergency" as "[t]he remaining unburned groves and unburned portions of burned groves are under severe threat to wildfire due to fuel and drought conditions. Lightning strikes threaten the groves daily and immediate action is needed to remove fuels around these trees to limit further mortality." AR 00005. But these facts, based on conditions that have developed over decades and fires taking place over a period of seven years before the "emergency" was declared, are not an "emergency" as that term is commonly used. They are not "sudden" or "unforeseen," or "unexpected." Indeed the Service admits in its Answer that none of the underlying conditions it cites "suddenly arose in 2022." ECF 44 and 45, ¶ 90.[2]

In *FSEEE v. U.S. Forest Service,* 2017 WL 2962771, at *5 (E.D. Wash. July 11, 2017), the district court addressed a challenge to a Service emergency declaration under 36 C.F.R § 220.4(b) to address a wildfire that was at that moment burning toward a town. The court upheld the emergency declaration, distinguishing between a specific wildfire, which is usually not foreseeable and can create an emergency, and wildfires generally, which are "common and their general existence is foreseeable." *Id.* at *6. The Ninth Circuit affirmed noting that individual fires and their course, intensity and duration are unforeseeable and present emergency situations "when viewed at the time the fire is raging." *FSEEE v. U.S. Forest Service,* 726 Fed. Appx. 605, 606 (9th Cir. 2018). Similarly, while a specific wildfire threatening a Giant Sequoia grove might present an "emergency" that allowed the Service to invoke its authority under 36 C.F.R. § 220.4(b), the threats to Giant Sequoia groves presented by wildfires generally are foreseeable and, while those threats

---

[2] Defendants' Answer to Plaintiffs' Second Amended Complaint asserts three conclusory "defenses," ECF 45 at 23. The Parties' conferred about identical conclusory defenses, Buchele Decl. ¶ 21, in Defendants' prior answer, ECF 24 at 21, which are insufficient as a matter of law. See, e.g., *Jones v. City of Portland,* 2018 WL 7078670, *3 (D. Or. Dec. 21, 2018). Plaintiffs have no basis for responding to such conclusory assertions, and Defendants have waived the right to pursue any of these insufficiently pled defenses.

may have increased in recent years, the danger has not arisen suddenly and the Service could have acted, and in fact, with regard to some threatened groves has acted, by following NEPA's usual, mandatory procedures. *See* Buchele Decl. Ex. 3 at 1 (discussing why Mckinley Grove not covered by 2022 Memorandum).

The *FSEEE* district court, also distinguished the emergency situation created by a still-burning wildfire from the situation at issue in *Nat. Res. Defense Council v. Winter,* 527 F. Supp. 2d 1216, 1228 (C.D. Cal. 2008), *aff'd,* 518 F.3d 658, 680-682 ( 9th Cir. 2008), *rev'd on other grounds,* 555 U.S. 7, 31 (2008) (not reviewing merits), which it described as "a routine military training exercise planned in advance." 2017 WL 2962771, * 5. The NEPA regulation at issue in *Winter* was the CEQ's "emergency circumstances" regulation, then codified at 40 C.F.R. § 1506.11. On appeal the Ninth Circuit affirmed the district court's determination that the terms "emergency" and "emergency circumstances" were not ambiguous and should be read consistent with standard dictionary definitions quite similar to those cited by the Service regarding its use of the term "emergency." *Compare Winter,* 518 F.3d 658, 680-81 *with* 73 Fed Reg. 43084, 43087-88. The Ninth Circuit specifically upheld the district court's finding that the Navy's "emergency" was "a creature of its own making, *i.e.* its failure to prepare adequate environmental documentation in a timely fashion….it was not a sudden unanticipated event." 518 F.3d at 680 (quoting district court's order at 1228). Similarly, the Service's 2022 Memorandum is basing the "emergency" on the fact that the Service itself delayed starting the required NEPA process for the groves covered by the decision. *See* Buchele Decl. Ex. 3 at 1; AR 00004. The Service admits that the recent fires that killed mature Giant Sequoias began in 2015, with the most severe occurring in 2020, two years before the 2022 emergency declaration. It offers no explanation for why the NEPA process for fuels reduction actions in all the threatened groves was not begun much earlier. The absence of a true emergency is especially apparent for Nelder Grove where the Railroad Fire killed dozens of mature Giant Sequoias in 2017 and the Service admits it started NEPA scoping, but inexplicably did not pursue the NEPA process any further in 2018. See ECF 44 and 45, ¶ 14, 62, 63, 88, 94. Indeed long before the Railroad Fire in 2017, the Service's 1979 Plan for Nelder Grove acknowledged a "serious

fire hazard to the Sequoias…." Buchele Decl. Ex. 4 at 7.

The Sierra National Forest has two Sequoia groves. The second grove, McKinley, was not included in the 2022 Memorandum because the Service had already begun a NEPA process to address conditions there. Buchele Decl. Ex. 3 at 1. The existence of an "emergency" cannot be based primarily on the Service's failure to start a similar process for Nelder Grove before July of 2022, and the 2022 Memorandum is arbitrary in violation of the APA to the extent it includes Nelder Grove.

## II.     The Forest Service's 2022 Memorandum violates NEPA in Multiple Respects (Claim 1, Claim 2, Count 2, Claim 3).

### A. Legal Background

Congress enacted NEPA in 1969 to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The primary purposes of NEPA, 42 U.S.C. §§ 4321–4370h, are to ensure fully informed decision-making and to provide for public participation in environmental analysis and decision-making. 40 C.F.R. §§ 1500.1(a), (b). NEPA's public disclosure goals are twofold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to ensure that the public has had sufficient information to review, comment on, and challenge (if necessary) the agency's action. *See* 42 U.S.C. §§ 4321, 4332.

The CEQ promulgates regulations implementing NEPA. CEQ's regulations are binding on all federal agencies, 40 C.F.R. § 1500.3(a), and can be found at 40 C.F.R. pts. 1500–1508.[3] *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132 (9th Cir. 1998). Individual agencies promulgate their own regulations, 40 C.F.R. § 1507.3, but the CEQ's regulations state that federal agencies "shall comply with" the CEQ's NEPA regulations. 40 C.F.R. § 1507.1, *see also* 40 C.F.R. § 1507.2 ("Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations of [the CEQ regulations]").

The regulations governing NEPA list three potential avenues for federal agencies to comply

---

[3] Plaintiffs cite to the current CEQ regulations which were in force when Defendants issued the 2022 Memorandum. The CEQ recently announced revisions to its regulations, but they do not take effect until later this year. *See* 89 Fed. Reg. 35442 (May 1, 2024).

with the statute, each reflecting a different level of analysis to meet statutory and regulatory requirements. 40 C.F.R. § 1501.3(a)(1)–(3); *see also Mt. Cmtys. for Fire Safety v. Elliot*, 25 F.4th 667, 674-75 (9th Cir. 2022) (outlining levels of NEPA analysis). An agency must prepare an EIS for all actions significantly affecting the human environment. 36 C.F.R. § 220.5; 42 U.S.C. § 4332. Alternatively, an agency may prepare an EA to determine whether an action will significantly affect the human environment. 40 C.F.R. § 1501. Finally, if an agency "determines that a categorical exclusion *identified in its agency NEPA procedures* covers a proposed action," the agency may invoke that "identified" CE to comply with NEPA.[4] 40 C.F.R. § 1501.4(b)(1) (emphasis added); *see also Mt. Cmtys. for Fire Safety*, 25 F.4th at 691.

Categorical exclusions are specific "categories of actions" "that normally do not . . . have a significant effect on the human environment." 40 C.F.R. § 1501.4(a). CEQ directs agencies to identify "*specific* criteria for and identification of" such classes of actions which normally may be covered by a CE. 40 C.F.R. § 1507.3(e)(2)(ii) (emphasis added); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1032-33 (9th Cir. 2007) (evaluating whether a promulgated CE included requisite "specificity"). To establish a CE, an agency must make a "reasoned decision" showing evidence supporting its "determination that the identified category of actions in the [established] CE do not individually or cumulatively have a significant impact on the environment." *Bosworth*, 510 F.3d at 1026. An agency may therefore rely on a CE as a "form of NEPA compliance" because the agency can point to its "determination that the *identified* category of actions" do not typically have a significant impact on the environment." *See id.* at 1032-33. An agency, therefore, only complies with NEPA, if it identifies an existing CE and that specific CE applies to a project.

Pursuant to the CEQ's directive, 40 C.F.R. § 1501.4(a), the Forest Service promulgated rules identifying its own, specific CEs. 36 C.F.R. § 220.6. The Forest Service provides that actions may be categorically excluded if "[t]he proposed action is within" specific categories listed by rule. *Id.* § 220.6(a)(1)-(2). The Forest Service identifies two types of categorical exclusions: those where a "project or case file and decision memo are required," *id.* § 220.6(e), and those for which a such

---

[4] As discussed below, at 20, NEPA also requires the agency to evaluate "extraordinary circumstances" for any action an agency seeks to invoke a CE for to exclude from the requirement to prepare and EIS. 40 C.F.R. § 1501.4(b).

decision memo and files are optional, *id.* § 220.6(d). The Forest Service's rules list information that "decision memos *must* include," including "the category of the proposed action" and the "rationale for using the category." *Id.* § 220.6(f)(2)(i)-(ii) (emphasis added). The agency's rules permit the agency to proceed with an action under a single categorical exclusion if "one" or "a category" applies. *See id.* § 220.6(a)(1)-(2). Section 220.6 does not allow the Service to combine two CEs to categorically exclude an action when one would not cover that action. *Friends of the Inyo v. U.S. Forest Service*, 2024 WL 2281568, at *6-7 (9th Cir. May 21, 2024).

Courts review an agency's determination "that a particular action falls within one of its categorical exclusions" under the arbitrary and capricious standard. *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir. 1996); 5 U.S.C. § 706(2). An agency's decision that an action falls within one of its CEs is proper if the agency's "application of the exclusions to the facts of the particular action is not arbitrary and capricious." 82 F.3d at 1456 n.5; *see also California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002).

An agency frustrates this review "where there is no contemporaneous documentation to show that the agency . . . decided to apply a categorical exclusion to the facts of a particular decision." *Norton*, 311 F.3d at 1176, *aff'ing California v. Norton*, 150 F. Supp. 2d 1046, 1057 (N.D. Cal. 2001) (finding that the agency "should have provided some explanation for its reliance on the categorical exclusion"). In *Norton*, a federal agency approved suspension of offshore oil leases off the California. 311 F.3d at 1164-65. When the agency's decision suspending the leases was challenged, the agency asserted the lease suspensions were categorically excluded. *Id*. However, the record was devoid of any documentation surrounding that CE. *Id*. at 1175. In effect, the court in *Norton* found that juridical review is frustrated—if not impossible—if an agency fails to identify a CE and explain how a project fits into that CE. *Id*. at 1176. The court found a "[p]ost hoc invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made." *Id*. at 1176. This requirement to identify a CE evidenced in the record is "heightened" when "there is substantial evidence in the record" that extraordinary circumstances exist that could preclude use of a CE. *Id*.

Courts have properly found that *Norton* prevents an agency from invoking a CE even when

there is some documentation in the record that a CE *may* apply if the record fails to show the agency evaluated how the agency's actions fit into that CE. *See Ctr. for Food Safety v. Johanns*, 451 F. Supp. 2d 1165, 1182-84 (D. Haw. 2006). In *Johanns*, the agency approved permits for field tests. *Id.* at 1182. The record showed that the agency believed a categorical exclusion may apply. *Id.* at 1183. The record, however, included no "reasoned explanation for [the agency's] apparent determinations that a categorical exclusion applied and that the exceptions did not apply[,]" because nothing "contemporaneous" with the agency's decision showed that the agency considered the applicably of one of the agency's CEs or its exceptions. *Id.* (citing *Norton*, 311 F.3d at 1176). The agency's decision to rely on a CE was therefore an arbitrary "post-hoc rationalization" because the agency "failed to provide a reasoned explanation for its apparent determinations that a categorical exclusion applied and that the exceptions to the exclusion did not apply." 451 F.Supp. 2d at 1183.

Even valid emergencies do not exempt agencies from NEPA—including when an agency invokes a categorical exclusion. *See* 40 C.F.R. § 1506.12; *see also* 85 Fed. Reg. 43304, 43339 (July 16, 2020) ("This Amendment [clarifying that alternative arrangements must comply with NEPA Section 102(2)(C)] is consistent with CEQ's longstanding policy that it has no authority to exempt Federal agencies from compliance with NEPA."). The CEQ's emergency regulations allow for an agency to consult with the CEQ about "alternative arrangements" to NEPA compliance for actions "with significant environmental impact[s]," if the "emergency circumstances make it necessary to take [that action]" before complying with NEPA. 40 C.F.R. § 1506.12.[5] Such arrangements are "limit[ed]" to "actions necessary to control the immediate impacts of the emergency." *Id.* All "[o]ther actions remain subject to NEPA review." *Id.*

---

[5] The CEQ's emergency regulation was recodified and slightly modified on September 14, 2020, from its former section, 40 C.F.R. § 1506.11, to its current section, *id.* § 1506.12, but the language is similar: the CEQ did add that the alternative arrangements should be "for compliance with section 102(2)(C) of NEPA, clarifying that "alternative arrangements are still meant to comply with [NEPA] section 102(2)(C)." *See* 85 Fed. Reg. 43304, 43339 ("This amendment is consistent with CEQ's longstanding position that it has no authority to exempt Federal agencies from compliance with NEPA . . ."); 42 U.S.C. § 4332(2)(C) (requiring an EIS for agency actions having a significant effect on the human environment). In other words, the CEQ's emergency regulations changed to more explicitly require compliance with NEPA, even under emergency circumstances. *See* 40 C.F.R. § 1506.12.

**B. The Forest Service's application of its emergency regulation violates NEPA and CEQ regulations.**

As discussed above, at 5, the Service has promulgated its own emergency regulations to "supplement" and be "used in conjunction" with these CEQ regulations when "an emergency exists that makes it necessary to take urgently needed actions." 36 C.F.R. §§ 220.1(b), 220.4(b). Plaintiffs established above that there is no emergency regarding Nelder Grove within the meaning of this regulation. But even if there were an emergency, nothing in the Forest Service's regulations exempt an agency's action from complying with NEPA in emergency circumstances, nor can they. *See* 40 C.F.R. § 1506.12 (allowing "alternative arrangements" not exemptions); 42 U.S.C. § 4332 (directing agencies to comply with NEPA "to the fullest extent possible"). Nevertheless, the Service is applying and interpreting the 2022 Memorandum to allow it to illegally and completely evade NEPA's requirements in multiple respects. First, despite the limited purpose of the 2020 Memorandum to protect living, mature Giant Sequoias, the Service is arbitrarily relying on it to conduct additional actions, such as logging in severely burned areas where there are no living mature Giant Sequoias to protect. These additional actions require their own separate NEPA compliance, which has never occurred, and the Service's continuing actions without NEPA compliance are a failure to act in violation of Section 706(1) of the APA. (Claim 1). Second, the 2022 Memorandum illegally allows the Service to completely evade its obligation to prepare a Decision Memo regarding the CE it purportedly is relying on for the Project. (Claim 2, Count 1 and Claim 3). Third, the 2022 Memo illegally failed to identify the CE it is relying upon for the Nelder Grove actions and failed to even mention potential impacts to extraordinary circumstances, much less consider whether impacts to those circumstances preclude the use of a CE. *Id.* Further, the Service appears to illegally interpret the 2022 Memo to completely absolve it from ever identifying an applicable CE or considering impacts to the extraordinary circumstances that exist in Nelder Grove. Finally the Service's foundational determination that the authorized actions in Nelder Grove will likely not have significant environmental impacts (thereby allowing the Service to avoid consulting with the CEQ) is wholly conclusory and unsupported by the record. (Claim 2, Count 2).

**1. Defendants' fuels reduction in Nelder Grove exceeds the limited scope of authorization provided by the Chief's Memorandum (Claim 1).**

Even if the Court finds an "emergency" under 36 C.F.R. § 220.4(b)(2), Defendants unlawfully exceeded the scope –and continue to exceed the scope - of the alternative arrangements authorized in the Chief's Memorandum. These actions exceeding the scope violate NEPA because the Service failed to comply with NEPA before approving and undertaking those additional, non-emergency actions. See 40 C.F.R. § 1506.12 ("Other [non-emergency] actions remain subject to ENPA review"). The Chief's Memorandum only authorized limited and immediate fuels reduction around the remaining Giant Sequoia trees to reduce their mortality in the event of another severe wildfire. *See* AR 00001–2. Instead of following that direction, Defendants significantly exceeded the actions authorized in the Chief's Memorandum to include any actions they wanted to undertake in the Grove. These additional unauthorized actions included logging in severely burned areas of Nelder Grove, fuels treatment beyond the Grove's boundary, and killing of young Giant Sequoias.

To effectuate the purposes of NEPA, this Court should read the 2022 Memorandum's authorization narrowly. *Cf. NRDC v. Winter*, 527 F.Supp. 2d at 1229, 1231 (interpreting CEQ's emergency regulation narrowly). The relevant regulation in this case allows alternative arrangements where "an emergency exists that makes it *necessary* to take urgently needed actions before preparing a NEPA analysis[.]" 36 C.F.R. § 220.4(b) (emphasis added). This arrangement only applies to actions which are predetermined to not have significant impacts. *Id.* However, generally, "[p]ost-hoc examination of data to support a pre-determined conclusion is not permissible because this would frustrate the fundamental purpose of NEPA, which is to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions early enough so that it can serve as an important contribution to the decision making process." *Bosworth*, 510 F.3d at 1026. Given that acting before analyzing contravenes NEPA's "fundamental purpose," agencies should only make such uninformed decisions in the most limited circumstances. *See* 40 C.F.R. § 1500.1(a) ("NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action"). Therefore, the Court should read 36 C.F.R. § 220.4(b) narrowly to meet NEPA's fundamental purpose of ensuring agencies are fully informed

1  of the environmental impacts of their actions before implementation and similarly should read the

2  2022 Memorandum's authorization of alternative arrangements as narrowly as possible so that it

3  only covers the uninformed actions strictly necessary to meet the emergency.

4      **(a) The 2022 Memorandum only authorized limited fuels reduction treatments in the immediate vicinity of Giant Sequoias in moderately burned or unburned areas.**

5

6      The 2022 Memorandum states that fuels build up and drought caused Giant Sequoia loss in

7  past, severe wildfires. AR 00001-2. Therefore, as the 2022 Memorandum explains, "the objective

8  for emergency response is to provide for long term survival of Giant Sequoias by reducing the

9  likelihood and effects of high severity wildfire before it occurs in previously unburned or

10 moderately burned Giant Sequoia groves." AR 00006. Thus, authorized treatments would reduce

11 the likelihood and effects of high severity wildfire in areas that have not yet experienced severe

12 wildfire by reducing the fuel in those areas. As Giant Sequoias experienced 100% mortality in high

13 severity fire areas within Nelder Grove, any fuel load reduction measures bear no relevance to those

14 severely burned areas. AR 00071. This means, at a minimum, that authorized fuel treatments did

15 not extend to parts of the forest that already experienced severe wildfire. Any action in those areas

16 would not fall within the scope of this limited emergency authorization and would likely have

17 different impacts from fuel reduction in the "unburned or moderately burned" areas considered

18 when granting the alternative arrangements. *See* AR 04725-29; AR 00878-79 (showing significant

19 loss of regenerating sequoia in severely burned area caused by this logging project).

20     In pursuit of the stated objective, the 2022 Memorandum describes specific fuels reduction

21 treatments limited to the immediate vicinity of the remaining live Giant Sequoia trees. Per the 2022

22 Memorandum, "immediate action is needed to remove fuels from around these trees to limit further

23 mortality." AR 00002. As such, the 2022 Memorandum authorized "fuels reduction treatments on

24 approximately 13,377 acres (displayed in attached maps) prior to completion of the Categorical

25 Exclusions…" AR 00002. The Background and Rationale document from the Regional Office

26 explains that of the 13,337 total acres authorized for emergency work, the decision allowed fuels

27 reduction on "up to 1,432 acres in [Nelder Grove]." AR 00006–7. This authorized "specific fuels

28

treatments," i.e. the fuel reduction methods outlined on the memo's first page. AR 00001.[6] Further, under the heading "Proposed Emergency Actions," the 2022 Memorandum explained that "proposed urgent treatments include removal of green and dead surface and ladder fuels from immediately around large Giant Sequoias to prevent trees from torching." AR 00006. It then listed the exact same fuels treatments in the memo. AR 00001, 00006. The 2022 Memorandum describes no additional treatments under this "Proposed Emergency Action." AR 00006. The 2022 Memorandum only contemplates the "specific" described treatments in areas immediately around living, mature Giant Sequoias to prevent them from burning.

Early correspondence among Service employees confirms their understanding of the limited nature of the Chief's Memorandum. For example, meeting notes from July 27, 2022, explain that "EA's will allow future work around the groves, long term work – this is just emergency actions to save monarchs from next fire." Buchele Decl. Ex. 5 at 1. In addition, a July 25 email from Ecosystem Staff Officer Gretchen Fitzgerald wrote that "[f]or our emergency action all we are planning on doing is going in and removing ladder fuels and down fuels from around 25' of every monarch and or large old growth that we want to make sure survives the next fire… And maybe removing dead fuel in between…" Buchele Decl. Ex. 3 at 3). It was not until later in the project implementation that the Forest Service began considering work beyond a Giant Sequoia Buffer zone. This is because they understood the alternative arrangements authorized by the Chief's Memorandum as they are written — covering limited and specific fuels reduction to prevent Giant Sequoia mortality in the event of another severe wildfire.[7]

**(b) Defendants' actions in Phase I and II of the Project clearly exceed the limited authorizations in the 2022 Memorandum.**

Despite Forest Service documents showing that they initially and correctly interpreted the

---

[6] These treatments specifically described by the 2022 Memorandum were: hand cutting of small trees with piling or lop-and-scatter of debris; mechanical removal of trees ≤20" DBH; application of borate on green stumps; pulling duff away from the base of large Giant Sequoias; and prescribed burning. AR 00001.

[7] This understanding of the limited authorization in the Chief's Memorandum likely came from the fact that there is no evidence in the record that the local district Service employees were consulted before the 2022 Memorandum was signed. Thus, these employees were simply reading the authorization as written.

narrow authorization in the Chief's Memorandum, planned actions expanded beyond the scope of that authorization. Decision makers chose to significantly increase fuels reduction efforts beyond the specific treatments immediately adjacent to living Giant Sequoias and even split the Project into multiple "phases." AR 02037–40. Phase I implemented a buffer-zone reducing fuel loads within 100 feet of Giant Sequoia trees. AR 02108. However, even Phase I exceeded the authorized arrangement when the treatment within the buffer-zone allowed for logging "very poor vigor small giant sequoia (less that 12 inches dbh)…" AR 02112; Buchele Decl. Ex. 6 at 2–3, 6. This does not come within the scope of the emergency authorization. Ironically, an email from one Forest Service employee explains that little NEPA work had taken place in part because "any time we even look at the grove, we get hit by groups and blasted for 'logging sequoias' even though we have not cut a sequoia within it." Buchele Decl. Ex. 3 at 4–5. Cutting down Giant Sequoias does not fit within the alternative arrangements because it went beyond the work necessary to address the emergency —mortality to mature Giant Sequoias. Rather, these actions harm the very species the Chief's Memorandum authorized emergency actions to protect. Further, the strong public interest in felling Giant Sequoias means that this Project is the exact kind of action the government should seek information on before implementation. *See Bosworth*, 510 F.3d at 1026.

Even if Phase I actions fell within the ambit of the alternative arrangement, the Forest Service exceeded the scope of its authorization with the Phase II treatments it is currently implementing. According to the February 2023 Phase II Biological Assessment (BA), "emergency" fuels reduction work in Nelder Grove would include up to 3,127 acres of forest. AR 02040; *See also* Buchele Decl. Ex. 7. This is more than double the 1,432 acres authorized by the emergency decision. AR 00006–00007. Based on the maps included in each BA, it appears this increased acreage comes from additional mechanical, hand, and helicopter yarding treatment, and from the designation of a fuel break encompassing most of the Grove. AR 02040. This additional acreage also comes from work outside the boundary of the Grove, a boundary clearly marked on the map in the Background and Rationale document attached to the Chief's Memorandum. AR 02040, AR 00012. The additional work also includes at least 454.32 acres of high burn severity forest. AR 02066. These new aspects of the fuels reduction work go beyond the limited scope of the alternative

arrangement because they act on thousands of acres of additional forest not contemplated for emergency action in the Chief's Memorandum. Moreover, the Phase II work is not limited to the area immediately surrounding the still standing Giant Sequoias. Instead, it covers the entire Grove and even goes beyond the authorized borders. The Phase II work also includes fuels reduction in severely burned areas which is unrelated to removal of fuels from immediately around living Giant Sequoias to prevent them from torching. AR 00006.[8] These changes all come with additional environmental impacts, but those impacts could not possibly be considered in the Chief's Memorandum because they were not even on the table at the time of authorization. Without considering the impact of these additional actions, it was impossible for the Chief to know at the time of authorization that "such actions are not likely to have significant environmental impacts." 36 C.F.R. § 220.4(b)(2). Therefore, the actions in Phase II do not qualify for the limited emergency exception provided by the regulation.

To make matters worse, the Forest Service has even admitted that the Phase II actions are not part of the emergency authorization. An October 2022 email from the Wildlife and Aquatics Program Manager for the Sierra National Forest said that "under phase one, the emergency fuels reduction treatments have been completed in 25ft and 100 ft thinning and felling prescriptions… after the [limited operating period for the Pacific Fisher] ends, we anticipate actions will essentially transition over from 'emergency' to 'planned' (phase two), at which time a broader set of prescriptions for the whole grove will be implemented…" Buchele Decl. Ex. 9 at 1. Not only does this show that the Forest Service does not consider Phase II part of the "emergency," it demonstrates that the Phase II actions do not fit the "emergency" regulation. *See* 36 C.F.R. § 220.4(b)(2). In addition, as late as April 2023 the Forest Service admitted that these actions do not qualify as part of the emergency, yet they are still taking them before analysis under Chief's Memorandum. *See* Buchele Decl. Ex. 7 (listing NEPA for Phase II as CE or EA to be completed sometime in 2024).

---

[8] The fact that these changes exceed the scope of authorization finds additional support in Defendants' need to amend their implementation timeline to accommodate them. Instead of completing fuels reduction work by 12/31/2024, as authorized in the Chief's Memorandum, Defendants may extend implementation through 2025 due to "concerns over whether the work can be accomplished in the original timeline." Buchele Decl. Ex. 8 at 1–2. If Defendants had kept to the scale of work in Phase I, then they would have easily met the timeline in the 2022 Memorandum.

Therefore, Defendants' actions under Phase I and Phase II of the Project exceeded the scope of authorization in the Chief's Memorandum. These actions exceeding the scope require their own separate NEPA compliance, which illegally has not occurred, and is also a continuing violation of NEPA and the APA, § 706(1).

**2. The 2022 Memorandum could not completely exempt the Service from the NEPA requirement to Prepare a Decision Memo Regarding the Applicable CE or the Requirement to Determine which Specific CE Supposedly applies to the Project.**

The 2022 Chief's Memorandum allegedly authorized the Project to proceed without ever complying with the 36 C.F.R. § 220.6(e) NEPA requirement to document a CE decision in a decision memo. AR 00002. This was improper. The Forest Service's own emergency regulations, 36 C.F.R. § 220.4, only allows for the *postponement* of NEPA compliance. Nothing in the agency's emergency regulation allow for the exclusion of a project from ever complying with NEPA. Indeed, to do so would be inconsistent with the very text of NEPA, which requires compliance "to the fullest extent possible." 42 U.S.C. § 4332. The Supreme Court has made clear that the "possible" language is only triggered in cases in which there is an "irreconcilable and fundamental conflict" between NEPA's requirements and another statute's requirements. *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787–88 (1976). In that same vein, CEQ has interpreted this statutory language to mean that "each agency of the Federal Government shall comply with that section unless existing law . . . expressly prohibits or makes compliance impossible." 40 C.F.R. § 1500.6. There is nothing in any other statute which expressly prohibits or makes eventual compliance with 36 C.F.R. § 220.6(e) "impossible." Nor does the 2022 Chief's Memorandum claim that there is an irreconcilable statutory conflict. Therefore, the Forest Service cannot circumvent its own NEPA requirements to publish a Decision Memo. In the almost two years after the 2022 Chief's Memorandum was published, the Service has still not completed any of the documentation required under 36 C.F.R. § 220.6(e) and has not indicated any plan to do so. The original exemption is arbitrary in violation of Section 706(2) of the APA, and the Service's continuing failure to prepare a Decision Memo violates APA Section 706(1).

Defendants must, at a minimum, determine and identify which CE supposedly covers its actions in Nelder Grove. Even if the Service could avoid meeting all the Service's NEPA

requirements for a Decision Memo, the CEQ regulations, 40 C.F.R. § 1501.4(b), still mandate that the Service actually "determine" that a specific CE applies. The Service failed to identify any specific CE for the Nelder Grove actions in the 2022 Memorandum. AR 00001–37. The Forest Service then failed to invoke any listed categorical exclusion in its November 2022 Scoping Notice for the Project. AR 01929-35. The November 2022 Scoping Notice does not even mention that the actions will be covered by a CE. *Id.* As of April 2024, Defendants admit they have still not identified any specific, applicable CE for the Project, ECF 44 and 45, ¶¶ 8, 78**.** There is in fact no record evidence to support the application of any established CE to the Service's actions in Nelder Grove.

The agency has been implementing the project for over a year and yet the record is still devoid of any mention of a specific CE, much less any analysis that such a CE applies, or a determination "that [this] particular action falls within" a particular CE. *Bicycle Trails*, 82 F.3d at 1456. The 2022 Memo indicated the NEPA process would be completed in November 2023. AR 00008. Therefore, any attempt by Defendants to justify the use of a CE now would constitute "post hoc" rationalization. *Norton*, 311 F.3d at 1176. The Forest Service's requirement to identify a CE is "heightened" because "substantial evidence in the record" shows "extraordinary circumstances" are present in the project area. *Id.*; AR 00044-361. The agency therefore acted arbitrarily and capriciously by failing to determine which CE applies to the Nelder Grove project. *Id.*; 5 U.S.C. § 706(2)(A); *see also Johanns*, 451 F. Supp. 2d at 1182-84 (finding an agency acted arbitrarily and capriciously invoking a CE to cover a project because the record included no contemporaneous "reasoned explanation for its apparent determination that a categorical exclusion applied and that the exceptions to the exclusion did not apply"); *Earth Island Institute v. Elliott*, 318 F. Supp. 3d 1155, 1178 (E.D.Cal. 2018)(agency identified a CE "months before the project was to begin"). The Service also has "unlawfully withheld or unreasonably delayed" compliance with NEPA by failing to identify an applicable CE over a year-and-a-half after asserting that emergency actions may proceed under such a CE. 40 C.F.R. § 1501.2(a) (directing agencies to comply with NEPA "at the earliest reasonable time").

The Service cannot invoke some amorphous or "floating" CE that covers the project. The Service has insisted it is not required to identify a specific CE, ECF 44 and 45, ¶ 78, but allowing

an agency to act under a CE without identifying one that applies would defeat the purpose of a CE. *See Bosworth*, 510 F.3d at 1032–33 (noting CEs are only valid if "specific"). Allowing the Service to implement a project without even identifying a CE would render superfluous NEPA's directive that an agency may only invoke CEs for specific actions that do not typically have significant environmental impacts. *See* 40 C.F.R. § 1507.3(e)(2)(ii) (agencies must promulgate "specific criteria for and identification of" actions for CEs); *Bosworth*, 510 F.3d at 1026 (agency adopting a CE must present evidence to make a "determination that the identified category of actions in the [established] CE do not individually or cumulatively have a significant impact on the environment."), *id.* at 1032-33 (evaluating Service CE to determine whether it included requisite "specificity").

### 3. The Forest Service violated NEPA by failing to evaluate effects on extraordinary circumstances present in Nelder Grove.

An agency must evaluate extraordinary circumstances before invoking a CE. 40 C.F.R. §§ 1501.4(b), 1507.3(e)(2)(ii); 36 C.F.R. § 220.6(b)(1). The Forest Service's extraordinary circumstances, otherwise known as "resource conditions," include, among other things, "Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species," "American Indians and Alaska Native religious or cultural sites," and "Archaeological sites, or historic properties or areas." 36 C.F.R. §§ 220.6(b)(1)(i), (vi), (vii). The Forest Service approaches these obligations in a two-step process. First, the Forest Service must determine if any resource conditions exist in the action area. *Greater Hells Canyon Council v. Stein*, 2018 WL 3966289, at *7 (D. Or. June 11, 2018) (citing 36 C.F.R. § 220.6(b)(1)). Second:

> the Forest Service must assess the degree of potential effect of the proposed action on the resource condition. If the proposed action may have a significant environmental effect, the agency must prepare an EIS. If the Forest Service is uncertain whether the proposed action may have a significant effect, it must prepare an EA. Only where the potential effect on the resource condition is known to be insignificant does the action comply with the Forest Service's policy on extraordinary circumstances. And, therefore, only where the potential effect is known to be insignificant may the Forest Service apply a CE.

2018 WL 3966289, at *7.. In other words, the Forest Service must supply a "convincing statement

of reasons why potential effects are insignificant." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999); *see also Defenders of Wildlife v. U.S. Forest Serv.*, 2015 WL 14070482, at *7 (D. Ariz. Sept. 15, 2015) (finding Service's determination of effect on listed species arbitrary because the Service provided no explanation for why potential effects were certain to b insignificant and the determination was based in large part upon the anticipated ability of species to avoid affected area).

In this case, the Project area contains several extraordinary circumstances. First, all Project activities take place in Nelder Grove, which is a designated "historical area." *See, e.g.,* AR 02040. Second, the Project area contains Federally listed threatened or endangered species or designated critical habitat, including the Pacific Fisher. *See, e.g.,* 85 Fed. Reg. 29532 (June 15, 2020); 86 Fed. Reg. 57773 (Oct. 19, 2021); 87 Fed. Reg. 66987 (Nov. 7, 2022). Third, Nelder Grove is suitable habitat for several listed Forest Service Sensitive Species, including the Great Gray Owl, the Northern Goshawk, the Mountain Lady's Slipper, and the Western Waterfan. *See* Buchele Decl. Ex. 10 at 5–6; AR 01966-70. Fifth, the Project area contains numerous known cultural resources, including historic and prehistoric sites. See discussion below, at 22. Finally, the Project is killing young Giant Sequoias, as is discussed above, at 16.

The Service failed to contemporaneously explain why extraordinary circumstances do not apply to preclude the use of CE. There is nothing in the record whatsoever that demonstrates that the Forest Service considered any of the resource conditions by the time the 2022 Memorandum was signed. Indeed, the 2022 Memorandum never mentions anything about "resource conditions" or "extraordinary circumstances" at all. AR 00001–037. The Service could not possibly be certain that the Project activities would have an insignificant impact on resource conditions without even evaluating what resource conditions exist in the Project area. Thus, there is no possible way that the Service could have legitimately authorized the use of a CE for the Project at the time the 2022 Memorandum was signed. *See* 36 C.F.R. § 220.6(b)(1).

Moreover, since then, there is nothing in the record that demonstrates a reasoned determination that resource conditions will not be affected by the Project. There is not a single document in the record that evidences the Forest Service's determination of the resource conditions

in the action area or the effect of the Project on those resource conditions. While there are scattered references pertaining to other legal requirements, such as consultation, which required the consideration of effects on listed species or cultural sites, *see, e.g.,* AR 01992, AR 02163, none of these documents contains the Forest Service's required determination of effect on resource conditions under 36 C.F.R. § 220.6(b)(1). Thus, the Forest Service "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Without any analysis of effects on resource conditions, the Forest Service should have, at a minimum, completed an EA. 36 C.F.R. § 220.6(b)(1).

The Service's failure is especially stark in light of evidence demonstrating adverse impacts on resource conditions. For example, the Service was not able to identify all of the cultural resource conditions prior to the Project work beginning. Buchele Decl. Ex. 11 at 1. This alone is problematic, given the complexity of the cultural sites in Nelder Grove. Buchele Decl. Ex. 12 at 7 (Ecosystem Staff Officer noting that he has never been involved in "a veg mgmt./fuels reduction project in an area with this degree of cultural resource complexity."); *Id.* (District Archaeologist, noting that the Project "has been the most complex project I have worked on in my career with the shortest implementation timeframe."). But, more importantly, since the Project work began, there was already an inadvertent effect on cultural resources. *Id.* at 6–7. Further, project activities, such as the removal of snags "regardless of size," AR 002600, will likely affect the Fisher. *See* AR 02158 (Fisher Conservation Measures recommending maintenance of snags). The Service's determination that Project activities "may affect, but is not likely to adversely affect" the Fisher, in Nelder Grove, AR 01992, also demonstrates that further evaluation of this resource condition was necessary. *Conservation Cong. v. U.S. Forest Serv.*, 2013 WL 2457481, at *7 (E.D. Cal. June 6, 2013).

### 4. The Service's "Not Likely to Have Significant Environmental Impacts" Determination is Arbitrary and Capricious.

In order to avoid consulting with the CEQ regarding its emergency response, which the Service admits it did not do ECF 44 and 45 ¶ 75**,** the Service had to find that its actions were not likely to have significant environmental impacts. 36 C.F.R. §§ 220.4(b)(2) and (3). The Service's

determination in that regard is found in a short, mostly conclusory paragraph:

> In accordance with 36 CFR 220.4(b)(2), these actions are not likely to have significant adverse environmental impacts (40 CFR 1501.3(b). This preliminary assessment is based on 1) the proposed actions' consistency with each respective forest's land management plan, including the Giant Sequoia National Monument Plan (Sequoia); 2) preliminary analysis used to develop the proposed actions for the Castle Fire Restoration and Hume Basin Restoration projects, and 3) experience implementing similar projects.

AR 00005. As an initial matter, this finding sets forth the wrong standard; Section 1501.3(b) is concerned with the significance of all impacts, not just adverse impacts. Second, a finding of no significant impacts must be supported by a convincing statement of reasons, *see, e.g., Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d 846, 864-65 (9th Cir. 2005), but this statement is not at all convincing and is in fact arbitrary. It cites no evidence specific to Nelder Grove.

As discussed below**,** at 24, the authorized actions are in fact not consistent with the Sierra National Forests 1991 Plan. The preliminary analysis regarding the two other projects does not appear to be in the record and thus cannot support the statement. In any case, any analysis regarding those other projects in different national forest could not reflect conditions in Nelder Grove. The third reason, Service "experience," is exactly the sort of conclusory assertions that courts have repeatedly refused to defer to. *Id.* at 864. Finally, the finding fails to consider an important aspect of the problem, the scientific controversy and uncertainty regarding the effectiveness of the actions being taken by the Service to supposedly prevent or reduce the severity of wildfire. This issue should be part of any significance determination. See, e.g., *City of Davis v. Coleman,* 521 F.2d 661, 675 (9th Cir, 1975); *Hanly v. Kleindeinst,* 471 F.2d 823, 830-31 (2d Cir. 1972). Here Earth Island submitted extensive evidence with its scoping comment regarding the scientific uncertainty and controversy regarding the fire severity reduction techniques being implemented by the Service, and that evidence is in the record. AR 861-879 (June 2023 Comment with attachments); AR 00944-01901 (December 2022 Comment with attachments). There is no record evidence that the Service ever considered this evidence or the underlying uncertainty and controversy. Its failure to do so makes its non-significance finding and its failure to consult with the CEQ arbitrary and a continuing violation of NEPA and the APA.

**III.    The Forest Service Removed Trees in Violation of the Governing Land Management Plan (Claim 4).**

The Nelder Grove Project violates NFMA by failing to comply with the applicable 1991 Sierra Forest Plan. NFMA mandates forest planning "through analysis of environmental economic impacts, coordination of multiple use and sustained yield…." 16 U.S.C. § 1600(3). NFMA further mandates all plans, permits, contracts, "shall be consistent with the land management plans." 16 U.S.C. § 1604(i). An action that does not comply with the Forest Plan violates NFMA. *Mt. Cmtys. for Fire Safety*, 25 F.4th at 681. Here, there are two land management plans and Records of Decision potentially relevant to the 2022 Memorandum: the 1991 Forest Land and Resources Management Plan, Sierra National Forest[9] ("1991 Plan") and the 2023 Forest Land and Resources Management Plan ("2023 Plan"). The operative plan for Nelder Grove at the time the 2022 Memorandum was signed was the 1991 Record of Decision – Land and Resource Management Plan ("1991 ROD") which required the development of a "detailed long-term implementable strategy for the Grove." AR at 00465 (1992 Record of Decision).

The United States Forest Service has admitted the 1991 Plan applies to its operations within Nelder Grove.[10] ECF 44 and 45, ¶ 56. The 1991 Plan required the Forest Service to "develop and implement" a fuels reduction plan for Nelder Grove by 1995; designate Nelder Grove as a special interest area "stressing" its historic and botanic features; and the adoption of a Nelder Grove specific management plan as part of the Land and Resources Management Plan. AR at 00532. On July 19, 1992, the Regional Forester clarified that *only* human hazard trees could be removed until Nelder Grove was governed by a "detailed long term management plan[]… developed with full recognition of the results of public involvement in the NEPA process." AR at 04767 (1992 Regional Forester Policy Statement). The Regional Forester's policy statement was incorporated into the 1991 Plan by the September 1992 Record of Decision ("ROD"). AR at 00465 (ROD for 1991 Plan). The record is devoid of any management plan for Nelder Grove meeting the requirements of the

---

[9] As amended by the 2004 Sierra Nevada Forest Plan Amendment. AR at 00362–00433 (2004 Sierra Nevada Forest Plan Amendment FEIS).

[10] The Forest Service's actions are also inconsistent with the 2023 Plan. To the extent that the Forest Service attempts to argue its actions under the Chief's Memorandum are controlled by the 2023 Plan, Plaintiffs reserve the right to address those arguments in subsequent briefing.

| | |
|---|---|
| 1 | 1991 Plan. Further, the Forest Service's current actions within Nelder Grove are not the result of |
| 2 | public involvement in the NEPA process. |
| 3 | The 2022 Memorandum stated that the proposed actions would be consistent with each |
| 4 | forest's land management plan. AR at 00005. This makes sense, as site-specific projects or |
| 5 | activities authorized after a plan is approved must be consistent with the plan. 36 C.F.R. § |
| 6 | 219.15(b). Notably, prior to the Chief's Memorandum, the Forest Service had not conducted any |
| 7 | work (other than minor fuels work) in Nelder Grove. Buchele Decl. Ex. 3 at 6–7, Buchele Decl. |
| 8 | Ex. 13 at 2. This also makes sense, because, as acknowledged by the Forest Service in a July 18, |
| 9 | 2022 email, before the Forest Service could do the "required" tree removal to address the fuels |
| 10 | issue, a "grove specific [management] plan" and an EIS were necessary. Buchele Decl. Ex. 3 at 6. |
| 11 | The necessity of a Nelder Grove-specific management plan is only emphasized by the complexity |
| 12 | of managing the archaeological and historical resources of the grove and the compressed timeframe |
| 13 | required by the Chief's Memorandum. Buchele Decl. Ex. 12 at 7–8. But despite the lack of a Nelder |
| 14 | Grove specific management plan, the Service Silviculturist also recommended larger spacings |
| 15 | between Giant Sequoias and even called for removal of "poor quality" Giant Sequoias. Buchele |
| 16 | Decl. Ex. 6 at 2–3, 6. Any removal of naturally-regenerating Giant Sequoias flies in the face of |
| 17 | recruiting "specimen" trees and is not limiting tree removal to "human hazard trees." AR at 04766– |
| 18 | 04767. The Forest Service failed to develop a grove specific management plan or an EIS before |
| 19 | undertaking tree removal in Nelder Grove in violation of the 1991 Plan, NFMA and the APA. |

**Conclusion**

| | |
|---|---|
| 22 | For the reasons stated above, in Plaintiffs' motion and their supporting Declarations, |
| 23 | Plaintiffs respectfully request that the Court enter Summary judgment on all of their claims in their |
| 24 | Second Amended Complaint, ECF 44. |
| 25 | Respectfully submitted on this 21st day of May 2024. |

/s/Thomas Buchele
Thomas Buchele, CA Bar No. 129657
Earthrise Law Center

25  MEMO IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Lewis & Clark Law School
10101 S Terwilliger Blvd.
Portland OR  97219-7799
Tel:  503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Rachel M. Fazio, CA Bar No. 187580
John Muir Project of the Earth Island Institute
P.O. Box 897
Ridgecrest, CA 92314
Tel: 530-273-9290
Email: rachelmfazio@gmail.com

*Attorneys for Plaintiffs*