TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

SEAN C. DUFFY (NY Bar No. 4103131)
ERIKA NORMAN (CA Bar No. 268425)
Trial Attorneys
Natural Resources Section
150 M Street NE, Suite 2.9000
Washington, DC 20002
Ph: (202) 305-0445 (Duffy)
Ph: (202) 305-0475 (Norman)
sean.c.duffy@usdoj.gov
erika.norman@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

EARTH ISLAND INSTITUTE, *et al.*,

      Plaintiffs,

   v.

RANDY MOORE, in his official capacity as the Chief of the United States Forest Service, *et al.*,

      Defendants.

No. 1:23-cv-1045-EPG

**DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 47)**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................**Error! Bookmark not defined.**

I.    LEGAL BACKGROUND....................................**Error! Bookmark not defined.**

    A.    National Environmental Policy Act ..........**Error! Bookmark not defined.**

    B.    National Forest Management Act .............**Error! Bookmark not defined.**

    C.    Review of agency action under the Administrative Procedure Act ...**Error! Bookmark not defined.**

II.    FACTUAL BACKGROUND...............................**Error! Bookmark not defined.**

    A.    The state of emergency in California's Giant Sequoia groves..........**Error! Bookmark not defined.**

    B.    The Forest Service's July 2022 Decision Memorandum authorizing emergency actions in Giant Sequoia groves, including Nelder Grove ......................................................**Error! Bookmark not defined.**

III.    ARGUMENT.......................................................**Error! Bookmark not defined.**

    A.    The Forest Service properly determined there is an emergency warranting immediate action in Nelder Grove. (Claim 2, Count 1)...**Error! Bookmark not defined.**

    B.    The emergency actions in Nelder Grove fall within the 2022 Decision Memo's authorization. (Claim 1)**Error! Bookmark not defined.**

    C.    The Forest Service was authorized to proceed with emergency actions in Nelder Grove prior to completing the regular NEPA process ......................................................**Error! Bookmark not defined.**

        1.    The Emergency Decision does not "exempt" the Forest Service from complying with NEPA. (Claim 3, Count 2) .....**Error! Bookmark not defined.**

        2.    The Forest Service was not required to document whether extraordinary circumstances exist prior to taking emergency action. (Claim 2, Count 2).............**Error! Bookmark not defined.**

        3.    The Forest Service was not required to issue a "finding of no significant impact" before taking emergency action. (Claim 2, Count 2)...................................**Error! Bookmark not defined.**

D.  The emergency response activities on Nelder Grove comply with NFMA. (Claim 4, Count 1)........................**Error! Bookmark not defined.**

E.  Defendants object to consideration of exhibits 1-13 attached to the declaration of Plaintiffs' counsel...............**Error! Bookmark not defined.**

F.  Plaintiffs abandoned claims they failed to address in their summary judgment brief. (Claim 3, Count 1, and Claim 4) ....**Error! Bookmark not defined.**

G.  If the Court finds for Plaintiffs on any claims, it should deny equitable relief or order supplemental briefing on remedy................**Error! Bookmark not defined.**

CONCLUSION...........................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Addington v. U.S. Airline Pilots Ass'n*,
  606 F.3d 1174 (9th Cir. 2010) ..........................................................................16

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
  No. 12-9861, 2016 WL 4445770 (C.D. Cal. Aug. 12, 2016) ............................24

*Bishop Paiute Tribe v. Inyo Cty.*,
  863 F.3d 1144 (9th Cir. 2017) ..........................................................................16

*Blue Mountains Biodiversity Project v. Jeffries*,
  99 F.4th 438 (9th Cir. 2024) .......................................................................3, 23

*California. Cmtys. Against Toxics v. United tates. EPA*,
  688 F.3d 989 (9th Cir. 2012) ............................................................................24

*Camp v. Pitts*,
  411 U.S. 138 (1973) .............................................................................................3

*Conservation Cong. v. U.S. Forest Serv.*,
  720 F.3d 1048 (9th Cir. 2013) ............................................................................3

*Ctr. for Biological Diversity v. Haaland*,
  58 F.4th 412 (9th Cir. 2023) ............................................................................16

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  450 F.3d 930 (9th Cir. 2006) ..............................................................................9

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ............................................................................21

*Earth Island Inst. v. Pengilly*,
  376 F. Supp. 2d 994 (E.D. Cal. July 2, 2005)....................................................8

*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) ............................................................................21

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of*,
  *Okla.*, 426 U.S. 776 (1976)...............................................................................15

*Forest Guardians v. U.S. Forest Serv.*,
  No. CIV 05-0372, 2006 WL 4109661 (D.N.M. Aug. 22, 2006) ......................21

*Forest Serv. Emps. for Env't Ethics v. United States Forest Serv.*,
  No. 2:16-CV-0293-TOR, 2017 WL 2962771 (E.D. Wash. July 11, 2017) ............9

*Jenkins v. Cnty. of Riverside*,
  398 F.3d 1093 (9th Cir. 2005) ..........................................................................24

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ..................................................................................3

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ...........................................................16, 19

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen,*
  615 F.3d 1122 (9th Cir. 2010) ...............................................................20

*Modesto Irrigation Dist. v. Gutierrez,*
  619 F.3d 1024 (9th Cir. 2010) .................................................................3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................................3

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior,*
  983 F.3d 1077 (9th Cir. 2020) .................................................................2

*Nat. Res. Def. Council, Inc. v. Winter,*
  518 F.3d 658 (9th Cir. 2008) .................................................................10

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) ...................................................................2

*Native Ecosystems Council v. Weldon,*
  697 F.3d 1043 (9th Cir. 2012) .................................................................2

*Ocean Advocates v. U.S. Army Corps of Engineers,*
  402 F.3d 846 (9th Cir. 2005) .................................................................19

*Or. Nat. Desert Ass'n .v United States Forest Serv.,*
  957 F.3d 1024 (9th Cir. 2020) ...............................................................21

*Pit River Tribe v. United States Forest Serv.,*
  615 F.3d 1069 (9th Cir. 2010) ...............................................................24

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) .................................................................................1

*Sequoia ForestKeeper v. Elliott,*
  50 F. Supp. 3d 1371 (E.D. Cal. 2014) ...................................................25

*Sierra Forest Legacy v. Sherman,*
  951 F. Supp. 2d 1100 (E.D. Cal. 2013) ...........................................24, 25

*Siskiyou Reg'l Educ. Project v. Goodman,*
  No. CIV 04-3058 CO, 2005 WL 2083011 (D. Or. July 29, 2005) ...........8

*Sw. Ctr. for Biological Diversity v. United States Forest Serv.,*
  100 F.3d 1443 (9th Cir. 1996) .................................................................3

*Texas v. United States,*
  523 U.S. 296 (1998) ...............................................................................16

*Tri-Valley Cares v. Dep't of Energy*,
  203 F. App'x 105 (9th Cir. 2006) ........................................................................... 9

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ............................................................................................... 1

*W. Radio Servs. Co. v. Espy*,
  79 F.3d 896 (9th Cir. 1996) .................................................................................. 22

**Statutes**

16 U.S.C. § 1604(a) ..................................................................................................... 2

16 U.S.C. § 1604(i) ............................................................................................... 2, 20

42 U.S.C. § 4332(2)(C) ............................................................................................... 19

42 U.S.C. § 4336e(7) ................................................................................................... 19

42 U.S.C. §§ 4321-4370m-12 ...................................................................................... 1

**Regulations**

36 C.F.R. § 219.10(e) ............................................................................................ 2, 20

36 C.F.R. § 220.4(b) ..................................................................................................... 2

36 C.F.R. § 220.4(b)(2) ........................................................... 2, 5, 10, 14, 15, 18, 19, 24

36 C.F.R. § 220.6(a) ................................................................................................... 17

36 C.F.R. § 220.6(b)(1) .............................................................................................. 18

36 C.F.R. § 220.6(b)(1)(i) .......................................................................................... 17

36 C.F.R. § 220.6(b)(2) .............................................................................................. 17

36 C.F.R. § 220.6(d) ................................................................................................... 17

36 C.F.R. § 220.6(e) ................................................................................................. 6, 7

36 C.F.R. §§ 220.5-220.7 .............................................................................................. 2

40 C.F.R. § 1501.4 ....................................................................................................... 2

40 C.F.R. § 1501.5 ....................................................................................................... 2

40 C.F.R. § 1501.6 ..................................................................................................... 19

40 C.F.R. § 1502 ........................................................................................................... 2

40 C.F.R. § 1506.12 ........................................................................................ 2, 15, 24

73 Fed. Reg. 43,084 (July 24, 2008) ........................................................................... 8

**INTRODUCTION**

Giant Sequoias are a crown jewel of California's National Forests and are known across the world for their enormous size and incredible lifespan. These majestic trees can live for thousands of years and, until recently, were thought to be largely invulnerable to fire. Now, however, they face an urgent existential threat from severe wildfires fueled by forest overcrowding, drought, and a warming climate. Over a recent two-year period, a shocking 20% of "monarchs"—the largest and oldest Giant Sequoias—were killed by severe wildfire. The Nelder Grove in the Sierra National Forest, the subject of this lawsuit, is one center of that destruction. Less than seventy monarch Giant Sequoias remain there, and at the current rate, all monarch Giant Sequoias may be lost within the next few decades if nothing is done to save them.

To address this urgent problem, the Forest Service invoked regulations that allow the agency to take emergency actions prior to completing an environmental analysis under the National Environmental Policy Act (NEPA). The Forest Service authorized, and is now undertaking, emergency fuel treatments in twelve Giant Sequoia groves. Plaintiffs have sued to stop these treatments in Nelder Grove, arguing that the emergency is not an emergency, that the Forest Service's emergency authorization does not mean what it says, and that the emergency regulations contain limitations that are not there. Plaintiffs also allege that the Project is inconsistent with the Forest Plan but have not identified any Forest Plan standard the agency has violated. None of Plaintiffs' arguments withstand scrutiny. The Court should reject them, grant summary judgment for the Forest Service, and allow the Forest Service to finish the project.

I.    **LEGAL BACKGROUND**

    A.    **National Environmental Policy Act.**

NEPA, 42 U.S.C. §§ 4321-4370m-12, establishes a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA imposes procedural rather than substantive requirements. It does not "mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).

A NEPA analysis is generally documented in an environmental impact statement (EIS) or an environmental assessment (EA), unless the action falls within the scope of a categorical exclusion (CE). *See* 40 C.F.R. §§ 1502, 1501.5, 1501.4 (2022); 36 C.F.R. §§ 220.5-220.7.

In cases when there is an emergency that requires urgent action, CEQ's and the Forest Service's NEPA regulations provide a series of exceptions and alternative arrangements for standard NEPA processes. *See* 40 C.F.R. §1506.12; 36 C.F.R. § 220.4(b). Relevant here, the Forest Service's NEPA regulations state that when there is an emergency that requires urgent action before a standard NEPA analysis can be completed and the actions to be taken are not likely to have significant environmental effects, the Chief or Associate Chief of the Forest Service may grant alternative arrangements for NEPA compliance, relieving the agency of its regular obligation to prepare an EA or decide on a CE before taking action. 36 C.F.R. § 220.4(b)(2).

**B.      National Forest Management Act.**

The National Forest Management Act (NFMA) and its implementing regulations "provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). At the forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans [or 'forest plans'] for units of the National Forest System. . . ." 16 U.S.C. § 1604(a). At the project level, the agency implements the forest plan through site-specific projects, which must be "consistent with" the applicable forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e) (1982).

**C.      Review of agency action under the Administrative Procedure Act.**

Because NEPA and NFMA do not contain their own provisions for judicial review, the merits of Plaintiffs' claims are reviewed under the Administrative Procedure Act (APA). *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1084 (9th Cir. 2020) (NEPA); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (NFMA). Judicial review under the APA is deferential, particularly in areas involving "scientific

judgments and technical analyses." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013). The reviewing court may not substitute its judgment for the agency's, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and must uphold the agency's reasonable decision. *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010). It is a plaintiff's burden to demonstrate that the agency failed to meet this highly deferential standard. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

Under the APA, a court is to review an agency's decisions based on the administrative record that existed before the agency at the time the decision was made. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). The agency's designation of the administrative record is presumed to be correct and "deliberative materials are generally not part of the AR absent impropriety or bad faith by the agency." *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 444-45 (9th Cir. 2024) (citation omitted). A reviewing court may consider extra-record materials in APA cases under four narrow exceptions:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter, [or] . . . (4) when plaintiffs make a showing of agency bad faith.

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

## II.    FACTUAL BACKGROUND

### A.    The state of emergency in California's Giant Sequoia groves.

California's Giant Sequoia groves are in a state of emergency caused by recent wildfires that killed more than 20% of monarch Giant Sequoias coupled with persistent high fuel accumulations and a changing climate that further increases the risk of severe wildfire. Giant Sequoias have captured the public's imagination due to their great size, age, and limited

distribution in groves across the western slope of the Sierra Nevada, like Nelder Grove. AR68.[1] The "monarchs" are the most massive trees on earth and can live more than 3,000 years. AR4361; *see also* AR264 (photo). In 1972, the Nelder Grove Historical Area was set aside for the preservation of Giant Sequoias. AR500.

Giant Sequoia monarchs were, until recently, thought to survive all fires. AR2. In recent years, however, severe wildfires of unprecedented size, intensity, and frequency burned or partially burned 32 of the 37 Giant Sequoia groves and killed record numbers of Giant Sequoias. AR1. At first, several monarch Giant Sequoias were killed in high severity wildfires in 2015 and 2017. AR2. Then, in the two-year period from 2020 to 2022, more than 20% of monarch Giant Sequoias were killed, 17% in the Castle Fire and an additional 5% in the Windy Fire and the KNP Complex Fire. *Id.* Previously, the last recorded evidence of extensive Giant Sequoia mortality was in the thirteenth century. *Id.*

California's overly dense forests, extended drought, insect, and disease infestations, and a warming climate have all exacerbated the emergency threatening Giant Sequoias. AR2565 (photograph of burned grove from 2020 Castle Fire). More than a century of fire suppression, combined with logging of larger, more fire-resistant trees have left much of California's forests in an overly dense state with small and medium-sized trees of fire-susceptible species, increased canopy cover, and heavy concentrations of fuels and low growing vegetation known as "ladder fuels" that can move fire into the forest canopy. AR2566. Trees in these overly dense stands are more likely to die, further exacerbating fire risk. AR2570-71. In short, the situation requires urgent action to protect ecosystems. AR2584.

High-severity fire is a threat to more than just trees; it can result in long-term loss of essential habitat for native plants and animals, including the California spotted owl and the threatened Pacific fisher. AR2572-73. Extensive severe fire has already resulted in site abandonment for these species. AR2573. Between 2017 and 2021, approximately 16-18% of the

---

[1] For brevity, citations to the administrative record in this brief are abbreviated by dropping the extra zeros. For example, AR00005 is cited as "AR5."

reproductive habitat for the Pacific fisher's Southern Sierra Nevada population burned at high severity, rendering those areas largely unsuitable as fisher reproductive habitat. AR2573-74.

Active forest management, including thinning to reduce tree density and removing accumulated surface and ladder fuels, can help ensure that when wildfires occur, they burn along the surface at low-to-moderate intensity, rather than through the canopy thereby killing most trees. AR2580. Post-fire fuel reduction treatments can reduce the risk of reburn and foster ecological recovery. AR2582. In addition, in areas where fires have occurred, it is critical that the Forest Service remove hazard trees, which pose a risk of injury or death. AR2484. While treatments have proven effective at improving forest resilience, the normal pace for planning and approving forest management projects must be accelerated to change the trajectory of wildfire risk and losses and restore forest health before it is too late. *Id.*

**B.    The Forest Service's July 2022 Decision Memorandum authorizing emergency actions in Giant Sequoia groves, including Nelder Grove.**

To address the imminent threat to Giant Sequoias, the Chief of the Forest Service signed a Decision Memorandum ("Emergency Decision") in July 2022 granting approval for emergency action under the Forest Service's emergency response regulations, 36 C.F.R. § 220.4(b)(2). AR3. This allowed for immediate implementation of fuels reduction treatments on 13,377 acres across a total of twelve Giant Sequoia groves on the Sequoia and Sierra National Forests without having to wait years to complete an environmental analysis under NEPA. AR1. The treatments include removal of snags (standing dead trees) and small trees up to 20 inches diameter at breast height ("dbh"), thinning of overcrowded areas to reduce ladder fuels, surface fuels removal, and disposal of materials by mastication and prescribed burning. AR1, 5-7, 1930-31. Within Nelder Grove, the Sierra National Forest may create a 100-foot buffer around each of the 67 remaining monarch Giant Sequoias, create a defensible fuels profile zone for firefighters along two roads, and fell hazard trees along roadsides and trails. AR1930. The Sierra National Forest also plans to engage in reforestation using Giant Sequoia cones from within Nelder Grove. AR1931.

Based on a preliminary analysis and years of experience implementing similar projects, the Forest Service determined that the emergency response on the twelve Giant Sequoia groves was not likely to have significant environmental impacts. AR2, 5. In particular, the Forest Service determined that the actions on all the groves were consistent with the standards and guidelines in the applicable Forest Plans. AR5. In carrying out the activities, the Forest Service is applying design features outlined in the Castle Fire and Hume Basin Restoration projects to ensure that treatments do not approach established thresholds for significant environmental effects. AR5; AR1940-41 (listing mitigation and design measures for species). In addition, the Forest Service will apply protection measures from the Southern Sierra Nevada Fisher Conservation Strategy and separate protection measures for archaeological sites, historic properties, and culturally sensitive areas. *Id.* The Emergency Decision also sets out several associated conditions that the Forest Service must follow, including compliance with the Endangered Species Act, National Historic Preservation Act, and other laws; initiation of public scoping and tribal engagement; ongoing monitoring; regular implementation progress updates; and an annual review to re-evaluate the need for the emergency response. AR3.

The Emergency Decision allows urgent work to begin immediately in Giant Sequoia groves, but it does not remove the obligation to undertake a NEPA analysis. AR2. In Nelder Grove, the work is anticipated to fall within one or more of the Forest Service's CEs under 36 C.F.R. § 220.6(e), for which the Forest Service ordinarily prepares a memorandum memorializing the decision. AR2, 4. The Forest Service is now developing an analysis that addresses the environmental impacts of the actions—including the work already underway—and it intends to disclose that analysis to the public. AR1930.

The Forest Service estimates that by using its emergency response procedures it will accelerate work by up to 9-12 months in most of the twelve groves and several years in others. AR2. Public scoping of this and similar projects has revealed support for taking emergency actions on fuels reduction in Giant Sequoia groves. AR2; AR942-43. These emergency actions to

save Giant Sequoias have the support of a diverse group of landowners and scientists in the Giant

Sequoia Working Group and the Giant Sequoia Lands Coalition. AR2.

Between August 2022 and October 2023, the Forest Service implemented treatments around 4,442 individual Giant Sequoias across all the groves covered by the emergency authorization. AR2525. In Nelder Grove, the Forest Service treated around thirty-four Giant Sequoias, completed hazard tree abatement, burned two acres of large tractor piles, and awarded a stewardship contract for hand, mechanical, and aviation treatments. AR2526-27. Work under that contract began in early October 2023, AR2526, and stopped in early January 2024 because of the onset of winter. Decl. of Jon Regelbrugge ¶ 11 ("Regelbrugge Decl.").[2] The emergency response actions in Nelder Grove are about 50% complete. *Id.* ¶ 13.

Since the Chief issued the Emergency Decision in July 2022, the Sierra National Forest has worked to complete a NEPA analysis of the emergency response activities in Nelder Grove. It issued a NEPA scoping letter to the public on November 8, 2022. AR1929-35. The Forest Service has also drafted specialist reports, *see, e.g.*, AR1936-86, engaged in Endangered Species Act consultation with the U.S. Fish & Wildlife Service (FWS), prepared a Biological Assessment, *see, e.g.*, AR1992-95, 2033-2103, prepared archaeological evaluations to comply with the National Historic Preservation Act, undertaken species surveys, *see, e.g.*, AR2450-96, and prepared maps and collected photos of the area, *see, e.g.*, AR2498-2517. The Forest Service lodged the administrative record in December 2023 and supplemented the record in April 2024. Notice of Lodging, ECF No. 25; Notice of Filing Supplement, ECF No. 43. While contracting issues and personnel constraints—including the need for staff to spend time on this litigation— prevented the Forest Service from completing its NEPA analysis for Nelder Grove by November 2023, as originally anticipated, work on the NEPA analysis has continued and the Forest Service anticipates completing the process and documenting the use of a CE for the emergency response in Nelder Grove in the summer or fall of 2024. Regelbrugge Decl. ¶ 20.

---

[2] Defendants submit the Declaration of Jon Regelbrugge to provide background information on the ongoing implementation and NEPA process for Nelder Grove and to provide information relevant to equitable considerations in the context of remedy. *See supra,* part III.G, below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.   ARGUMENT

### A.   The Forest Service properly determined there is an emergency warranting immediate action in Nelder Grove. (Claim 2, Count 1)

Plaintiffs argue there is no "emergency" that would justify the Forest Service's use of its emergency response procedures because the threat of wildfire is not "sudden," "unforeseen," or "unexpected," and because the emergency is of the Forest Service's own making. *See* Mem. in Supp. of Pls.' Mot. for Summ. J. 4-8, ECF No. 47 ("Pls.' Mem."). Both arguments lack merit.

An emergency need not be "sudden," "unforeseen," or "unexpected." While some emergencies can be characterized by those descriptors, an emergency can also be "'[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures.'" *See* 73 Fed. Reg. 43,084, 43,088 (July 24, 2008) (quoting Black's Law Dictionary 260, 562 (8th ed. 2004)). Courts in this Circuit have interpreted the term "emergency" as a condition requiring an urgent or immediate response, without requiring the condition to be sudden, unforeseen, or unexpected. *See Earth Island Inst. v. Pengilly*, 376 F. Supp. 2d 994, 1008-09 (E.D. Cal. July 2, 2005) (the rapidly deteriorating value of burnt timber was an emergency because it required immediate action by the Forest Service to avoid a loss); *Siskiyou Reg'l Educ. Project v. Goodman*, No. CIV.04-3058 CO, 2005 WL 2083011, at *7 (D. Or. July 29, 2005) (similar finding for Forest Service).

The emergency on Nelder Grove was both unforeseen and demanding of immediate action. The Forest Service Chief determined that conditions within twelve Giant Sequoia groves, including Nelder Grove, were in a state of emergency for several reasons that support the need for urgent or immediate action. The first is the recent and unexpected surge in the severity and size of wildfires in California, including those in 2020 and 2021 that had the most significant impact to date on Giant Sequoias. AR1-2, 4, 5-8; *see also* AR2584 ("The scope of California's wildfire and forest health emergency requires an immediate, sustained, and effective response"). The second is the recent and unprecedented loss of 20% of monarch Giant Sequoias and the associated realization that Giant Sequoias are now extremely vulnerable to high severity wildfire.

*See* AR1-2, 4, 5-8 (discussing "unprecedented" recent mortality); AR4361-73 (2022 study by Shive *et al.* raising alarm about declining resistance to wildfire). In Nelder Grove, the 2017 Railroad Fire killed 39 of 104 monarch Giant Sequoias (only 65 live mature trees remain) and burned much of the Nelder Grove Historical Area at moderate and high severity levels. *See* AR621; AR265; AR1930. The third is the "extreme fuels accumulation" in the groves from drought and recent wildfires that left behind dead trees and other accumulating fuels making the groves more vulnerable to future high severity wildfire. AR1, 5; AR1929. The fourth is the severe threat of wildfire to the remaining unburned Giant Sequoias from lightning strikes and increasing temperatures and wind events. AR2, 5.

In arguing that wildfires do not constitute an emergency, Plaintiffs stretch the Court's reasoning in *Forest Service Employees for Environmental Ethics v. United States Forest Service* (*FSEE*) too far. In that case, the plaintiff claimed that a wildfire was not an "emergency" because such fires are not "unforeseen." No. 2:16-CV-0293-TOR, 2017 WL 2962771, at *6 (E.D. Wash. July 11, 2017)*, aff'd*, 726 F. App'x. 605 (9th Cir. 2018). The district court flatly rejected that argument as "without merit." *Id.* The Ninth Circuit affirmed: "it defies plain language and common sense to conclude that no individual fire—or its course, intensity, or duration—could be unforeseeable." *FSEE*, 726 F. App'x. at 606. While the courts in *FSEE* agreed that an active wildfire constitutes an emergency, those opinions do not suggest that a wildfire must be active to constitute an emergency.[3]

---

[3] Plaintiffs offer the declaration of Chad Hanson ("Hanson Declaration") purportedly to establish their standing to sue. *See* Pls.' Mem. 4. Paragraphs 1-11 of the Hanson Declaration are properly submitted for that purpose and Defendants do not challenge Plaintiffs' standing to sue. But paragraphs 13, 19, 29, and portions of paragraphs 20, 24, and 27 go beyond Dr. Hanson's personal knowledge of alleged harms and offer expert opinions on the sufficiency of the Forest Service's NEPA process and the scientific impacts of the Nelder Grove Project. Such extra-record opinion and argument attacking the merits of an agency's decision violates the APA rules that govern judicial review, and the Court should decline to consider those opinions and legal conclusions in resolving the parties' cross-motions for summary judgment. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006); *Tri-Valley Cares v. Dep't of Energy*, 203 F. App'x 105, 108 (9th Cir. 2006) (legal conclusions are not permissible in a declaration and the court should strike them). The specific paragraphs and portions of the declaration that Defendants object to are paragraphs 13, 19, 20 ("Such unlogged

- 9 -

Plaintiffs also cite *Natural Resources Defense Council v. Winter*, but that case does not establish that the conditions in and around Nelder Grove are not an emergency. First, the Ninth Circuit affirmed that the term "emergency" should be read consistently with standard dictionary definitions, which as explained above, aptly apply to the situation at Nelder Grove. *See* 518 F.3d 658, 680-81 (9th Cir. 2008). Second, whereas the agency's failure to undertake a timely NEPA analysis before a routine planned military exercise in *Winter* may have been an emergency of the government's own making in that case, here, the Forest Service did not have such warning. The effects of the wildfires that killed many Giant Sequoias in short succession in 2020 and 2021 were unprecedented in recent history, and the Forest Service acted promptly to put out the Emergency Decision. Plaintiffs have put forth no evidence of purposeful delay or neglect.[4]

Finally, Plaintiffs' argument that an emergency response on Nelder Grove was not warranted because the Forest Service undertook a traditional NEPA analysis for different work on McKinley Grove is unpersuasive. Fundamentally, it is not the Court's role to compare the threat level of the two sequoia groves nor is the Court equipped to do so having only the Nelder record in front of it; the only question before the Court is whether the conditions on Nelder Grove supported the Chief's Emergency Decision authorizing emergency action. In any event, the extra-record documents Plaintiffs cite do not even support the comparison they ask the Court to draw, because the limited work on McKinley Grove as part of the Exchequer project was too limited, in the Forest Service's view, to impactfully reduce fuels. Buchele Decl. Ex. 3 at 2-3.

In sum, the Forest Service Chief appropriately approved an emergency response under 36 C.F.R. § 220.4(b)(2) in Nelder Grove based on the extreme fuel accumulation in the Grove, the unprecedented recent fires and loss of monarch Giant Sequoias, and the severe threat of high

---

locations" through the end), 24 (second sentence), 27 (second, third, fifth, and sixth sentences) and 29.

[4] Buchele Declaration Exhibit 3, cited at Pls.' Mem. 7, does not identify evidence of purposeful delay on the part of the Forest Service. The exhibits to the Buchele Declaration are extra-record materials for which no exception under the APA applies. Still, the Forest Service provides substantive responses to the documents Plaintiffs cite in their brief, because in many cases they do not stand for the propositions Plaintiffs claim or have been taken out of context.

severity wildfire to California's unburned Giant Sequoias. The Court should grant the

Government's cross-motion for summary judgment on Claim Two, Count One.

### B.     The emergency actions in Nelder Grove fall within the 2022 Decision Memo's authorization. (Claim 1)

Plaintiffs assert that the Forest Service is taking actions in Nelder Grove that are not

authorized by the July 2022 Emergency Decision. Pls.' Mem. 13-18. This is incorrect for several

reasons. First, Plaintiffs erroneously contend that the Emergency Decision "only authorized

limited and immediate fuels reduction around the remaining Giant Sequoia trees to reduce their

mortality in the event of another severe wildfire." *Id.* 13-15. Nowhere does the Emergency

Decision state that the fuels reduction treatments are limited to areas around the remaining

monarchs. The Emergency Decision authorized "fuels reduction treatments on approximately

13,377 acres . . . prior to completion of [NEPA] documentation." AR2. And those treatments are

not limited to "immediate fuels reduction around the remaining Giant Sequoia trees" as Plaintiffs

claim but include removal of "surface and ladder fuels which present the greatest risk from

wildfire." AR1; *see also* AR6. And the Emergency Decision confirms that "[o]n the Sierra

National Forest, proposed emergency treatments include manual and mechanical treatments on

up to 1,432 acres in one grove," *i.e.*, the entirety of Nelder Grove. AR6; *see also* AR7, 11 (map).

Fourteen-hundred acres is far larger than the area immediately surrounding the remaining 65 live

monarch Giant Sequoias. *See* AR2518 (map).

Plaintiffs draw upon "[e]arly correspondence among Service employees" to support their

erroneous argument that the Emergency Decision was limited to the areas immediately

surrounding the Giant Sequoias. *See* Pls.' Mem. 15. But those informal, deliberative, post-

decisional, extra-record staff communications do not supplant the text of the Emergency

Decision, which supports the Forest Service's interpretation here. Even if the Court were to

consider these materials, they do not support Plaintiffs' argument. The meeting notes Plaintiffs

cite, Buchele Decl. Ex. 5, discuss future work "around the groves," *i.e.*, not within them where

all the emergency response actions are taking place. And the email from a member of the Forest

- 11 -

Service staff that Plaintiffs cite, Buchele Decl. Ex. 3 at 2-5, is not even referring to Nelder Grove, but to a different project—the Exchequer Restoration Project.

Second, Plaintiffs argue that the Emergency Decision could not have authorized treatments in severely burned areas, because there would be no benefit to live Giant Sequoias. Pls.' Mem. 14. Plaintiffs read a limitation into the Emergency Decision that does not exist. The Emergency Decision acknowledges that the greatest risk to Giant Sequoias on Nelder Grove is from the build-up of fuels that threaten the unburned portions of the grove, but it does not limit treatments to moderately burned or unburned areas. *See* AR5. In any event, Plaintiffs' argument is a scientific one for which Plaintiffs offer no support. Not only are there living Giant Sequoias near severely burned areas, *see* AR2497, but reducing high fuel loading in burned areas is crucial to preventing reburn and protecting living Giant Sequoias in other parts of Nelder Grove. *See* AR2802-10, 02814, 02817 (discussing the risk of reburn in previously burned areas, especially following high-severity fire); *see also* AR22-27 (photographs showing fuels risk in burned areas next to unburned areas); AR2500-02 (photographs showing fuel loads in areas that burned at high severity). The twelve groves proposed for emergency action were identified based on their high fuel accumulations. AR4.

Plaintiffs also argue that the removal of "very poor vigor small giant sequoia[s]" is not allowed under the Emergency Decision. Pls.' Mem. 16. Again, Plaintiffs read limitations into the Emergency Decision that are not there. In fact, the Emergency Decision explicitly authorizes hand treatments to remove ladder fuels, which includes small trees near large trees. AR2602; *see also* AR1. To the extent Plaintiffs are making a scientific argument that the cutting of small "poor vigor" trees would not protect mature Giant Sequoias, the science considered by the Forest Service supports the opposite conclusion. *See, e.g.*, AR2733 (chapter by Collins & Skinner discussing, *among others*, efficacy of ladder fuel reductions); AR4446-61 (study by Stephens *et al.* discussing how thinning and prescribed fire reduce potential for crown fire); AR3230-47 (Lydersen *et al.* study discussing how thinning and prescribed fire reduce severity of future fire).

Plaintiffs' next argument that the Forest Service is undertaking "Phase II" activities that fall outside the boundaries of the Nelder Grove and the scope of the Emergency Decision fails because the Forest Service has undertaken no emergency response actions outside the Grove. *See* AR2497 (map showing area contracted treatments, all within the Grove). Plaintiffs point to the Forest Service's Biological Assessment as evidence that the agency is exceeding its authority under the Emergency Decision, but the Forest Service analyzed some potential future work outside the Grove as part of its "Phase II" consultation, which was not limited to the implementation of the Emergency Decision.[5] AR2040-43. That potential future work includes a fuel break and prescribed burning outside the Grove, AR2040, which the Forest Service may or may not undertake later as part of another decision.

Finally, Plaintiffs suggest that the Forest Service must be doing unauthorized work because it is now outside the "anticipated" November 2023 timeframe for completing its NEPA analysis. Pls.' Mem. 17 n.8. But the Forest Service's "anticipated" timeline, AR8, is not a requirement. Further, as explained, the Forest Service has encountered unforeseen issues with contracting, cost, and resource constraints, which Plaintiffs' Exhibit 8 acknowledges. *See* Buchele Decl. Ex. 8.

In sum, the Government should prevail on Claim one.

**C.    The Forest Service was authorized to proceed with emergency actions in Nelder Grove prior to completing the regular NEPA process.**

Plaintiffs allege that the Forest Service was required to complete various NEPA processes and analyses before it could rely on the agency's emergency response procedures. Pls.' Mem. 13-18. But Plaintiffs misconstrue the language and purpose of the emergency response

---

[5] FWS divided its consultation into two phases—one where FWS employed its emergency consultation procedures under the Endangered Species Act for work before March 2023 and one for work after March 2023. AR 02044. FWS's "Phase II" is what the Forest Service was referring to as the "planned" actions verses "emergency" actions in the internal email Plaintiffs cite (Pls.' Mem. 17 (citing Buchele Decl. Ex. 9)), with the "planned" actions being those activities for which FWS did not employ its emergency consultation process. Plaintiffs' own documents show that the "Phase II" work has not yet been contracted for. *See* Buchele Decl. Ex. 7.

regulations, which are intended to provide an "*alternative*" path to NEPA compliance, and which contemplate that emergency actions will be taken "*prior to*" standard NEPA processes. The regulations provide that when the responsible official determines "that the nature and scope of proposed emergency actions are such that they must be undertaken *prior to* preparing any NEPA analysis and documentation associated with a CE or an EA . . . . The Chief or Associate Chief of the Forest Service may grant emergency *alternative arrangements* under NEPA for environmental assessments, findings of no significant impact and categorical exclusions." 36 C.F.R. § 220.4(b)(2) (emphasis added). The Regional Forester determined that the "emergency facing Giant Sequoias requires urgent and immediate action," and thus sought "permission to initiate fuels reduction treatments prior to completion of environmental analysis." AR1. Based on a preliminary analysis and experience implementing similar projects, the Regional Forester determined that the needed actions "are not likely to have significant adverse environmental impacts." AR2. The Chief of the Forest Service accordingly granted authorization to begin the fuels reduction treatments on approximately 13,377 acres (including Nelder Grove) prior to completing the documentation for a CE. AR2-3. In short, the regulatory criteria for undertaking emergency alternative arrangements under NEPA on Nelder Grove were met, and the Emergency Decision properly allowed actions to proceed prior to completing the standard NEPA analysis and documentation.

> 1. The Emergency Decision does not "exempt" the Forest Service from complying with NEPA. (Claim 3, Count 2)

Plaintiffs contend that the Emergency Decision "completely exempt[s]" or "exclu[des]" the actions authorized on Nelder Grove "from ever complying with NEPA." Pls.' Mem. 18. This is incorrect. The alternative arrangements approved in the Emergency Decision contemplate the "completion of the documentation of . . . [CEs] . . . and [EAs]" in the groves where the emergency work will take place. AR2. And the status and timing of NEPA analyses are discussed in the Emergency Decision itself. *See* AR7 (Table 1, listing NEPA status for each grove), AR8 (discussing timing of NEPA analyses)). This approach is consistent with the Forest

- 14 -

Service's NEPA regulations, which provide for "alternative arrangements" in emergency situations where actions "must be undertaken prior to preparing any NEPA analysis and documentation," and not an exemption from NEPA. *See* 36 C.F.R. § 220.4(b)(2); *see also* 40 C.F.R. §1506.12 (CEQ NEPA regulations providing for alternative NEPA arrangements in emergencies for actions significantly affecting the environment). In addition, the Emergency Decision requires compliance with other laws, such as the Endangered Species Act, National Historic Preservation Act, and Clean Water Act, and requires notification to stakeholders, consultations and permitting, as well as public scoping and tribal engagement, all of which are hallmarks of the NEPA process. AR3. Plaintiffs argue that the Forest Service was required to show that compliance with NEPA was "impossible" or that there was an irreconcilable conflict between NEPA and some other statute. Pls.' Mem. 18 (citing *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787-88 (1976)). This argument incorrectly assumes that the Emergency Decision exempts the emergency action from the NEPA process when the opposite is true. It directs the Forest Service to comply with NEPA via alternative arrangements. Furthermore, the cases and regulations that Plaintiffs rely on in support of this argument do not involve the alternative arrangements process for emergencies—an integral component of both the Forest Service's and CEQ's NEPA regulations; it is not a NEPA exemption or an exclusion.

Based on a misreading of the Emergency Decision, Plaintiffs contend that it violates APA section 706(2), and the absence of documentation showing the completion of a NEPA analysis for Nelder Grove violates APA section 706(1). Pls.' Mem. 18. Both claims fail for the same reasons set forth above—the Emergency Decision does not provide an exemption from NEPA but sets forth alternative arrangements that authorize fuels reduction treatments before completion of the NEPA analysis and documentation process, consistent with the emergency regulation. AR2; 36 C.F.R. § 220.4(b)(2). The Forest Service is still performing a NEPA analysis for the emergency response but has not finished yet. [6]

---

[6] For this reason, Plaintiffs' references to *Sierra Club v. Bosworth* and the NEPA's "hard look" requirement, *e.g.*, Pls.' Mem. 13, are inapt.

1    Plaintiffs argue that the Forest Service must determine which CE covers its actions at

2    Nelder Grove. Pls.' Mem. 18. But the Emergency Decision already anticipates that the Forest

3    Service will do that, just not before beginning work. AR2. Plaintiffs' arguments about a future

4    CE that has not yet issued are premature and unripe because they do not challenge final agency

5    action. *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 418-419 (9th Cir. 2023) (APA

6    section 704 "expressly limits review to 'final agency action.'"); *Bishop Paiute Tribe v. Inyo Cty.*,

7    863 F.3d 1144, 1153 (9th Cir. 2017) (ripeness "ensure[s] that courts adjudicate live cases or

8    controversies and do not issue advisory opinions.'" (cleaned up)). Any claim Plaintiffs may have

9    regarding a future CE is unripe because it is based on "contingent future events that may not

10    occur as anticipated . . . ." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted);

11    *see also Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010) (same).

12    Plaintiffs also claim that because the Forest Service has not completed a NEPA analysis

13    and associated documentation that identifies an applicable CE for the actions on Nelder Grove, it

14    has unlawfully withheld or unreasonably delayed NEPA compliance. Pls.' Mem. 19. This is

15    incorrect. The emergency response regulation that the Forest Service relied on outlines a

16    procedure and criteria for complying with NEPA, which the Forest Service has followed.

17    Plaintiffs identify nothing in the emergency regulation or the Emergency Decision's alternative

18    arrangements that requires that a CE be identified by a particular time, much less at the outset.

19    And the Court is not free, as Plaintiffs assume, to impose procedural requirements that are not

20    found in the governing regulations. *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)

21    (en banc) ("we are not free . . . impose procedural requirements not explicitly enumerated in the

22    pertinent statutes.") (cleaned up). In the Emergency Decision, the Forest Service estimated that

23    "the four CEs covering the remaining eight groves . . . are anticipated by November 2023." AR8.

24    Plaintiffs cite nothing to suggest the Forest Service has abandoned that effort. Indeed, the Forest

25    Service is in the final stages of preparing CE documentation for Nelder Grove. Regelbrugge

26    Decl. ¶ 20. That process has been delayed, in part, to allow the same Forest Service personnel

27    responsible for preparing the CE to instead focus on preparing the administrative record for this

28

litigation as well as the ongoing NEPA process, reviewing the litigation filings, and responding to Plaintiffs' broad FOIA request for records in support of their litigation efforts. *Id*. In sum, the Forest Service is not unlawfully delaying the preparation of documentation for a CE for Nelder Grove, and Plaintiffs' unsubstantiated claims to the contrary lack merit.

2. <u>The Forest Service was not required to document whether extraordinary circumstances exist prior to taking emergency action. (Claim 2, Count 2)</u>

The Forest Service's NEPA regulations provide that if an action fits within a category of actions listed in 36 C.F.R. § 220.6(d) and (e) and there are no "extraordinary circumstances" related to the proposed action, it is categorically excluded from further NEPA analysis. 36 C.F.R. § 220.6(a). In determining whether there are extraordinary circumstances, the Forest Service regulations require it to consider seven "resource conditions," the mere presence of which "does not preclude use of a categorical exclusion (CE)." 36 C.F.R. § 220.6(b)(2). Instead, "[i]t is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions and, . . . the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id.* The resource conditions include effects to species of conservation concern, native religious or cultural sites, and archeological or historic properties. 36 C.F.R. § 220.6(b)(1)(i), (vi), (vii).

Plaintiffs claim that the Forest Service cannot rely on a categorical exclusion because of the presence of several resource conditions in Nelder Grove. Pls.' Mem. 21. As an initial matter, this claim is not ripe because the Forest Service has not completed an environmental analysis or documented reliance on any specific CE. Thus, Plaintiffs' challenge to a CE is entirely speculative, since there is the potential that the agency will choose to prepare an EA rather than rely on a CE, which does not involve an extraordinary circumstances analysis. If the Forest Service makes a final decision to rely on a CE, Plaintiffs can challenge the agency's determination of extraordinary circumstances at that time.

Even if Plaintiffs challenge the July 2022 Emergency Decision, the nature of an emergency determination is that the "responsible official determines that an emergency exists

that makes it necessary to take urgently needed actions *before* preparing a NEPA analysis and any required documentation" and that "such actions are not likely to have significant environmental impacts." 36 C.F.R. § 220.4(b)(2) (emphasis added). To that end, the Emergency Decision contemplates later NEPA analyses—which could include the identification of a categorical exclusion and attendant consideration of resource conditions as part of an extraordinary circumstances analysis—would be completed after the emergency actions were authorized. Plaintiffs' complaint that analysis of extraordinary circumstances was not completed at the same time as the Emergency Decision fails to acknowledge the relevant regulations, which do not require the Forest Service to analyze extraordinary circumstances before undertaking emergency actions. Indeed, such a requirement would make the emergency regulations process nonsensical by requiring the very NEPA analysis and documentation that the regulations recognize cannot be completed prior to action. *See* 36 C.F.R § 220.4(b)(2) (contemplating actions taken "prior to preparing any NEPA analysis and documentation associated with a CE").[7]

At bottom, Plaintiffs' challenge to the Forest Service's as-yet-uncompleted NEPA analysis is premature. Claim 3, Count 2, and Claim 2, Count 2, which attempt to challenge this incomplete process should therefore be dismissed.

---

[7] Plaintiffs mischaracterize the CE regulations, claiming the Forest Service would need to demonstrate that resource conditions "will not be affected." Pls.' Mem. 21. But the regulations state that resource conditions "should be *considered* in determining whether extraordinary circumstances . . . warrant further analysis" and their "*mere presence*" does not preclude use of a CE. 36 C.F.R. § 220.6(b)(1),(2) (emphasis added). In any event, the administrative record for Nelder Grove shows that the Forest Service is engaged in an ongoing environmental analysis of those resource conditions. *See* AR1936-79 (analyzing impacts on species); AR1985-86 (discussing design features to avoid impacts on species). The administrative record for the agency's reliance on a CE, including the extraordinary circumstances analysis, will not be complete until the agency finalizes the CE process; a challenge to the extraordinary circumstances analysis is not proper until then.

3.      The Forest Service was not required to issue a "finding of no significant impact" before taking emergency action. (Claim 2, Count 2)

Prior to authorizing actions on Nelder Grove, the Forest Service determined, based on a preliminary analysis, that the emergency actions it sought to undertake were not likely to have significant environmental impacts. AR2, 5. That finding is not the same as a "finding of no significant impact" or "FONSI," which the agency issues after preparing an EA and concluding that the proposed action does not have significant environmental effects. 42 U.S.C. §§ 4336e(7), 4332(2)(C); 40 C.F.R. § 1501.6. Plaintiffs' attempt to import the EA analysis misses the mark, and the court may not impose procedures not included in the emergency response regulations. *See Lands Council*, 537 F.3d at 993. The Emergency Decision's determination that an emergency exists and preliminary finding that the actions are not likely to have significant environmental impacts, AR1-2, are the conditions precedent that allowed the Forest Service to begin work prior to completing NEPA or issuing a FONSI. 36 C.F.R. § 220.4(b)(2). Reading the emergency response regulations as requiring the initial preparation of a FONSI when the regulations contemplate emergency actions being taken *before* NEPA analysis is completed would render them nonsensical.

Rather than evaluate the actions under the NEPA procedures in the emergency response regulation that applies here, Plaintiffs incorrectly seek to import different NEPA procedures that apply outside the emergency context *after* NEPA review is complete and an EA and FONSI are issued. Indeed, Plaintiffs cite *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) for the standard for upholding a finding of no significant impact following the EA at the end of an environmental analysis in a non-emergency context. Pls.' Mem. 23. Unlike the case Plaintiffs cite, the environmental analysis in this case is currently underway, it has not concluded, and there is no EA to challenge now.

Pointing to scoping comments they submitted after the Emergency Decision issued, Plaintiffs claim that there is a scientific controversy about the actions the Forest Service is undertaking in Nelder Grove. *Id.*; *see* AR876. Such comments are not part of the administrative

record for the Emergency Decision because they postdate the action. Nor are Plaintiffs' claims of scientific controversy or uncertainty relevant to the specific determinations that the Forest Service was required to make under its NEPA regulations in issuing the emergency determination. If Plaintiffs believe their comments are relevant to a future decision based on the ongoing environmental analysis, they may raise them when appropriate.

As explained in the Emergency Decision, due to the emergency, actions must be taken before the normal NEPA analysis is complete, and given the emergency, it only makes sense that the Forest Service initially conducted a truncated review process before actions commenced. If Plaintiffs are in fact challenging the determination that the emergency actions are not likely to have significant environmental impacts, rather than a FONSI the agency was never required to make, that determination was based on a preliminary analysis and years of experience implementing similar projects. AR2. It was also supported by the Forest Service's application of protective design features outlined in the Castle Fire and Hume Basin Restoration projects so that treatments do not approach thresholds for significant environmental effects. AR5. A court reviewing determinations based on the agency's substantial experience pays the "highest deference . . . to the Forest Service's technical analyses and judgments within its area of expertise." *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1131 (9th Cir. 2010). So long as that process is rational, as it is here, the Court should defer to the agency's determination that an emergency exists, and the emergency actions the Forest Service sought to undertake were not likely to have significant environmental impacts.

As with their challenges to the anticipated categorial exclusion, Plaintiffs' challenge to a hypothetical EA is premature and unripe for judicial review. For all the reasons set forth above, Count 3, Claim 2, and Count 2, Claim 2 should be dismissed.

### D. The emergency response activities on Nelder Grove comply with NFMA. (Claim 4, Count 1)

NFMA requires the Forest Service to ensure that site-specific projects and activities are "consistent with the land management plans" for the forest. 16 U.S.C. § 1604(i); *see also* 36

C.F.R. § 219.10(e) (1982). Thus, in assessing the merits of a NFMA challenge to a particular project or activity, a court must look to the language in the applicable *Forest Plan*—not some other document—and should afford the agency substantial deference in its interpretation and implementation of its own Forest Plan. *See, e.g.*, *Or. Nat. Desert Ass'n v. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (explaining the Forest Service's obligations under NFMA); *see also Earth Island Inst. v. Carlton*, 626 F.3d 462, 471-72 (9th Cir. 2010) (noting the particular species viability requirements upon which plaintiffs relied were not contained *in the pertinent forest plan*). Courts distinguish between mandatory standards contained in the Forest Plan and non-enforceable guidelines, recommendations, and suggestions, with the latter not being subject to NFMA's consistency requirement. *See, e.g.*, *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660-61 (9th Cir. 2009) (suggestive language like "should" not enforceable under NFMA).

Plaintiffs' NFMA claim fails because they have alleged no inconsistency with the 1991 Forest Plan for the Sierra National Forest. Instead, Plaintiffs allege that the Forest Service has disregarded a provision contained in the errata to an appendix to the Final EIS for the Forest Plan that addressed the development of a "detailed long-term implementable strategy for the Grove." *See* Pls.' Mem. 24 (citing AR465).[8] This is not a Forest Plan requirement.

NFMA requires consistency with mandatory standards contained in *Forest Plan* itself, not with recommendations in policy statements or companion documents like EISs. *See Forest Guardians v. U.S. Forest Serv.*, No. CIV 05-0372, 2006 WL 4109661, at *26 (D.N.M. Aug. 22, 2006) ("Because NFMA requires that projects be consistent with Forest Plans, and a [Management Indicator Species Assessment or MISA] and a FEIS are not Forest Plans, the Court concludes that the Forest Plan does not require the USFS to maintain the Abert's squirrel at populations 'greatly exceeding minimum viable populations,'" as stated in the MISA). In sum, the errata to the FEIS appendix are not part of the Forest Plan, do not impose a separate binding requirement on the Forest Service, and Plaintiffs have no NFMA claim based on the errata alone.

---

[8] The Final EIS and appendices for the 1991 Plan are not in the administrative record. Only the 1991 Plan and Record of Decision, which contains the one-page errata, are in the record.

- 21 -

Nor do Plaintiffs have a NFMA claim based on an alleged inconsistency with a memorandum containing a "Forester Policy Statement." Pls.' Mem. 24 (citing AR4767). Policy documents do not have the force and effect of law. *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996). Even if it had been incorporated into the Forest Plan, which it was not, the policy statement is not a mandatory standard that binds the agency under the APA.[9]

To the extent Plaintiffs invoke provisions that do appear within the 1991 Forest Plan (*see* Pls.' Mem. 24), none of those provisions require the "detailed long-term implementable strategy" referenced in the FEIS errata. And Plaintiffs do not articulate how, if at all, the Nelder Grove emergency response actions are inconsistent with any actual plan standards of the type that would be enforceable against the agency. Plaintiffs cite the requirement to develop and implement a "fuels reduction plan" for Nelder Grove, but the emergency response actions taken under the Emergency Decision comprise such a plan. *See* AR1 (the main purpose of the emergency response is "fuels reduction").[10] Finally, if Plaintiffs are arguing that "[a]ny removal of naturally-regenerating Giant Sequoias" is inconsistent with the 1991 Forest Plan, they cite no support for that proposition in the Plan itself. Pls.' Mem. 25. The removal of fuels, which may result in the inadvertent destruction of a small percentage of regenerating Giant Sequoias despite the imposition of protective design features, is necessary to protect the remaining monarch Giant Sequoias from the inevitable next wildfire. AR4722.

Plaintiffs' suggestion that what the Forest Service is doing now on Nelder Grove must disregard the Forest Plan because no work (other than minor fuels work) has ever occurred on Nelder Grove previously is not even supported by their own documents, which recite one person's recollection (Buchele Decl. Ex. 3 at 6-7), repeat hearsay from years ago (Buchele Decl.

---

[9] Although Plaintiffs claim this non-binding policy statement "was incorporated into the 1991 Plan," this is unsupported. The document they cite—AR465—is just the errata to the FEIS, which does not even mention the policy statement, much less incorporate it.

[10] Plaintiffs' citation to an extra-record internal email about whether an EIS is needed for work on Nelder Grove, *see* Pls.' Mem. 25, has nothing to do with whether the Forest Service violated NFMA. The Forest Plan speaks for itself, and Defendants are not bound by informal, deliberative statements made in passing by agency staff.

Ex. 3 at 6), or pertain only to post-2017 work (Buchele Decl. Ex. 13). Finally, Plaintiffs'

assertion that a Nelder Grove-specific management plan must be required under the Forest Plan

because of a casual exchange between agency employees about the complexity of the area

(Buchele Decl. Ex. 12 at 7-8) is not worthy of serious attention by the Court.

In sum, the Court should grant summary judgment for the Forest Service on Plaintiffs'

NFMA claim (Claim 4, Count 1).

**E.    Defendants object to consideration of exhibits 1-13 attached to the declaration of Plaintiffs' counsel.**

In support of their summary judgment motion, Plaintiffs' counsel has submitted a

declaration with thirteen exhibits, which comprise documents that Plaintiffs requested

Defendants include in the administrative record for this case. The Forest Service reviewed each

these documents during the parties' conferral process on the contents of the administrative record

and confirmed that none of the documents are appropriately part of the administrative record

because they are deliberative or immaterial to the challenged decision or they are otherwise

inconsistent with the Forest Service's administrative record guidelines. Additionally, many

documents are post-decisional. Defendants included other documents Plaintiffs had requested be

added to the record in a supplemental administrative record filed with the Court. ECF No. 43. To

avoid motions practice on the contents of the administrative record, Defendants agreed that

Plaintiffs may use the extra-record documents that had been included in their requests in their

summary judgment brief subject to Defendants' objections.

Defendants do object to the Court considering any of the thirteen exhibits in addressing

the merits of Plaintiffs' claims, because they are not part of the administrative record in this case

and Plaintiffs have failed to show that any of the four narrow exceptions to the record-review

rule applies to the documents. In particular, exhibits 3, 8, 9, 11, 12, and 13 contain internal,

deliberative, and sometimes post-decisional email correspondence between federal agency

employees that are not part the record for the July 2022 Emergency Decision. *See*, *e.g.*, *Blue*

*Mountains Biodiversity Project*, 99 F.4th at 444-45 (rejecting argument that deliberative

materials part of the "whole record" and noting the presumption that the agency properly designated the record and that deliberative documents are not part of the administrative record). Furthermore, as explained throughout this brief, Plaintiffs mischaracterize many of the statements they cherry-pick from the documents and Defendants object to their use on that basis.

**F.      Plaintiffs abandoned claims they failed to address in their summary judgment brief. (Claim 3, Count 1, and Claim 4)**

In Claim 3, Count 1 of the Complaint, Plaintiffs alleged that the Forest Service's use of its emergency response regulation, 36 C.F.R. § 220.4(b)(2), violated NEPA because use of those regulations does not comply with a regulation promulgated by the Council on Environmental Quality, 40 C.F.R. § 1506.12 (2022). 2nd Am. Compl. ¶¶ 142-148. In their summary judgment memo, Plaintiffs provide no argument to support this claim. Likewise in Claim 4, Count 2, Plaintiffs alleged that ongoing actions implementing the project violate the 2023 Sierra Forest Plan, but have provided no argument in support of this claim. Because they press neither claim in their summary judgment motion both claims should be dismissed as abandoned. *See Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005).

**G.      If the Court finds for Plaintiffs on any claims, it should deny equitable relief or order supplemental briefing on remedy.**

The Court should deny any request for vacatur or injunctive relief since equitable relief is not appropriate here. Alternatively, the court should not issue any equitable relief without further briefing on this issue. Both vacatur and permanent injunctive relief under NEPA are subject to principles of equity. *See Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080-81 (9th Cir. 2010). While vacatur may be appropriate at times, it is by no means the presumptive remedy and before imposing it, the Court should consider the seriousness of the agency's errors, the equities, and the public interest. *See Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1106 (E.D. Cal. 2013) (rejecting claim that "vacatur [for] a NEPA violation was virtually automatic").

The Forest Service did not commit any error, let alone a serious, substantive error requiring vacatur. *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. 12-9861, 2016 WL 4445770, at *12 (C.D. Cal. Aug. 12, 2016) ("procedural deficiencies and/or questions as to the sufficiency of . . . analysis" do not warrant vacatur); *Sequoia ForestKeeper v. Elliott*, 50 F. Supp. 3d 1371, 1379 (E.D. Cal. 2014) ("[A]ny equitable remedy the court may impose will necessarily focus on the procedural deficiency identified, if any."). Vacatur will also have disruptive consequences—halting and delaying the implementation of emergency activities that are currently 50% complete and which the agency determined are necessary to reduce the threat posed by wildfire to the remaining Giant Sequoias in Nelder Grove. *See* Regelbrugge Decl. ¶¶ 13, 21-22. By contrast, Plaintiffs cannot show irreparable harm from implementation, having waited more than a year after the 2022 Decision to challenge the project and having declined to seek emergency relief throughout this case while implementation was ongoing.

The public interest also weighs heavily against vacating or enjoining the work on Nelder Grove. Reducing the risk of catastrophic wildfire to the surviving Giant Sequoias is undeniably in the public interest. *See Sierra Forest Legacy*, 951 F. Supp. 2d at 1115 (holding that to "[e]njoin[] . . .vegetation management work . . . [would] have a negative impact on the Forest Service's ability to address the intertwined threats posed by climate change, drought and bark beetles, and is thus contrary to the public interest"). Just in the last several years, severe wildfire has killed 39 of the 104 centuries-old monarch Giant Sequoias in Nelder Grove. AR265. Members of the public have also affirmed their support for this work.

In sum, if the Court finds for Plaintiffs on the merits, the court should deny any equitable relief. In the alternative, the Court should order further briefing.

## CONCLUSION

For all the reasons stated above, the Court should deny Plaintiffs' motion for summary judgment, grant the Forest Service's cross-motion, and enter judgment for the Forest Service.

Dated: June 21, 2024

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*Erika Norman*
SEAN C. DUFFY
ERIKA NORMAN
Trial Attorneys
Natural Resources Section
150 M Street NE, Suite 2.900
Washington, DC 20002
Ph: (202) 305-0445 (Duffy)
Ph: (202) 305-0475 (Norman)
sean.c.duffy@usdoj.gov
erika.norman@usdoj.gov

*Attorneys for Defendants*