Thomas Buchele, CA Bar No. 129657
Earthrise Law Center
Lewis & Clark Law School
10101 S Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Rachel M. Fazio, CA Bar No. 187580
John Muir Project of the Earth Island Institute
P.O. Box 897
Ridgecrest, CA 92314
Tel: 530-273-9290
Email: rachelmfazio@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **EARTH ISLAND INSTITUTE**, a non-profit corporation; **SEQUOIA FORESTKEEPER**, a non-profit corporation; **SIERRA CLUB**, a non-profit corporation,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>**RANDY MOORE**, in his official capacity as the Chief of the United States Forest Service; **DEAN GOULD,** in his official capacity as the Forest Supervisor for the Sierra National Forest; **JENNIFER EBERLIEN,** in her official capacity as the Regional Forester for the Pacific Southwest Region; **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture,<br><br>　　　　　Defendants. | CASE No. 1:23-cv-01045-JLT-EPG<br><br><br>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

Argument

I. The Service cannot use a "situation" it created to declare an emergency (Claim 2, Count 1) .... 3

II. Defendants' activities in Nelder Grove exceed the scope of emergency actions authorized by the Chief's Memorandum (Claim 1). .............................................................................. 6

III. Deference to the Service's Determination that the Project would not likely have significant environmental impacts is both not appropriate and not possible (Claim 2, Count 2)........................................................................................................................... 11

IV. The Service Cannot Construe its Emergency Regulation to Allow it to Never Prepare A Decision Memo or to Not Determine a Specific CE Applies Before Implementing Its Actions (Claim 2, Count 2; Claim 3, Counts 1 and 2)……………………………………...15

A. The Service cannot entirely excuse itself from Preparing a Decision Memo ............. 15

B. The Service cannot legally rely on a CE without determining that a specific CE in fact applies to the Emergency actions authorized within Nelder Grove ........................... 15

V. The Service logged in Nelder Grove in violation of the governing 1991 Plan (Claim 4, Count 1)……………………………………………………………………………...18

VI. The Court should consider all of Earth Island's Exhibits…………………………...22

VII. The Service's Discussion of Remedy is Premature and is misleading…………………..24

Conclusion ....................................................................................................................... 25

MEMO IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Cases**                                                                                    **Page(s)**

*Alaska Ctr. for Env't v. U.S. Forest Service*, 189 F.3d 851 (9th Cir. 1999) ................................. 12

*Auer v. Robbins*, 519 U.S. 452, (1997) ...................................................................... 21

*Blue Mtns. Biodiversity Project v. Jeffries*, 99 F.4th 438 (9th Cir. 2024)............................ 23

*California v. Norton*, 311 F.3d 1162 (9th Cir. 2002)............................................. 16, 17

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ............. 5, 6

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ............................ 21

*Corner Post, Inc. v. Board of Governors*, 144 S. Ct. 2440 (July 1, 2024)................................... 25

*Earth Island Inst. v. Carlton*, 626 F.3d 462 (9th Cir. 2010) ........................................ 19

*Earth Island Institute v. Pengilly*, 376 F. Supp. 2d, 994 (E.D. Cal July 2, 2005).......................... 5

*Ecology Ctr. v. Castaneda*, 574 F.3d 652 (9th Cir. 2009) ........................................ 20

*Forest Guardians v. U.S. Forest Serv.*, No. CIV 05-0372, 2006 WL 4109661 (D.N.M. Aug. 22, 2006) ................................................................................................ 19, 20

*Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 2017 WL 2962771 (E.D. Wash. July 11, 2017), aff'd, 726 F. App'x 605 (9th Cir 2018)........................... 5

*Friends of the Clearwater v. Dombeck,* 222 F.3d 552 (9th Cir. 2000) ....................... 24

*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) ................................................ 22

*Friends of the Inyo v. U.S. Forest Service*, 2024 WL 2281568 (9th Cir. May 21, 2024)............ 26

*Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) ........................................................ 21, 22

*Lands Council V. Powell*, 395 F.3d 1019 (9th Cir. 2005)............................................ 24

*League of Wilderness Defenders/BMBP v. Allen*, 615 F.3d 1122 (9th Cir. 2010) ................. 12

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024)............................... 6, 21

*NRDC v. Winter*, 518 F.3d 658 (9th Cir. 2008) .................................................... 21

*NRDC v. Winter*, 527 F.Supp. 2d 1229 ................................................... 4, 5, 6

*Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 2018 WL 6524161 (D. Or. Dec. 12, 2018) ... 25

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 864–65 (9th Cir. 2005) ................. 12

*Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) ............................................. 8, 9, 13

*Or. Nat. Desert Ass'n v. Forest Serv.*, 957 F.3d 1024 (9th Cir. 2020) ......................................... 21

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520 (9th Cir. 2015) ........ 25

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) ..................................................... 8, 12, 16

*Siskiyou Reg'l Educ. Project v. Goodman*, 2005 WL 2083011 (D. Or. July 29, 2005) ................. 5

*Thompson v. U.S. Dept of Labor*, 885 F.2d 551 (9th Cir. 1989) ................................................. 23

*W. Watersheds Project v. Krayenbrink*, 63d F.3d 472 (9th Cir. 2011) ......................................... 12

**Statutes**                                                                                                      **Page(s)**

5 U.S.C. § 706(1) ................................................................................................ 11, 15, 18, 24

5 U.S.C. § 706(2) ........................................................................................................ 15, 18

16 U.S.C. § 1604(i) ........................................................................................................... 18

**Regulations**                                                                                                 **Page(s)**

36 C.F.R. § 215.2 ................................................................................................................ 5

36 C.F.R. § 220.4 ................................................................................................................ 4

36 C.F.R. § 220.4(b) ........................................................................................ 1, 4, 5, 6, 11, 12

36 C.F.R. § 220.4(b)(2) ......................................................................................... 1, 11, 12, 16

36 C.F.R. § 220.6 ............................................................................................................... 16

36 C.F.R. § 220.6(e) ................................................................................................... 15, 16, 17

40 C.F.R. § 1501(a) ............................................................................................................. 8

40 C.F.R. § 1501.4(b) ...................................................................................................... 16, 17

40 C.F.R. § 1506.12 ........................................................................................................ 7, 11

40 C.F.R. § 1508.13 ........................................................................................................... 12

iii    MEMO IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

**Other**                                                                                    **Page(s)**

73 Fed. Reg. 43084 (July 24, 2008) ........................................................................ 4

73 Fed. Reg. 43087–88 (July 24, 2008) ................................................................... 4

73 Fed. Reg. 43088 (July 24, 2008) ........................................................................ 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv      MEMO IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
        JUDGMENT

# TABLE OF ACRONYMS

APA ...................................................................................... Administrative Procedure Act

ARA ................................................................................................. Appeals Reform Act

CE ...................................................................................................Categorical Exclusion

CEQ ...................................................................Council on Environmental Quality

FEIS ................................................................. Final Environmental Impact Statement

NEPA ......................................................................National Environmental Policy Act

NFMA ....................................................................National Forest Management Act

**INTRODUCTION**

In order to invoke their emergency response regulation, 36 C.F.R. § 220.4(b), and allow for their actions in Nelder Grove to occur first and complete compliance with NEPA to come later, the Defendants (the "Service") had to make three threshold determinations. First it had to find that there was in fact an "emergency" within the meaning of the regulation. *Id.* Second it had to find that it was necessary to complete the authorized actions immediately, before it could fully comply with NEPA. *Id.* Third, because the Service was invoking its authority under Section 220.4(b)(2), it also had to determine the proposed emergency actions "are not likely to have significant environmental impacts." *Id.* This third threshold determination is what allowed the Service to avoid consulting with the Council of Environmental Quality ("CEQ") about the emergency response.

While the immediate dangers imposed by an actively burning wildfire would be an emergency, the risk of future wildfires and dangers they pose to Nelder Grove's Giant Sequoias have been quite foreseeable since at least 2017, when the Railroad Fire burned a significant portion of the Grove and killed dozens of mature Giant Sequoias. Those obvious risks did not suddenly create an emergency in 2022. The fact that the Service waited until July of 2022 to take action in Nelder Grove cannot turn those actions into urgently needed emergency actions that can occur before the Service complies with otherwise mandatory procedures under NEPA.

Even if the risks to the remaining mature Giant Sequoias in Nelder Grove did qualify as an emergency under Section 220.4(b), the "emergency actions" the Service is undertaking go far beyond what is necessary to immediately address the stated emergency and even include logging regenerating young Giant Sequoias. The Emergency Response Decision Memorandum signed by the Chief of the U.S. Forest Service on July 22, 2022 (the "Chief's Memorandum") explained that "the remaining unburned groves and unburned portions of burned groves are under severe threat to wildfire. Lighting strikes threaten the groves daily and immediate action is needed to remove fuels from around those trees to limit further mortality." AR2. [1]Although the Service focused its initial

---

[1] Plaintiffs ("Earth Island") cite to the Service's December 2023 Administrative Record, ECF 25 and April 2024 Supplement, ECF 43-3, as "AR____," referencing the page numbering at the bottom, right-hand corner of each record page. When citing to documents in the ECF, Earth Island use the page numbers in the bottom of each page and not the ECF page stamps.

true emergency response on removing fuels from around the mature Giant Sequoias in the unburned areas, they have illegally expanded their emergency response into the severely burned areas. There are no living mature Giant Sequoias to protect in the severely burned areas of Nelder Grove. There are numerous regenerating young Giant Sequoias in those severely burned areas, and the Service has even illegally expanded its emergency response to include logging some of the young Giant Sequoias, actions that would surely have drawn significantly public outcry if they had been publicly disclosed by the Service's decision, press releases and scoping notice.

The Service insists that it is entitled to deference regarding its key, threshold determination that the authorized emergency actions in Nelder Grove are "not likely to have significant environmental impacts," *see* ECF 57-1 at 20, but courts do not generally defer to such mandatory findings under NEPA that allow agencies to avoid otherwise applicable statutory requirements. More importantly, the Service offers the Court nothing to defer to. The Service's non-significance finding is based on a single paragraph that points to a "preliminary analysis" and the Service's "experience implementing similar projects." Even for an emergency determination a court cannot defer to a void, especially regarding such an important threshold 'non-significance" finding.

NEPA's emergency procedures do allow for full compliance with NEPA to be delayed in an emergency, but those procedures do not and cannot excuse prior compliance with NFMA and the applicable forest plan. The parties agree the controlling Plan in July of 2022 was the 1991 Plan. The Service simplistically argues the 1991 Plan's binding requirements can only be found in AR467-603, the first page of which identifies it as the 1991 "Forest Land and Resource Management Plan" for the Sierra National Forest. The Record of Decision ("ROD") approving that proposed 1991 Plan is also in the administrative record. AR434–466. This September 1992 ROD unambiguously explains that the final, binding 1991 plan includes the proposed 1991 Plan document, Alternative A from the Final Environmental Impact Statement ("FEIS") for the 1991 Plan and "changes, clarifications and additions" set forth in the ROD. AR437–438. One of those changes is that Nelder Grove "will be managed in a manner consistent with the Regional Foresters Giant Sequoia policy letter (June 19, 1992)," AR444, that unambiguously requires that no trees can be removed from Sequoia groves, other than hazard trees, until the Service completes a "long term

management plan[]" for each grove, AR4767. The errata for the 1992 ROD unambiguously set forth that for Nelder Grove this means that "[u]ntil the long-term implementation strategy for [Nelder Grove] is approved, only human hazard trees will be removed." AR465. The Service does not dispute it has not developed such a plan or strategy for managing Nelder Grove. ECF 57-1 at 21–22. But it also includes conclusory assertions in the Chief's Memorandum that the authorized actions, which allow for the removal of far more than human hazard trees, are consistent with the 1991 Plan. AR1. Those conclusory assertions are contrary to the actual binding and unambiguous language of that 1991 Plan, and the Chief's Memorandum therefore violates NFMA.

Finally, although the alternative arrangements allowed by NEPA's emergency regulation can postpone complete compliance with NEPA they cannot completely excuse such compliance. The Chief's Memorandum purports to rely of a Categorical Exclusion ("CE") to comply with NEPA for the authorized emergency actions in Nelder Grove. But the Chief's Memorandum then illegally goes on to completely excuse the Service from ever preparing the mandatory Decision Memorandum for the use of certain CEs. But the Chief's Memorandum then goes even further and allows the Service to purportedly rely on a CE to comply with NEPA for its actions in Nelder Grove, but without first determining that there actually is a specific CE that could cover the actions authorized for Nelder Grove or without any consideration, or even mention, of any possible extraordinary circumstances. The emergency regulations could excuse the Service from fully documenting how the authorized actions fall within a specific CE or why extraordinary circumstances would not preclude the use of that specific CE, before implementing the emergency actions. However, those regulations cannot excuse the Service from initially, and before implementing the emergency actions, making a preliminary determination/finding that a specific CE applies and extraordinary circumstances do not preclude its use.

## Argument

### I.  The Service cannot use a "situation" it created to declare an emergency (Claim 2, Count 1).

Earth Island is challenging only the Service's inclusion of Nelder Grove in its emergency

declaration. After citing a series of wildfires, starting in 2015, that killed mature Giant Sequoias, that Memorandum defines the supposed emergency as the need to protect "the remaining unburned groves and unburned portions of groves…[where] lighting strikes threaten the groves daily and immediate action is need to remove fuels from around [the mature Giant Sequoias]to limit further mortality." AR2. Significant portions of Nelder Grove were burned by the 2017 Railroad fire which killed dozens of Nelder Grove's mature Giant Sequoias. See ECF 47 at 7. Interpreting the term "emergency" from its "Emergency Response" regulation, 36 C.F.R. § 220.4, to apply to a wildfire threat that has been unquestionably apparent in Nelder Grove since at least 2017, is unreasonable and not consistent with the common usage of that term.

When promulgating its regulation the Service specifically explained that it was using such common usage, citing multiple dictionary definitions. 73 Fed. Reg. 43084, 43087-88 (July 24, 2008). Neither side argues that the term emergency is ambiguous and significantly, although it demands deference in other parts of its brief, the Service does not do so when addressing this claim. Instead of demanding deference, the Service skips over the first three dictionary definitions from its Federal Register notice, all of which use the words like "unforeseen," "sudden" and/or "unexpected, "and latches onto the fourth and final definition which is "[a] situation that demands unusual or immediate action and that may allow people to circumvent unusual procedures***" 73 Fed. Reg. at 43088 (quoting Black's Law Dictionary (8th Ed. 2004)). It then insists an "emergency under" Section 220.4(b) can exist even in circumstances that are not "sudden," unforeseen," or "unexpected." ECF 57-1 at 8. There are multiple problems with this argument.

Most fundamentally, the Service, is reading the fourth listed definition in isolation and out of context. The "situation" that this fourth Black's Law Dictionary definition is referencing is in fact a "sudden," unforeseen" or "unexpected" situation, which is apparent when you read the entire definition from Black's, which the Ninth Circuit provided in *NRDC v. Winter,* 518 F.3d 658, 681 (9th Cir. 2008), *vacated on other grounds*, 129 S. Ct. 365, 381-82 (2008). That complete definition is: "[a] situation that demands unusual or immediate action and that may allow people to circumvent unusual procedures, *as when a neighbor breaks through a window of a burning house to save someone." Id*. (emphasis added by Ninth Circuit opinion). Thus the complete Black's Dictionary

definition is plainly describing a sudden, unforeseen or unexpected "situation," like a burning fire. The Ninth Circuit rejected the agency argument in *Winter,* citing additional dictionary definitions, that an "emergency" under the NEPA emergency regulation need not be "unexpected" or "unforeseen," and upheld the district court's determination that the plain meaning of "emergency" did not include something that was "entirely predictable." *Winter,* 518 F.3d at 681 & n. 41.

Like *Winter,* the other case law cited by Earth Island, *Forest Service Employees for Environmental Ethics v. U.S. Forest Service,* 2017 WL 2962771, at *6 (E.D. Wash. July 11, 2017)*, aff'd,* 726 F. App'x 605 (9th Cir. 2018), also requires that an "emergency" be sudden, unexpected or unforeseeable. Although the Service argues that these "opinions do not suggest that a wildfire must be active to constitute an emergency," ECF 57-1, at 9, both the district court and Ninth Circuit opinions, interpreting the term "emergency" in 36 C.F.R. § 220.4(b), expressly distinguish between the unforeseeable risks created by wildfires as they are burning, which would be an "emergency," and the plaintiff/appellant's argument that the risk of wildfires generally is foreseeable and does not create an emergency situation. 2017 WL 2962771, at *6; 746 F. App'x at 606.

Rather than following this case law interpreting the actual NEPA emergency regulation at issue here, 36 C.F.R. § 220.4(b), the Service urges this Court to follow decisions construing the term "emergency" as used in a different regulation, 36 C.F.R. § 215.2, interpreting the Appeals Reform Act ("ARA"), an entirely different statute. Those cases both uphold the Service treating situations where logging was needed immediately to prevent burnt timber from deteriorating in value as an emergency under that different regulation and statutory scheme. See *Earth Island Inst. v. Pengilly,* 376 F. Supp. 2d 994, 1008–09 (E.D.Cal. 2005), *aff'd in part sub nom. Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687 (9th Cir. 2007), *rev'd on other grounds sub nom. Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *Siskiyou Reg'l Educ. Project v. Goodman,* 2005 WL 2083011, at *7 (D. Or. July 29, 2005). In both these cases, however, the Service asked for deference to its interpretation of the underlying statute, citing *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984), and in both cases the district court relied upon such deference to find that the agency's interpretation of the term "emergency" was not an impermissible reading of the underlying statute, the ARA. *Pengilly,* 376 F. Supp. 2d at 1008-1009;

*Goodman*, 2005 WL 2083011, at *4-8. In this case the Service has never requested *Chevron* deference, and, in any case the Supreme Court has recently overruled *Chevron* and such deference is no longer available. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024). Neither of these cases can support the Service's strained interpretation of the term "emergency" as used in the Service's NEPA emergency regulation.

In this case the so-called "emergency" with regard to Nelder Grove was primarily caused by the Service's own inaction since it was put on notice of the very real danger from wildfire to the Nelder Grove Sequoias by the 2017 Railroad fire. The Service's response repeatedly invokes the more recent fires from 2020 and 2021, and tries to distinguish the "predictable" situation in *Winter* by arguing it "did not have such warning." ECF 57-1 at 10. This argument might possibly work for groves included in the Chief's Memorandum that have never been recently threatened by wildfire or have not actually burned. But the Service was warned about the danger to Nelder Grove when it was directly and severely impacted by wildfire in 2017, five years before the declaration of an "emergency" covering that Grove, and in 2018 the Service admits it began a NEPA process to evaluate a response to that 2017 fire but did not follow through and complete that process. *See* ECF 47 at 7.[2] The danger to Nelder Grove's remaining mature Giant Sequoias could not in 2022 be treated as "sudden" or "unforeseen" and cannot therefore constitute an "emergency" under the common usage of that term in 36 C.F.R. § 220.4(b) which would allow the Service to avoid the otherwise mandatory provisions of NEPA. The Service's inclusion of Nelder Grove in the Chief's Memorandum was therefore contrary to law in violation of the APA and NEPA.

## II. Defendants' activities in Nelder Grove exceed the scope of emergency actions authorized by the Chief's Memorandum (Claim 1).

Defendants have exceeded, and continue to exceed, the scope of the actions expressly authorized in the Chief's Memorandum. Actions exceeding the scope of the Chief's Memorandum

---

[2] ECF 54-3, indicates Nelder Grove was included and the Sierra National Forest's other Sequoia Grove, McKinley, was not included in the 2020 Memorandum, primarily because one (McKinley) had an ongoing NEPA process and the other (Nelder) did not. The Service does not directly dispute this but instead argues that its delay in addressing the situation in Nelder Grove was not "purposeful," S*ee* ECF 57-1, and note 4. But the Service fails to explain how its alleged intent changes the fact that a risk apparent since at least 2017 cannot be treated as an "emergency" that excuses its duty to comply with otherwise mandatory legal obligations under NEPA.

violate NEPA because, while "emergency" actions are excused from the standard NEPA process, "[o]ther [non-emergency] actions remain subject to NEPA review." 40 C.F.R. § 1506.12 (2023). The Chief's Memorandum states that the emergency fuels treatments would "remove surface and ladder fuels *which present the greatest risk* from wildfires." AR1–2 (emphasis added). It goes on to find that "[t]he remaining *unburned* groves and *unburned* portions of burned groves are under severe threat [from] wildfire." AR2 (emphasis added). Given that Nelder Grove's Giant Sequoias experienced one hundred percent mortality in areas that burned at high severity, any surface or ladder fuels in these areas pose little risk to any mature Giant Sequoias. AR71. The Service repeatedly made this distinction between severely burned and unburned or less-severely burned areas within Giant Sequoia groves. *See* AR2, 4–7. The idea that an "emergency" (regarding protection of mature Giant Sequoias) exists in the severely burned areas of the Giant Sequoia groves is unsupported in the AR. The Service exceeded the actions authorized by the Chief's Memorandum by logging in the severely burned areas of Nelder Grove even though that memorandum only authorized the Service to "remove surface and ladder fuels which present the greatest risk from wildfires," in the "remaining unburned groves and unburned portions of groves." AR1–2.

The Chief's Memorandum includes a "background and rationale" document which lays out the Service's understanding of its own emergency decision. *See* AR3–37. Here, the Service reiterates that "[t]he remaining unburned groves [] and unburned portions of burned groves [] are under severe threat [from] wildfire…." AR5. Additionally, the "objective" of the Chief's Memorandum "is to provide for long term survival of Giant Sequoias by reducing the likelihood and effects of high severity wildfire before it occurs in previously *unburned or moderately burned* Giant Sequoia Groves. This foundational document states that the "urgent" proposed treatments "include removal of green and dead surface and ladder fuels from immediately around large Giant Sequoias…." AR6. If an emergency is a circumstance "that demands unusual or immediate action…" as Defendants suggest, it follows that the "urgent" actions within the emergency decision address the fuels presenting the greatest risk from wildfires. *See* ECF 57-1 at 8

The Service's opening brief does not dispute that when reviewing emergency actions, any invocation of this regulation should be read narrowly, as Earth Island argued in its opening brief.

*See,* ECF 47 at 13–14, *citing NRDC v. Winter*, 527 F.Supp. 2d 1216, 1229, 1231 (C.D. Cal. 2008). This is because leaping before looking violates the "fundamental purpose of NEPA," which is, "to provide for informed decision making…." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007); 40 C.F.R. § 1500.1(a) (2023). In fact, from the outset, the Service understood the narrow scope of the Chief's Memorandum. *See* ECF 54-3 at 3.[3]

The Chief's Memorandum only authorized fuels reduction work in the area around mature Giant Sequoias. AR1–2. The Service correctly understood that any work it wanted to do beyond this narrow authorization required an EA. ECF 54-5 at 1. Defendants now attempt to minimize the Service's original and correct understanding that EAs were required to do any other work besides fuels reduction surrounding monarch Giant Sequoias by claiming that the reference to "around the groves" in the Service's email communications means "outside the groves." *See* ECF 57-1 at 11; ECF 54-3 at 3. However, the Chief's Memorandum used similar language when it stated that "immediate action is needed to remove fuels from *around* [Giant Sequoias] to limit further mortality." AR2 (emphasis added). If Defendant's interpretation of "around the groves" as meaning "outside the groves" were to be accepted as true, the Chief's Memorandum would be understood to allow fuels reduction efforts *only* outside the bounds of the twelve groves, an absurd result.

Although an agency's actions can only be upheld on the basis articulated by the agency, *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1120 (9th Cir. 2010), the Service repeatedly demands deference and the ability to expand their emergency actions beyond the actions expressly authorized by the Chief's Memorandum based only on "experience implementing similar projects." *See* ECF 57-1 at 6, 14, 19, 20; AR2, 5. The so-called "similar projects" do not even support the Service's decision to log in the severely burned areas. The AR "Supporting Documents" section contains only one document that could be the "similar projects" relied upon: the "Post-fire Restoration Strategy for the 2021 for the Windy Fire, KNP Complex, and French fires" document ("Restoration Strategy"). *See* AR92–240. In the Restoration Strategy, there is a marked difference on activities

---

[3] The Service inaccurately asserts that these emails in ECF 54-3 do not discuss Nelder Grove but instead the Exchequer Restoration Project. ECF 57-1 at 12. While the Exchequer Restoration Project mentioned in the email exchange, the pertinent email at the top of ECF 54-3 at 3 discusses both Nelder Grove and the emergency response.

to be carried out in "severely burned areas" and "severely burned groves." *See* AR139 (discussing reforestation and fuels reduction to be conducted in the severely burned groves generally *and* regeneration in severely burned areas specifically). Additionally, the "restoration strategies" for the Giant Sequioa National Monument "[e]mphasize[d] the protection of large giant sequoias," "[p]rovide[d] additional protection to named giant sequoias from wildfires," and, encouraged regeneration of Giant Sequoias. AR123–24. Nowhere in the Restoration Strategy does it mention the logging of young, naturally regenerating Giant Sequoias.[4] Nor does the Restoration Strategy indicate that protecting large Giant Sequoias requires fuels reduction efforts in severely burned areas. At *most* under the Restoration Strategy, fuels reduction in severely burned areas could occur in "areas that are unlikely to support post-fire natural conifer regeneration…." AR94.  But Giant Sequoias are naturally regenerating in the severely burned areas of Nelder Grove. AR878 (picture showing "vigorous[] young giant sequoia forest growing rapidly in the high-severity fire areas").

Defendants attempt to rely on science to prop up their broad interpretation of the Chief's Memorandum (i.e. to justify logging in severely burned areas of Nelder Grove). However, the science cited by the Service in its legal briefing was not cited in the Chief's Memorandum and so could not have been considered by the Chief when authorizing work within the groves. Defendants merely point to a laundry list of scientific articles within the AR and provide meager descriptions of each citation unsupported by any Service analysis. ECF 57-1 at 12. Because there are no agency interpretations within the Chief's Memorandum, the scant sentences describing the scientific articles are merely counsel's *post hoc* rationalizations for Service actions that cannot be accepted. *Or. Nat. Desert Ass'n*, 625 F.3d at 1120. Additionally, the Service misrepresents its own studies.

*Influences of prior wildfires on vegetation response to subsequent fire in a reburned Southwestern landscape* (AR2802–2810) discusses the impacts of fire returning to an already burned landscape, particularly as it relates to changes in forest composition. In Nelder Grove however, Giant Sequoias are naturally regenerating in the severely burned areas. *See* AR878

---

[4] The Service also claims "[m]embers of the public have affirmed their support for this work." ECF 57-1 at 25.However, neither the Chief's Memorandum nor the scoping notice, AR1929–1935, mentioned that the Service would be logging young Giant Sequoias or logging in the severely burned areas. The Service cannot claim to have "public support" for something the public never knew was happening and never had the opportunity to comment on.

(picture showing "vigorous[] young giant sequoia forest growing rapidly in the high-severity fire areas"). Because Giant Sequoias are naturally regenerating within the severely burned portions of Nelder Grove, there is no urgent need to protect the grove from forest type transition. AR878.

First, *Influences of prior wildfires on vegetation response to subsequent fire in a reburned Southwestern landscape* found that "increased resilience [to forest cover transition] is especially evident in sites that burned at higher severities but quickly recovered.) AR2808. Further, Defendant's citations to AR2814 do not support their assertions. Defendants claim AR2814 shows that conducting logging and fuels reduction in the severely burned areas protects Giant Sequoias in other parts of Nelder Grove. ECF 57-1 at 12. In fact, AR2814 merely says that a recently burned area *may* reburn at higher severity on a subsequent burn and lead to forest cover conversion. Defendant's citation makes no mention of protecting the *unburned* areas of a forest stand on reburn. Further, the citation discusses "nonserotinous tree species" as not being able to recover well post-fire, the Giant Sequoia is a semi-serotinous tree species. AR94. The Chief's Memorandum states the "issue" it addresses is that recent wildfires have been "killing an unprecedented number of giant *monarchs.*" AR1 (emphasis added). Defendant's citations do not support the idea that it is "urgent" to log in the severely burned areas of Nelder Grove and to kill naturally regenerating Giant Sequoias in order to protect the "monarch" trees.

Second, Defendants citation to AR2817 is inapposite for the same reason, it does not support their assertion. It mentions that fuels reduction may provide "dampening feedback" on subsequent high-severity burns. "These effects, however, are generally temporary. Furthermore, negative feedbacks may be overridden by severe fire-weather and climate change-driven increases in wildfire activity." AR2817 (internal citations omitted). *Wildfire-Driven Forest Conversion in Western North American Landscapes* simply acknowledges that climate change-driven increases in wildfire activity and increases in severe fire-weather are happening now. AR2811. In short, defendant's science does not support their assertions and indicates that logging and fuels reduction in the severely burned portions of Nelder Grove *will not* help protect mature Giant Sequoias.

Defendants misconstrue Earth Island's argument regarding the "phases" to the Service's actions within Nelder Grove. As explained above, whether the Service's actions are characterized

as "Phase I" or "Phase II," they have exceeded the scope of measures authorized by the Chief's Memorandum. While defendant's claim that "Phase II" is merely "potential future work," their own documents show that "Phase II" is currently being implemented. ECF 57-1 at 13; *See* ECF 54-11 at 2 (stating that "[a]s with the 1st phase, we were not able to identify everything before work already began…"); *See also* ECF 54-7 at 2 (describing "Nelder Grove Fuels Reduction Project" as "Completed" and showing a "Nelder Grove Fuels Phase 2"); AR2592; AR 2594. [5] Even if the fuel break extending beyond the bounds of Nelder Grove is a future action possibly to be conducted pursuant to NEPA, there are still 374.19 acres of high severity fire that are within the bounds of Nelder Grove that the Defendants do not dispute. *See* AR2066 (total of all treatments in areas burned at high severity less "Fuelbreaks' and "No Treatment"); ECF 57-1 at 13. The actions within the severely burned areas could not have been authorized by the Chief's Memorandum because they do not pertain to "reducing the likelihood and effects of high severity wildfire before it occurs in the previously unburned or moderately burned Giant Sequoia groves." The Service's actions have exceeded and continue to exceed the scope of the Chief's memorandum and therefore require full compliance with NEPA before those actions occur. Because such NEPA analysis has not occurred, the Service has and continues to be in violation of NEPA and the APA, § 706(1).

**III.    Deference to the Service's Determination that the Project would not likely have significant environmental impacts is both not appropriate and not possible (Claim 2, Count 2).**

The Service's finding that its proposed emergency actions under 36 C.F.R. § 220.4(b)(2) "are not likely to have significant environmental impacts" is the key, threshold determination that allows the Service to both avoid consulting with the CEQ under 40 C.F.R. § 1506.12 about alternative arrangements and allows the Service to instead only consult internally. The Service's explanation

---

[5] The Service argues the two phases of the project were references used by the Fish & Wildlife Service ("FWS")  for ESA consultations, that included actions outside the scope of the emergency, ECF 57-1 at 13, n.5, but this is a red herring. The Service itself is using these references to describe work it is conducting under the Chiefs memorandum. On December 16, 2022, the Service told the public the "[Phase I] incident is complete. Point protection was conducted around all the monarch giant sequoias in the first seven groves." AR2592. On March 9, 2023, the Service told Fish & Wildlife Service that they had "carried out [] Phase 1[] stand prescriptions for [Nelder Grove]" and that "Phase 2 treatments will begin following phase 1 treatments when soil conditions allow…." AR1997.

for this key determination is found in a single paragraph of the Chief's Memorandum. It references a "preliminary assessment," a conclusory, and for Nelder Grove incorrect, assertion about forest plan compliance, "preliminary analysis" from two other "restoration projects," "experience implementing similar projects" and the use of "design features" and "protection measures" from several listed sources. The Service argues that "so long as [the Service's] process is rational…the Court should defer to the agency's determination that… the emergency actions the Forest Service sought to undertake were not likely to have significant environmental impacts." ECF 57-1 at 20. Such deference is neither appropriate nor possible here.

NEPA requires a very similar and similarly important determination for avoiding the preparation of an EIS, a finding that an action "will not have a significant effect on the human environment" or "FONSI." 40 C.F.R. § 1508.13 (2020). As Earth Island noted in its opening brief, far from deferring to an agency's FONSI, the Ninth Circuit closely scrutinizes FONSIs and requires they be supported by a convincing statement of reasons. ECF 47 at 23, citing *Ocean Advocs. v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 864–65 (9th Cir. 2005). Admittedly, 36 C.F.R. § 220.4(b)(2) establishes a lower threshold, "not likely to have," as opposed to 40 C.F.R. § 1508.13's "will not have" requirement. Nevertheless, because both determinations are specifically required by NEPA and fundamental to the NEPA process, the "highest deference" claimed by the Service is not appropriate.[6] Instead this Court should at least require that the Service fully explain and support in its administrative record the process it supposedly used to make its "not likely to have significant environmental impacts" determination. *See, e.g.*, *Alaska Ctr. for the Env't v. U.S. Forest Serv.,* 189 F.3d 851, 859 (9th Cir. 1999) (requiring an adequate explanation and record support for significance determination). An agency must also offer more than conclusions or references to its expertise to support its NEPA conclusions regarding the supposed significance or extent of environmental impacts. *See, e.g.*, *Ocean Advocs.,* 402 F.3d at 864–65; *Bosworth,* 510 F.3d at 1028; *W. Watersheds Project v. Kraayenbrink,* 632 F.3d 472, 493 (9th Cir. 2011) (refusing to defer to

_____

[6] The "highest deference" case cited by the Service, ECF 57-1 at 20, *League of Wilderness Defs./BMBP v. Allen,* 615 F.3d 1122, 1131 (9th Cir. 2010) applied that level of deference to a challenged agency decision to allow logging in Late Successional Reserves, which unlike a significance determination under NEPA, is a decision within the Service's specific area of technical expertise.

1 agency conclusions absent record support). Here there is no such explanation or record support,

2 just unsupported conclusions.

3     The "rational" process, *See* ECF No. 57-1 at 20, supposedly used by the Service to make its

4 "not likely to have significant environmental impacts" determination is just a series of conclusory

5 assertions with no record support. *See* AR5. First the Service references a "preliminary

6 assessment," but the only such assessment in the record is the short paragraph in the Chief's

7 Memorandum. Second the Service claims compliance with each forest's management plan, but

8 there is no actual analysis or even citation to those plans to demonstrate such compliance. More

9 importantly, for Nelder Grove, as is discussed below, the emergency actions actually violate the

10 Sierra National Forest's controlling 1991 Plan. Then the Chief's Memorandum points to

11 "preliminary analysis" from the Castle Fire and Hume Basin Restoration projects, but again, that

12 preliminary analysis is not in the record. Finally the Service broadly asserts its "experience

13 implementing similar [but unidentified] projects." Such conclusory, unsupported assertions deserve

14 no deference. A Court cannot defer to a void. *See Or. Nat. Desert Ass'n,* 625 F.3d at 1121.  The

15 Service's explanation for its key, threshold non-significance determination, a series of unsupported

16 conclusions and assertions, is just a void.[7]

17     Another huge void in the record underlying the Chiefs Memorandum is a total absence of

18 information about Nelder Grove itself. Threshold findings about the likely non-significance of a

19 decision's environmental impacts on distinct locations should not be a "one size fits all" conclusion,

20 but that is exactly what the Service offers regarding all twelve Giant Sequoia groves where it

21 authorized emergency actions. Earth Island had to offer its own Service documents obtained

22 through FOIA, ECF 54-1, 54-2 and 54-4, to complete the record regarding Nelder Grove's unique

23 history and circumstances (including its history of fire and known fire risks, *see* ECF 54-1 at 7–8

24

_____

25     [7] The Service's references to "standard design features" from the Castle and Hume
projects, protection measures for the endangered Southern Sierra Nevada Fisher and protection
26 measures from a 2018 Programmatic Agreement regarding cultural and historic resources, AR5,
do not fill this void. Instead they underscore that there are unique resources in the Groves,
27 including Nelder Grove (see discussion below regarding extraordinary circumstances) that merit
more than conclusory assertions about a likely lack of significant impacts.
28

and ECF 54-4 at 5) and its complex ecology and historical and archaeological sites.[8] There is no record evidence that the Service considered any of these facts when making its conclusory assertion that its actions would not likely have significant impacts on Nelder Grove.

The Service dismisses the evidence of scientific controversy regarding its methods for supposedly reducing the risks of severe fires that Earth Island documented in its scoping comments, see ECF 47 at 23(citing comments), because those comments are post-decisional. ECF 57-1 at 19-20. But the relevant point raised by those comments is that the cited science is not post-decisional, *see*, *e.g.*, AR861–879, 0944–01901 (citing scientific articles from 1994–2021), and had to be considered by the Service under the well-established case law concerning what evidence is relevant to agency findings regarding the potential significant impacts of proposed agency action. See ECF 47 at 23–27 (citing case law). Nothing in the Service's emergency regulations does or could allow them to totally ignore such evidence and issues when making the required non-significance finding.

Finally, the Service believes their emergency actions include actions that are not even mentioned in the Chief's Memorandum (see discussion above at 6-11), such as logging in already severely burned areas and logging regenerating young Giant Sequoias in those severely burned areas. There is no evidence in the record, or in the Chief's Memorandum itself, that the Service even considered the impacts of these actions when making its non-significance determination. In fact, long after making that finding in 2022, the Service drafted a February 1, 2024, response to an of Earth Island's scoping comment and that Service response purports to consider the impacts of the Service's destruction of young regenerating Giant Sequoias for the first time. *See* AR4722-23. But this post-decisional conclusion of supposed "net benefits" is an admission that such impacts were never considered when these actions were allegedly and silently authorized by the Chief's Memorandum, and, in any case, this conclusion has no actual support in the record.

---

[8] Earth Island also offered a post-decisional document to supplement the record, ECF 54-12, which confirms just how complex Nelder Grove is in terms historic and archaeological sites but the Service dismisses it as "not worthy of serious attention by the Court," ECF 57-1 at 23. But they submit their own post-hoc declaration repeatedly citing the complexity of the site and the project as reasons for their delayed actions. ECF 57-2, ¶¶ 9, 10, 20.

**IV.    The Service Cannot Construe its Emergency Regulation to Allow it to Never Prepare A Decision Memo or to Not Determine a Specific CE Applies Before Implementing Its Actions (Claim 2, Count 2; Claim 3, Counts 1 and 2).**

Earth Island's primary claims regarding the Service's invocation of a CE for the supposed emergency actions it is undertaking in Nelder Grove are legal challenges to the final agency decisions in the Chief's Memorandum. Earth Island challenges, as contrary to law under Section 706(2) of the APA and NEPA, the Chief's Memorandum's final decisions to (1) completely excuse the Service from preparing the otherwise required Decision Memo for projects relying upon certain CEs, AR2, (2) completely failing to determine that a specific CE applies to the authorized actions in Nelder Grove before beginning to implement the emergency actions, *See* AR7, and (3) completely failing to determine that extraordinary circumstances in Nelder Grove do not preclude the use of a CE. Earth Island also challenges as ongoing failures to act under Section 706(1) the Service's failure to correct these violations of NEPA and the APA in the Chief's Memorandum.

**A.    The Service cannot entirely excuse itself from Preparing a Decision Memo.**

Earth Island's opening brief expressly argued that the Chief's Memorandum violated NEPA and the APA by completely excusing the Service from preparing the Decision Memo required by 36 C.F.R. § 220.6(e). ECF 47 at 12, 18. The Service's Response, ECF 57-1, does not respond to this argument, which is part of both Claim 2, Count II, ¶ 127 and Claim 3, Count III, ¶ 146, from Earth Island's Second Amended Complaint, ECF 44.[9] The Service should therefore be deemed to have admitted these parts of both of those claims. The Service's response does not dispute Earth Island's overall argument that while its emergency regulation can postpone complete NEPA compliance, it cannot completely excuse compliance. See ECF 47 at 11, 18. The portion of the Chief's Memorandum completely excusing the Service from ever preparing the Decision Memo required by 36 C.F.R. § 220.6(e) is contrary to law in violation of NEPA and § 706(2) of the APA.

**B.    The Service cannot legally rely on a CE without determining that a specific CE in fact applies to the Emergency actions authorized within Nelder Grove.**

The Chief's Memorandum claims that the emergency actions for Nelder Grove are covered by an unidentified CE. See AR7 (referencing "Nelder Grove Restoration CE (Sierra)"). But an

---

[9] Thus the Service is wrong when it claims Earth Island abandoned Claim 3, Count 1. See ECF 57-1 at 24.

agency can only rely on a CE if it first "determines that a categorical exclusion identified in its agency NEPA procedures covers the proposed action." 40 C.F.R. § 1501.4(b). Although the Service has established numerous, specific CEs, *see* 36 C.F.R. § 220.6, the Chief's Memorandum illegally never determines which one of those specific CEs applies to Nelder Grove.

The Service argues that the Chief's Memorandum only postpones when it must conduct its complete NEPA analysis and documentation regarding the alleged CE for the Nelder Grove emergency actions. ECF 57-1 at 17-18. But that argument improperly conflates the initial threshold requirements imposed by 40 C.F.R. § 1501.4(b) to determine whether a specific CE applies with the complete documentation and analysis requirements imposed by regulations like 36 C.F.R. § 220.6(e), which can be postponed but not fully excused. There is no such thing as a general CE that an agency can initially invoke and then determine later which specific CE it will actually rely upon. A CE under NEPA only exists for a specific, clearly defined types of action. *See Bosworth,* 510 F.3d at 1032–33, and the Service cannot rely on more than one of its specific, identified CEs for a single project. *Friends of the Inyo v. U.S. Forest Serv.,* 103 F.4th 543, 553 (9th Cir. 2024).

The threshold determination that a specific CE applies is much like the threshold determination under the Service's emergency regulation for acting under 36 C.F.R. § 220.4(b)(2), that the emergency actions "are not likely to have significant environmental impacts." Indeed NEPA allows, after making such a finding, that an agency can then prepare an environmental assessment, see 40 C.F.R. § 1501.5(a), which the Service is doing for some of the projects covered by the Chief's Memorandum. See AR7. However, if an agency wants to use the even more abbreviated analysis requirements for a CE, NEPA requires that the agency also "find[] that a categorical exclusion (§ 1501.4) is applicable…." 40 C.F.R. § 1501.5(a).

The requirement to determine that a specific CE applies before acting is not an onerous one. As *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002), explains: "[i]n many instances, a brief statement that a categorical exclusion is being invoked will suffice." Thus the Service cannot claim that identifying a specific CE for Nelder Grove in the Chief's Memorandum would have been burdensome or not possible under the supposed emergency circumstances. The Service can postpone fully documenting its decision, preparing any required environmental analysis and

meeting the specific requirements of regulations like 36 C.F.R. § 220.6(e), but the Service cannot, consistent with NEPA, claim to be invoking a CE for a specific agency action without initially determining and identifying which specific CE supposedly covers that action.

As *Norton* expressly notes, the need to identify a specific CE is especially important when extraordinary circumstances are present. 311 F.3d at 1176 (discussing "exceptions" to use of CEs). NEPA regulations in fact require that an agency make two distinct threshold determinations when invoking a CE. The agency must identify the specific applicable CE and determine whether the use of the CE is precluded by potential significant impacts on extraordinary circumstances. 40 C.F.R § 1501.4(b). As Earth Island demonstrated in its opening brief, the Service's regulations identify several extraordinary circumstances that are present in Nelder Grove and that it was required to consider before deciding to use an unidentified CE for the emergency work in Nelder Grove. See ECF 47 at 20-22. But the Chief's Memorandum fails to even mention the possibility of extraordinary circumstances, much less identify those that had to be considered before using any CE for the actions on Nelder Grove. See AR1-37.

The Service only response to this argument is that the emergency excuses it from preparing any required analysis and documentation and that Earth Island's claims and arguments are premature. See ECF 57-at 17-18. This argument however ignores the fact that the Chief's Memorandum does in fact decide to use an unidentified CE for the work in Nelder Grove. AR7. At a minimum, mandatory NEPA regulations require that such a final decision include a determination of the specific applicable CE and some consideration of extraordinary circumstances, including which specific extraordinary circumstances could be impacted by the authorized actions. 40 C.F.R. § 1501.4(b). The Service's emergency regulations may be able to postpone complete analysis and documentation of the applicability of a specific CE or impacts to extraordinary circumstances. Those regulations however cannot be construed to completely excuse a final decision to use a CE from identifying the specific CE and, at the very least, identifying any applicable extraordinary circumstances. To hold otherwise would essentially require this Court to defer to a void in terms of the Service's decision to use a CE for NEPA compliance for its emergency actions in Nelder Grove.

The Service's emergency decisions are not exempt from judicial review. See cases

discussed above at 5. The Service argues Earth Island must wait until the Service has completed its NEPA analysis before it can obtain such review. ECF 57-1 at 17. But the Service has already missed the November 2023 timeline in the Chief's Memorandum for completing that review. AR8. The Service's "background" declarant's remarkably vague assertions regarding why that analysis is taking so long and when it will be complete, see ECF 57-2, provide no basis for denying Earth Island judicial review under the APA of the final decisions the Service actually made in its Chief's Memorandum. As the record now stands the Service has offered no evidence showing that when it made the decisions in the Chief's Memorandum it even considered whether there could be impacts to extraordinary circumstances such as listed species and historical and archaeological areas in Nelder Grove. The Service's failure to do so in the Chief's Memorandum is contrary to law under Section 706(2) of the APA and its continuing failure to do so as it implements the emergency actions in Nelder Grove is a failure to act under Section 706(1) of the APA.

## V. The Service logged in Nelder Grove in violation of the governing 1991 Plan (Claim 4, Count 1).

NFMA mandates the Service's actions must comply with the applicable Forest Land and Resources Management Plan. 16 U.S.C. § 1604(i); ECF 44 and 45, ¶ 56. Both sides agree that the controlling Plan was the 1991 Plan, that was approved by a September 1992 ROD. AR434–466.[10] At issue here is: what documents contain the mandatory enforceable provisions of the final 1991 Plan? Earth Island points to the express provision in the 1992 ROD incorporating and making mandatory earlier guidance from the Regional Forester that all Sequoia groves have management plans and that no tree removal other than hazard trees was allowed until such grove-specific plans were in place. The Service argues that because this requirement is not set out in record document labeled as the 1991 Plan, AR 467-603, it is not an enforceable requirement of the final 1991 Plan.

This question was in fact answered by the Regional Forester in the September 1992 ROD and their words, as discussed below, are the best evidence of what the Service considered the mandatory, final 1991 Plan to be. Although the Service argues that only the document labeled as

---

[10] Earth Island pled, in the alternative, that the Service's actions violated the 2023 Management Plan. ECF 44, ¶¶ 161-164. Because the parties agree that the 1991 Plan controls, Earth Island does not pursue this claim. See ECF 47 at 24 n.10

the 1991 Forest Land and Resources Management Plan (AR467–603) contains mandatory, enforceable provisions, ECF 57-1 at 21–23, that document is in fact the proposed final plan that the Service put out for final comment and evaluated in an accompanying Final EIS. When the proposed 1991 Plan was formally approved by the 1992 ROD, AR434-466, that ROD unambiguously explains that the Service understood the "final plan" to include three documents: the proposed 1991 Plan (AR467–603), the 1992 ROD and its attached errata (AR434–466), and Alternative A in the 1991 Plan FEIS.[11] See AR437. The 1992 ROD "summarizes the basis and need for the decision… and establishes the rationale for approving the Sierra National Forest Final Plan (Alternative A in the FEIS)". AR437. The Regional Forester also used the 1992 ROD to incorporate changes into the proposed 1991 Plan and Alternative A in the FEIS. In order "[t]o ensure that [the Service] did not overlook any critical information[,]" the Regional Forester had "delayed the Record of Decision [for the 1991 Proposed Plan] to allow for a 60 day informal public comment period," AR437, which "resulted in changes, clarifications and additions to the Final Forest Plan." AR437.

The Service claims the requirement set out in the 1992 ROD that Nelder Grove receive a specific management plan, AR444, 465, is in a separate document from the actual 1991 Plan. *See* ECF 57-1 at 21. The assertion that the final 1991 Plan does not include the Nelder Grove management plan requirement merely because it is not within the packet of pages labeled as the 1991 Plan (AR467-603, the document issued for public comment) strains credulity. The Service ask the court to believe that the 1992 ROD that approved the proposed 1991 Plan could not change or amend that final plan. Defendants ask the court to look *only* at the document labeled as the 1991 Plan. However, that simplistic and literal approach, to look only at what is in fact the proposed 1991 Plan, ignores the plain language of both the proposed 1991 Plan and 1992 ROD.[12]

Defendants rely heavily on *Forest Guardians v. U.S. Forest Serv.*, 2006 WL 4109661, at

---

[11] As the Service admits, ECF 21 n.8, it failed to include this FEIS for the 1991 Plan in the administrative record.

[12] The Service's cite to *Earth Island Inst. v. Carlton*, 626 F.3d 462, 471–72 (9th Cir. 2010), is inapposite. In *Carlton,*, plaintiffs cited a regulation that had since been amended as support for their "viability requirement" arguments. *Id.* at 472. Here however, Earth Island cites a requirement incorporated *into the applicable forest plan.* AR465.

*26 (D.N.M. Aug. 22, 2006) to support their claim that a Forest Plan can only exist in one document. *See* ECF 57-1 at 21. But *Forest Guardians* involves a wholly distinct issue from the instant case. In *Forest Guardians*, the plaintiffs argued that portions of the Forest Plan's Monitoring Plan *must* happen before a project could be approved. *Forest Guardians,* 2006 WL 4109661 at *24. However, as the Service notes, courts distinguish between mandatory standards and non-enforceable guidelines. ECF 57-1 at 21; *See e.g., Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660-61 (9th Cir. 2009) (suggestive language like "should" not enforceable under NFMA). The Forest Plan at issue in *Forest Guardians* made crystal clear that the monitoring requirements were merely suggestive. 2006 WL 4109661 at *24. By contrast, the proposed 1991 Plan contains a standard and guideline, #532, indicating that the Service will "adopt Nelder Grove management plan as part of its Final Plan." AR532.  On its face, Earth Island acknowledges that this provision by itself is not a mandatory standard. However, in the 1992 ROD section titled "Summary of the Major Provisions of the Forest Plan," the Service states that "Nelder and McKinley Groves have been given additional protection… and *will be managed in a manner consistent with* the Regional Foresters Giant Sequoia policy letter (June 19, 1992)." AR444 (emphasis added). Then in its Errata Section, consistent with the language from the 1992 Policy letter, AR4767, the ROD states that "[u]ntil the long-term implementation strategy is approved, only human hazard trees will be removed." AR465. Thus the ROD, when approving the final 1991 Plan, amended the earlier, proposed 1991 Plan and made the requirement for a Nelder Grove management plan, and the restriction on most logging in Nelder Grove absent such a plan, mandatory. AR 444, 465; see also AR 4766–4767 (policy letter).

Notably, the court in *Forest Guardians* places emphasis on the timeline of Forest Plan adoption, or as it calls it, the "structure" of the Forest Plan. *Forest Guardians,* 2006 WL 4109661 at *25. Here, the proposed 1991 Plan in the AR was *unapproved* until the 1992 ROD. *See* AR00473–474 (stating what the proposed 1991 Plan would accomplish "[w]hen approved" and "[u]pon approval"). The proposed 1991 Plan was released in April 1992, but the Regional Forester "delayed the Record of Decision to allow for a 60 day informal public comment period." AR437. On June 19, 1992 the Regional Forester released their Giant Sequoia Management Policy letter. AR4766–4767. The Giant Sequoia Management Policy letter required a "detailed long term

management plan[] for [Nelder Grove]…." And prohibited all tree removal except for hazard trees until such a plan was in place. AR4767. The Giant Sequoia Management Policy letter was subsequently incorporated into the proposed 1991 Plan when the Regional Forester signed the 1992 ROD on September 24, 1992. AR444, 461,465. The 1992 ROD restates the requirement from the Giant Sequoia Management Policy letter that the Service must "[d]evelop a detailed long-term implantable strategy for the Grove." AR465. In sum, the 1991 Forest Land and Resources Management Plan for the Sierra National Forest includes the proposed 1991 Plan, Alternative A from the FEIS for that proposed Plan and the 1992 ROD and its errata—Defendant's argument does not withstand scrutiny when contextualized within the chronology for adopting the 1991 Plan.

The Service claims "substantial deference" to the Service's interpretation and implementation of its own Forest Plan, citing *Or. Nat. Desert Ass'n v. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020). However, now such deference is limited to questions of *fact*, not questions of *law*. *Loper Bright* 144 S.Ct. at 2261.[13] Forest Plans are the law of the land when it comes to National Forests. While agencies get some deference from the courts when interpreting their own ambiguous regulations, this deference is far from absolute. Compare *Auer v. Robbins*, 519 U.S. 452, 461 (1997), *with Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) (*Auer* deference is most applicable only for "genuinely ambiguous" regulations). *Kisor* explains that "the possibility of deference can arise only if a regulation is genuinely ambiguous. 588 U.S. 558 at 573. The final 1991 Plan *unambiguously* required a Nelder Grove specific management plan before most logging could occur in the grove. AR04766, 460, 464.

Even if the Service is entitled to some deference, only interpretations issued contemporaneously with the statue, or in this case Forest Plan, have "great weight." *Loper Bright*, 144 S. Ct. at 2259. When, as here, an interpretation is merely a *post hoc* rationalization or a convenient position for litigation, it is entitled to no weight or deference *Christopher v. SmithKline*

---

[13] Notably, the language of *Loper Bright* is expansive and does not limit itself to agency interpretations of statutes. The Supreme Court emphasized that "courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action." *Loper Bright*, 144 S.Ct. at 2261 (emphasis in original) (quoting the APA, 5 U.S.C. § 706).

*Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012); *Kisor*, 588 U.S. at 579. As explained above, the Service at the time of promulgating the 1991 Forest Plan through the 1992 ROD considered the ROD and FEIS *part of* the Forest Plan. The Sierra National Forest and Bass Lake Ranger District held this interpretation *up to and until* this litigation.[14] The Service failed to develop the required Nelder Grove specific management plan before logging in Nelder Grove.

The Service's contrary arguments ask the court to assume that the final 1991 Plan ignored the Regional Forester's guidance document and that for over thirty years, the Service has been incorrectly interpreting the governing plan. The only support for this litigation position is their current argument. This does not track. The 1992 ROD imposes a requirement that Nelder Grove "will be managed" according to the Regional Forester's guidance document and subsequently incorporates that guidance into the final 1991 Plan itself. AR00444, 00465. The emergency actions in Nelder Grove, except for the removal of human hazard trees, are and have been conducted in violation of the 1991 Plan, NFMA, and the APA.

## VI. The Court should consider all of Earth Island's Exhibits.

The parties' stipulation, ECF 38, ¶¶ 3-4, allowed Earth Island to use its exhibits, see ECF 54, subject to any specific objections from the Service. When it does object, ECF 57-1 at 23-24, the Service totally ignores the initial justifications offered by Earth Island for all thirteen exhibits in ECF 54, ¶ 6. Then the Service only specifically objects to Exhibits ECF 54-3, 54-8, 54-9, 54-11, 54-12 and 54-13, but without addressing any of these exhibits individually.[15] Because of the

---

[14] Here, until the Chief's Memorandum, the Sierra National Forest had no intention of entering Nelder Grove because of negative public opinion of logging in Sequoia groves and because they knew a grove-specific plan and NEPA analysis were required. *See* AR4766–7 (discussing the need for "environmental analysis," "public participation under [NEPA]," and "[a] long term management plan"); *See also* Buchele Decl. Ex. 3 at 6 (email saying a management plan and EIS were needed before starting work in Nelder Grove); *See also* Buchele Decl. Ex. 3 at 4–5 (email chain discussing adverse public response whenever the Service conducts work near Sequoias).

[15] The Service also challenges, see ECF 57-1 at 9, n.3, several paragraphs in the Hanson Declaration, ECF 48. With the exception of paragraph 29, none of the challenged paragraphs are even arguably legal conclusions, they simply set forth Hanson's reasonable concerns about the impacts of the project on his aesthetic, recreational and professional interests and Earth Island has cited to the Hanson declaration only to establish Article III standing. See ECF 47 at 4. See *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 183–84 (2000). Paragraph 29 mentions some legal issues, but only to establish causation and redressability. Earth island's other standing

unusual nature of the decision at issue, an emergency declaration allowing for complete NEPA analysis to be conducted as the agency implements the emergency actions, Earth Island did not object to the Service's administrative record includes both documents that predate the challenged Chief's Memorandum and post-decisional documents regarding subsequent NEPA compliance and the implementation. *See* ECF 25-2 at 2–14. Thus the fact that many of Earth Island's exhibits also postdate the Chief's Memorandum should not by itself be a basis for any Service objection.

ECF 54-3 is the one mostly pre-decisional document exhibit that the Service specifically challenges. It is an email thread that begins in July 17, 2022, a few days before the Chiefs Memorandum was signed. The initial email is passing along a request for factual information from the Service's regional office (RO), which authored the emergency request. ECF 54-3 at **7**. The responses to that request are thus clearly information the Service considered, directly or indirectly, when it made the decisions in the Chief's Memorandum. See *Thompson v. U.S. Dep't of Labor,* 885 F.2d 551, 555 (9th Cir. 1989). Because the request and responsive information are entirely factual-whether there is any existing NEPA analysis for Nelder Grove and why that is the case-these emails are not deliberative. *See Blue Mtns. Biodiversity Project v. Jeffries,* 99 F.4th 438, 445 n.4 (9th Cir. 2024). Although not specifically challenged, ECF 54-1, 54-2 and 54-4 are also pre-decisional Service documents addressing the unique factual circumstances and the history of the Service's management in Nelder Grove, including the known fire risks to the Giant Sequoias since at least the 1970s, ECF 54-1 and 54-4, and the conditions of the individual Giant Sequoias in Nelder Grove just before the emergency decision. ECF 54-2. These documents fill in a huge gap in the current record and were at least indirectly before the Service and could have been considered by them.

Although it need not do so because these documents were clearly before the agency decision-makers before they made their decision, these exhibits also fit within the record exception for showing whether the agency considered all relevant factors, in this case the unique circumstances of Nelder Grove and whether the applicable management plan required a specific

declarations contain similar testimony that the Service does not challenge. See ECF 49 at ¶¶12-13; ECF 50 at ¶ 28.

plan for Nelder Grove before the Service could cut down trees within the Grove. See *See Lands Council v. Powell,* 395 F.3d 1019, 1030 (9th Cir. 2005).[16] Earth Island also relies on this factor for several of its post-decisional exhibits, ECF 54-10, ECF 54-11, ECF54-12 and ECF 54-13. It cites ECF 54-10, ECF 54-11, ECF 54-12 to show the Service's failure to consider extraordinary circumstances that exist within the Grove and which should have been at least acknowledged by the Chief's Memorandum, ECF 47 at 22. It cites ECF 54-13 to show how the Service's local employees had interpreted the 1991 Plan to limit them to management in Nelder Grove that did not involve cutting down trees. ECF 47 at 25. Because these exhibits are post-decisional, they are by definition not deliberative.

Finally, the Service's arguments ignore that Earth Island cites several of the challenged exhibits in support of its APA 706(1) claim regarding the Service's doing work that is beyond the scope of the emergency declaration. See ECF 47, at 15–18, citing Exhibits 3(post-decisional portion), 5, 6, 7, 8 and 9. For 706(1) claims, review is not limited to the record submitted by the agency or as it existed at any single point in time. *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir. 2000). Thus Earth Island can use the Service's own records to show it has gone beyond the scope of the emergency declaration and without first complying with NEPA.

## VII.    The Service's Discussion of Remedy is Premature and is Misleading.

Earth Island's opening brief did not address remedy issues because final remedy questions regarding the scope of vacatur are best addressed after the Court has ruled on the merits of a plaintiff's claims, and Earth Island still believes that is the correct approach. The Service nevertheless elects to address vacatur and makes several legal errors when doing so, which Earth Island will briefly correct here to avoid any argument that it has waived the right to do so. The Service first claims vacatur is not the "presumptive remedy." ECF 57-1 at 24.  That would be news to the Ninth Circuit, which orders remand without vacatur only in "limited circumstances."

---

[16] Curiously, although the Service cites to these factors in its brief, see ECF 57-1 at 3, when it attempts to justify its own post-decisional declaration, ECF 57-2, it argues that declaration provides "background information"  ECF 57-1 at 7, n.2, which is not one of the exceptions for allowing extra-record evidence. Although Earth Island could object to this very tardy declaration, see ECF 41 at 5-8, it will not do so because the declaration inadvertently provides some support for Earth Island's claims.

*Pollinator Stewardship Council v. U.S. Env't. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015). Because vacatur "is the ordinary remedy," the defendant "bears the burden of demonstrating vacatur is inappropriate." *Nw. Env't. Advocs. v. U.S. Env't. Prot. Agency*, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018). Indeed Justice Kavanaugh earlier this month wrote a concurring opinion emphasizing the importance of vacatur, the "usual relief" for violations of the APA. *Corner Post, Inc. v. Bd. of Governors,* 144 S. Ct. 2440, 2463 (2024) (Kavanaugh, J., concurring)*.* The Service then misleadingly suggests that Earth Island's irreparable harm is somehow relevant to a vacatur determination, ECF 57-1 at 25, but it cites no case to support that proposition, and then they criticize Earth Island for not having sought emergency relief in this case.

As the Service is well-aware, far from Earth Island sitting on its rights, the parties have worked closely to avoid the need for any motions practice regarding preliminary relief. Second Buchele Decl., ¶¶ 4, 6. Earth Island's representatives have visited the site during implementation and identified the areas where they would suffer the greatest irreparable harm from project implementation, which would be relevant if Earth Island sought a preliminary injunction. The Service has not even begun implementation in those units, the areas that were most severely burned in 2017 and where there is the most regeneration of young Giant Sequoias. The Service has agreed to give Earth Island two-weeks notice before it enters into contracts for project implementation in those units. This agreement has been in place since last fall. *Id.,* ¶4 .

### Conclusion

For the reasons stated above, in Plaintiffs' motion and their supporting Declarations, Plaintiffs respectfully request that the Court enter Summary judgment on all of their claims in their Second Amended Complaint, ECF 44, other than Claim 4, Count 2 (see note 10 above).

Respectfully submitted on this 15th day of July 2024.

/s/Thomas Buchele
Thomas Buchele, CA Bar No. 129657
Earthrise Law Center
Lewis & Clark Law School
10101 S Terwilliger Blvd.
Portland OR  97219-7799

Tel:  503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Rachel M. Fazio, CA Bar No. 187580
John Muir Project of the Earth Island Institute
P.O. Box 897
Ridgecrest, CA 92314
Tel: 530-273-9290
Email: rachelmfazio@gmail.com

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28