TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

SEAN C. DUFFY (NY Bar No. 4103131)
ERIKA NORMAN (CA Bar No. 268425)
Trial Attorneys
Natural Resources Section
150 M Street NE, Suite 2.9000
Washington, DC 20002
Ph: (202) 305-0445 (Duffy)
Ph: (202) 305-0475 (Norman)
sean.c.duffy@usdoj.gov
erika.norman@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARTH ISLAND INSTITUTE, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>RANDY MOORE, in his official capacity as the Chief of the United States Forest Service, *et al*.,<br><br>    Defendants. | No. 1:23-cv-1045-JLT-EPG<br><br>**DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>No hearing set (ECF No. 55) |

**INTRODUCTION**

Every major premise upon which Plaintiffs rely is wrong, starting with their overarching theory that the Forest Service is trying to "completely excuse" itself from complying with the National Environmental Policy Act.

- Plaintiffs' definition of the term "emergency" is artificially narrow, and wrong.
- Plaintiffs' singular focus on Nelder Grove, ignoring other groves and the regional emergency covered by the July 2022 Decision Memorandum is misplaced.
- Plaintiffs' opinion that the Forest Service can do no more than is necessary to address the emergency in Nelder Grove is wrong.
- Plaintiffs' interpretation of the emergency regulations to require the Forest Service to first identify a categorical exclusion before beginning emergency work is wrong.
- Finally, Plaintiffs are wrong that an erratum to an Environmental Impact Statement and a "policy letter" are part of the 1991 Forest Plan under NFMA.

The Court should grant summary judgment for the Forest Service and dismiss Plaintiffs' claims.

**ARGUMENT**

**I.      The Forest Service is Acting in Response to a Genuine Emergency**.

Plaintiffs argue that there is no "emergency" in Nelder Grove, and that the "emergency" originated with the 2017 Railroad Fire and therefore the Forest Service ("Service") cannot invoke its emergency regulations to address it. Both arguments are wrong.

First, Plaintiffs are wrong that a situation "demand[ing] unusual or immediate action" is not enough to constitute an emergency unless the situation was also "unforeseen." Pls.' Reply in Supp. of Mot. for Summ. J. 4, ECF No. 58 ("Pls.' Reply"). The preamble to the regulation states that "[t]here is no special meaning intended for the term 'emergency' beyond its common usage" and provides alternative dictionary definitions of "emergency," each highlighting different aspects of the term. 73 Fed. Reg. 43,087-88 (July 24, 2008). A "situation that demands unusual or immediate action" is one of those definitions. Further, the court in both the *Pengilly* and *Siskiyou* cases used the "situation that demands unusual or immediate action" definition the

Service advances here. *See Earth Island Inst. v. Pengilly*, 376 F. Supp. 2d 994, 1008 (E.D. Cal. 2005); *Siskiyou Reg'l Educ. Project v. Goodman*, No. CIV.04-3058 CO, 2005 WL 2083011, at *7 (D. Or. July 29, 2005).[1] Contrary to Plaintiffs' argument, it is appropriate for the Court to look beyond cases about the specific Service emergency regulations at issue, and *Winter*, which Plaintiffs rely on, concerned other regulations. In its opening brief the Service explained why the *Winter* and *FSEE* cases do not support Plaintiffs' artificially narrow definition of "emergency." *See* Defs.' Cross-Mot. for Summ. J. 8-10, ECF No. 57-1 ("U.S. Opp'n").

In any event, Plaintiffs' argument that an emergency must also be unforeseen is a strawman. The emergency in twelve Giant Sequoia groves, including Nelder Grove, was *both* "unforeseen" and "demanding of immediate action." *See* U.S. Opp'n 8-9. The destruction of 20% of monarch Giant Sequoias in the region during the unprecedented fires in 2020 and 2021 was sudden and unforeseen, and also created a situation demanding immediate action. *See id.* at 4, 8, 10. The Service's conclusion that this situation constitutes an emergency under its regulations in entitled to deference. *See Kisor v. Wilkie*, 588 U.S. 558, 576-579 (2019) (explaining when courts should defer to agency interpretations of their own regulations).

Second, Plaintiffs are wrong that the emergency became apparent in 2017 when the Railroad Fire killed 39 Giant Sequoias in Nelder Grove. Pls.' Reply 6. The emergency addressed by 2022 Memo included twelve groves in the region and revealed itself after two unprecedented fires in 2020 and 2021 killed 20% of monarch Giant Sequoias. U.S. Opp'n 4, 8. Plaintiffs err by looking at the Railroad Fire and Nelder Grove in isolation. The Service's decision to begin a NEPA process for Nelder Grove following the 2017 fire does not mean, as Plaintiffs suggest, that a regional emergency of which Nelder Grove is a part did not materialize in 2020 and 2021.

---

[1] Plaintiffs attempt to distinguish *Pengilly* and *Siskiyou* by noting that in those cases the Court applied *Chevron* deference to the agency's interpretation of the statutory term "emergency." Pls.' Reply 5. But the *Chevron* issue was narrowly focused on whether an emergency under the statute could include a decline in economic value, not whether an emergency as used in the regulations could involve foreseeable situations. The agency does not seek *Chevron* deference here.

*See* Pls.' Reply 6. Further, the 2017 effort focused on public health and safety, not Giant Sequoia protection.[2]

## II.  The Service Has Not Undertaken Unauthorized Work in Nelder Grove.

Plaintiffs argue the Service has undertaken two categories of activities in Nelder Grove that are "unauthorized"—activities in burned areas of Nelder Grove and activities that result in the incidental loss of regenerating young sequoias. Pls.' Reply 7, 9, 11. Both kinds of activities are authorized.

First, Plaintiffs double down on the erroneous idea that fuels in burned areas pose no risk to sequoias in nearby unburned areas. Pls.' Reply 7. The Service has explained why this is not true and that the 2022 Memo does not impose such limitations. U.S. Opp'n 11-12. The Memo states that the *risk* is greatest to sequoias in unburned areas, but that alleviating that risk may require work in burned areas. *Id.* at 12. And the science in the record plainly supports removing fuels in burned areas to reduce the risk to remaining Giant Sequoias nearby.[3] *See* U.S. Opp'n 12; AR2826-39 (concluding that fuel treatments can be effective in reducing fire hazard); AR111-16 (documenting benefits of post-fire fuels reduction work). The Service has also explained how Plaintiffs' reading of the authorization to only include work immediately around sequoias makes no textual or logical sense. U.S. Opp'n 11. The 2022 Memo describing work to "include" removal of fuels immediately around Giant Sequoias, Pls.' Reply 7, does not mean fuels removal is limited to those areas. Indeed, Plaintiffs are forced to add "in the" just before "the 'remaining unburned groves'" language from the 2022 Memo they cite, Pls.' Reply 7, so that it *appears* like the 2022 Memo supports their argument when it does not.

Plaintiffs' extra-record documents do not change that reality. While Plaintiffs are correct that the email chain in Exhibit 3 discusses both the Nelder and Exchequer projects, the specific language Plaintiffs rely on concerns Exchequer. U.S. Opp'n 11-12. Further, the reference to

---

[2] Similarly, the purpose and need for the Exchequer Project, which includes McKinley Grove, was narrow and does not include Giant Sequoia protection. *See* U.S. Opp'n 10.

[3] The science is in the record, so it was considered by the decisionmaker. *Cf.* Pls.' Reply 9.

3

"around the groves" in meeting notes in their Exhibit 5 cannot overcome the absence of the limitations in the 2022 Memo itself and the clear logical problems with reading them into the document. U.S. Opp'n 11-12. Plaintiffs' argument that "around the groves" means the same thing as "around [Giant Sequoias]," Pls.' Reply 8, because both phrases use the word "around" is nonsensical. Around the groves does not mean around the individual Giant Sequoias. Plaintiffs' detour into the "experience implementing similar projects" language, Pls.' Reply 8, is a non sequitur; the Service uses that language to support its finding that the actions are not likely to have significant adverse environmental impacts, a different issue (discussed below).

Second, Plaintiffs' assertion that the Service is "logging young Giant Sequoias" is misleading; the 2022 Memo explicitly allows the mechanical removal of small trees, which would encompass seedlings. *See* U.S. Opp'n 12, 22. Further, the limited incidental crushing of seedlings is implicit in the authorization to perform fuels reduction work across 1,400 acres using machinery. *See* AR6. Plaintiffs attempt to drag the Court into the weeds on the science, Pls.' Reply 10, but they take statements from a study which relates to non-forest vegetation out of context (*e.g.*, AR2808 (discussing savanna/meadow)). The science in the record supports the need for post-fire fuels reduction in burned areas to avoid a high severity reburn that could destroy sequoia seedlings as well as Giant Sequoias. *See* U.S. Opp'n 12; *infra* p. 3. This is enough to support the Service's decision to proceed with work that may have limited, incidental effects on seedlings.[4]

### III. The Service Reasonably Determined that the Emergency Response is Not Likely to have Significant Environmental Impacts.

The parties agree that the emergency regulations require the Service to determine that emergency activities are "not likely to have significant environmental impacts." Pls.' Reply 12; 36 C.F.R. § 220.4(b)(2). The Service made that determination based on its preliminary analysis

---

[4] In response to Plaintiffs' comments, Pls.' Reply 11, n.5, both the Service and U.S. Fish & Wildlife Service conceptualized the project in "phases," but the two agencies did not include the same activities in each phase. U.S. Opp'n 13 n.5 (explaining the two "phases" of FWS consultation); Decl. of Jon Regelbrugge ¶¶ 5-7, 18-19 ("Regelbrugge Decl."), ECF No. 57-2.

when it issued the 2022 Memo. AR2, 5. Plaintiffs claim the Service needed to produce a more thorough analysis and explanation for its significance determination. Pls.' Reply 12-13. Nothing in the emergency regulations supports this claim. Instead, Plaintiffs rely exclusively on inapplicable NEPA regulations and case law from the *non-emergency* context. *Id.* While those regulations may be similar on their face, Plaintiffs ignore that the emergency regulations provide the process for evaluating significance in an emergency rather than during the normal NEPA process. The significance determination in an emergency response must be interpreted in context—as a regulation for "emergency actions . . . [that] must be undertaken *prior to* preparing any NEPA analysis and documentation." 36 C.F.R. § 220.4(b)(2) (emphasis added). Plaintiffs' attempt to graft standards that apply in the normal NEPA process onto the emergency regulations is both improper and contrary to the regulation itself. *See Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) ("we are not free . . . impose procedural requirements not explicitly enumerated in the pertinent statutes") (cleaned up).

Plaintiffs then mischaracterize the significance finding in the 2022 Memo as a "void" and a "series of conclusory assertions with no record support." Pls.' Reply 13. Plaintiffs are wrong. The Service, through its preliminary analysis and years of experience implementing similar projects, supported its determination that emergency activities are not likely to have significant environmental impacts. AR2, 5. Specifically, the Service determined that the actions on all twelve groves (including Nelder Grove) are consistent with the standards and guidelines in the Forest Plans. AR5. The projects are based on design features to ensure that treatments do not approach established thresholds for significant environmental effects, as outlined in similar restoration projects. AR5, AR1940-41. The Service is also applying protection measures from the Fisher Conservation Strategy and separate measures for archaeological sites, historic properties, and culturally sensitive areas, AR5, and will comply with the Endangered Species Act, National Historic Preservation Act, and other laws.

Plaintiffs claim first that the Service's reliance on the foregoing determinations, which rely on agency experience and expertise, deserve no deference, and second that the 2022 Memo's

"absence of information about Nelder Grove itself" is a "huge void." Pls.' Reply 12-13. Plaintiffs are wrong on both points. A court reviewing determinations based on the Service's substantial experience pays the "highest deference" to its "technical analyses and judgments within its area of expertise." *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1131 (9th Cir. 2010). This is particularly true of the agency's determination of the appropriate scope of its analysis. The Service decided to analyze impacts on twelve Giant sequoia groves in the region, not just Nelder Grove in isolation. Plaintiffs offer no basis to question that determination. *See Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) ("identification of the geographic area within which [environmental impacts] may occur, is a task assigned to the special competency of the appropriate agencies"). Deference to the Service's analyses and judgment is appropriate here, where the Service relied on its substantial experience and technical expertise in making its determination.

     Finally, Plaintiffs renew their argument that the Service was required to analyze comments they submitted in December 2022 and June 2023 regarding an alleged scientific controversy over methods for reducing severe fire risks. Pls.' Reply 14. Those comments post-date the July 2022 Memo and were not before the agency when it issued its emergency decision. Such post-decisional material "may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130–31 (9th Cir. 2012) (cleaned up). Even if those materials were not post-decisional, Plaintiffs merely point to nearly 1,000 pages from the administrative record and identify none of the articles they believe the Service was required to consider. Plaintiffs also claim that the Service "totally ignore[d]" evidence presented in those articles. Pls.' Reply 14. But they provide no support for this assertion. The Service was not required to document its consideration of each bit of information in the context of emergency proceedings. If Plaintiffs want to challenge the science supporting the Service's non-emergency NEPA decision, they can do so when the decision is issued. Until then, the agency's emergency determination should stand.

### IV. The Service is Complying with the Emergency Regulations.

Plaintiffs incorrectly assume that the emergency regulations require the Service to document every EA or CE in a decision memo. Pls.' Reply 15. But there are many categories of CEs in the Service's non-emergency NEPA regulations that do not require a decision memo. *See, e.g.*, 36 C.F.R. § 220.6(d) (listing actions not requiring a decision memo). And the emergency regulations, which apply here, expressly allow the Service to follow "alternative arrangements for NEPA compliance." 36 C.F.R. § 220.4(b)(2). Nothing in the emergency regulations indicates that the alternative arrangements cannot include a waiver of a decision memo. Plaintiffs again seek to create a procedural requirement where one does not exist, but it is not for the Court to graft additional requirements onto the emergency regulations. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them."). And even if a decision memo were required, the Service is preparing one to document its use of a CE for the emergency activities in Nelder Grove. *See* Regelbrugge Decl. ¶ 20.

Plaintiffs next contend that the Service was required to make an "initial threshold determination" in the 2022 Memo that identified a specific CE and any extraordinary circumstances that may apply to Nelder Grove.[5] Pls.' Reply 16-17. But once again, Plaintiffs seek to improperly impose requirements that do not exist onto the emergency regulations. *See McNair*, 537 F.3d at 993 (en banc). And Plaintiffs' "initial threshold" requirement conflicts with the emergency regulations, which apply to emergency actions that "must be undertaken *prior to* preparing a NEPA analysis." 36 C.F.R. § 220.4(b)(2) (emphasis added). Plaintiffs also ignore the

---

[5] Plaintiffs contend that the emergency regulations cannot be construed to excuse the Service from identifying a specific CE and applicable extraordinary circumstances. Pls.' Reply 17. But the emergency regulations do precisely that when the standards for doing so are met. Section (b)(1) of the regulations provides a complete waiver of all NEPA processes. 36 C.F.R. § 220.4(b)(1). Both section (b)(1) and section (b)(2) apply to emergencies but have tiers of streamlining based on urgency. The Service's reliance on section (b)(2) in this case follows that regulatory structure. Plaintiffs' approach does not.

applicable Council on Environmental Quality (CEQ) and Service emergency regulations—40 C.F.R. § 1506.12 (2022); 36 C.F.R. § 220.4(b). Instead, they rely on non-emergency regulations to support their own proposed two-step process: an initial threshold determination requirement, allegedly imposed by CEQ regulations, 40 C.F.R. § 1501.4(b), followed by a "complete documentation" requirement imposed by Service regulations, 36 C.F.R. § 220.6(e). Pls.' Reply 16. But Plaintiffs' proposed two-step process is a creature of their own creation. The CEQ regulation they cite speaks generally about agencies' development and application of CEs, and the requirement to evaluate actions for extraordinary circumstances, but it says nothing about an initial threshold determination, and it does not apply to emergency situations. 40 C.F.R. § 1501.4. On top of all these deficiencies, Plaintiffs' proposed approach is also unworkable because even if there were a two-step process for identifying and applying CEs in theory, until the Service completes its NEPA process, the agency retains the option to prepare an EA or EIS rather than relying on a CE.

Finally, Plaintiffs complain that the Service did not meet a November 2023 estimate for completing its NEPA process. But this is immaterial because while Plaintiffs refer to APA Section 706(1), they do not contend that the Service has missed any binding deadline.

**V.    The Emergency Action is Consistent With the 1991 Forest Plan.**

Plaintiffs' NFMA claim hinges on the false premise that the 1991 Forest Plan ("Plan") incorporated an erratum to an appendix to the Final EIS listed in the 1992 Record of Decision ("ROD") and a "policy letter" by the Regional Forester. Pls.' Reply 22. But nowhere does the 1992 ROD incorporate the Final EIS (much less an erratum to a FEIS appendix) into the Plan, as Plaintiffs allege. *See* Pls.' Reply 19. The 1992 ROD did contain a list of "changes" to the Final Plan (AR437) as well as erratum to the Plan itself (AR462-63), though neither contain any of the alleged requirements upon which Plaintiffs base their claim.[6] Nor are the alleged requirements found in Chapter 4 of the Plan (or its erratum), which is "the heart of the plan" and "contains all

---

[6] Plaintiffs mischaracterize the 1991 Plan as a "proposed" plan. Pls.' Reply 19. The 1991 Plan is the Forest Plan and was officially adopted by the 1992 ROD.

management direction" for the Forest. AR474. Plaintiffs' claim that "[t]he final 1991 Plan *unambiguously* required a Nelder Grove specific management plan before most logging could occur in the grove," Pls' Reply 21 (citing AR4766, 460, 464), is unfounded. None of the pages Plaintiffs cite impose such a Forest Plan requirement.

Plaintiffs also erroneously claim that a "policy letter" by the Regional Forester is incorporated in the 1991 Forest Plan, Pls.' Reply 21, but none of the pages of the 1992 ROD that Plaintiffs cite (AR444, 461, 465) support this claim. The statement in the 1992 ROD that Nelder Grove "will be managed in a manner consistent with the [policy letter]," Pls.' Reply 20, is not a statement of incorporation into the Plan (the touchstone for NFMA compliance), but a general statement of management intent. *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1011 (9th Cir. 2012). Plaintiffs' effort to connect the erratum and the policy letter to the 1991 Plan is an acknowledgment of the fact that under NFMA, only what is in the Forest Plan binds the agency. *See* 16 U.S.C. § 1604(i). Because neither the FEIS erratum nor the policy letter is part of the Forest Plan, Plaintiffs' NFMA claim fails.

Plaintiffs' last-ditch argument that the 1992 ROD somehow amended the Plan to add a statement in the Final EIS erratum as a mandatory Plan standard, Pls.' Reply 20, is also flawed. To amend the 1991 Plan to add the requirement about completing a long-term implementable strategy for Nelder Grove before doing any work other than hazard tree removal, the Service would have had to follow the regulatory process for amending a Forest Plan, which it did not do. *See* 36 C.F.R. § 219.10(f) (1991). An email from one Service employee saying that a management plan and an EIS is required to undertake work in Nelder Grove, Pls.' Reply 22 n.14, does not change the fact that the Forest Plan contains no such requirement.

Finally, Plaintiffs' discussion of deference (Pls.' Reply 21) is off base. The 1991 Forest Plan is not ambiguous, and the parties are not arguing over what language in the Plan means. Plaintiffs are asking the Court to *add* a mandatory standard to the Plan.[7]

---

[7] Plaintiffs suggest that the decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) impacts the deference to which the Service's interpretation of its Forest Plan is entitled. But *Loper* concerned agency deference in interpreting ambiguous *statutory* provisions. *Loper* did

9

**VI.     Plaintiffs' Exhibits Should Not Be Considered; They Are Also Unhelpful.**

The Court should decline to consider Plaintiffs' extra-record exhibits. U.S. Opp'n 23-24. The Service considered and declined to add these documents to the record and Plaintiffs have not overcome the presumption that deliberative documents are not part of the record and that the record assembled by the agency is correct. *See Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 444-45 (9th Cir. 2024). Further, while Plaintiffs invoke the "relevant factors" exception, Pls.' Reply 23, they fail to articulate how each document fits within the exception. Extra-record documents are irrelevant to the NFMA claim, Pls.' Reply 23-24, where only the Forest Plan matters. Plaintiffs' claim that the Service was required to perform an extraordinary circumstances analysis, Pls.' Reply 24, is a strictly legal question. And questions about the scope of the 2022 Memo, Pls.' Reply 24, can be resolved by looking to the text of the Memo itself.

Even if the Court considers the documents, the Service has explained how Plaintiffs mischaracterize or take out of context the statements they use to support their claims. *See* U.S. Opp'n 10, 12, 22-23 (Ex. 3), 11 (Ex. 5), 13 (Ex. 8), 13 n.5 (Exs. 7 and 9), 23 (Exs. 12 and 13).[8]

**CONCLUSION**

The Court should enter summary judgment for the Service and dismiss all of Plaintiffs' claims.[9] The parties agree that the appropriate remedy, if there is one, is best addressed after the Court rules on the merits. *See* Pls.' Reply 24; ECF No. 55.

---

not concern the deference owed to an agency's fact- and policy-laden determinations about what actions are consistent with the agency's own management plans. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) ("[O]ur circuit's caselaw establishes that we give the [agency] ample latitude in ensuring the consistency of its actions with [land use plans]").

[8] Plaintiffs mischaracterize the Service's objections to the Hanson Declaration. Pls.' Reply 22 n.15. The basis for the Service's objections is chiefly Dr. Hanson offering improper expert opinion, and Plaintiffs do not address that argument. *See* U.S. Opp'n 9 n.3.

[9] Two claims should be dismissed as abandoned. U.S. Opp'n 24; *See Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005). Plaintiffs concede as much for Claim 4, Count 2, Pls.' Reply 25, and offer no argument on Claim 3, Count 1. *Id.* at 15 n.9.

Dated: August 1, 2024

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*Sean C. Duffy*
SEAN C. DUFFY
ERIKA NORMAN
Trial Attorneys
Natural Resources Section
150 M Street NE, Suite 2.900
Washington, DC 20002
Ph: (202) 305-0445 (Duffy)
Ph: (202) 305-0475 (Norman)
sean.c.duffy@usdoj.gov
erika.norman@usdoj.gov

*Attorneys for Defendants*